```
D9hilusc ag                    CONFERENCE
```

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4              v.                        13 Cr. 616 VB

 5   ROBERT LUSTYIK, JOHANNES
     THALER and RIZVE AHMED,
 6
                 Defendants.
 7
     ------------------------------x
 8
                                          September 17, 2013
 9                                        2:10 p.m.
                                          White Plains, N.Y.
10
     Before:
11
                     HON. VINCENT L. BRICCETTI,
12
                                          District Judge
13
                         APPEARANCES
14
     PREET BHARARA
15        United States Attorney for the
          Southern District of New York
16   BENJAMIN ALLEE
     EMILY RAE WOODS
17        Assistant United States Attorneys

18   RAYMOND A. MANSOLILLO
          Attorney for Defendant Lustyik
19
     BRAD L. HENRY
20        Attorney for Defendant Ahmed

21   FEDERAL DEFENDERS UNIT
          Attorney for Defendant Thaler
22   JASON SER

23

24   LEO BARRIOS, Pretrial Services

25
                         CONFERENCE

D9hilusc ag                    CONFERENCE

1          THE COURTROOM DEPUTY:  United States v. Robert

2     Lustyik, Johannes Thaler and Rizve Ahmed. Will counsel please

3     note their appearances for the record.

4          MR. ALLEE:  Benjamin Allee for the government. With me

5     is Rae Woods from Public Integrity of the Department of

6     Justice.

7          MS WOODS:  Good afternoon, your Honor.

8          MR. MANSOLILLO:  Raymond Mansolillo for Mr. Lustyik.

9          MR. SER:  Jason Ser for Mr. Thaler.

10          MR. HENRY:  Brad Henry for Mr. Ahmed.

11          THE COURT:  Welcome, everybody, have a seat.

12     Mr. Mansolillo, I believe I approved your application to be

13     admitted *pro hac vice* for this case and so welcome to my

14     courtroom.

15          MR. MANSOLILLO:  Thank you, your Honor.

16          THE COURT:  We have a number of things to do today.

17     This is Mr. Lustyik's first appearance before me on indictment

18     13 Cr. 616.  I do not believe he's been arraigned yet, is that

19     correct, Mr.~Allee?

20          MR. ALLEE:  Correct.  This is his first appearance and

21     his arraignment.

22          THE COURT:  Have you received a copy of indictment

23     13 Cr. 616?

24          DEFENDANT LUSTYIK:  Yes, sir.

25          THE COURT:  Have you reviewed it?

D9hilusc ag                    CONFERENCE

1              DEFENDANT LUSTYIK:  Yes.

2              THE COURT:  Have you discussed it with your attorney.

3              DEFENDANT LUSTYIK:  Yes, I have.

4              THE COURT:  Would you like me to read it aloud to you

5    or do you waive a public reading?

6              DEFENDANT LUSTYIK:  I'll waive a public reading.

7              THE COURT:  How do you plead to the indictment?

8              DEFENDANT LUSTYIK:  Not guilty.

9              THE COURT:  A not guilty plea will be entered.

10             When we were here the last time, which was August 28th

11   for a number of issues which we discussed, one of them was that

12   the government had submitted to the Court a proposed

13   confidentiality order, it's actually entitled protective order.

14   And I believe, correct me if I'm wrong, that on behalf of

15   Mr. Thaler, Mr. Ser had consented to the entry of that order.

16   Is that right, Mr. Ser?

17             MR. SER:  Correct, your Honor.

18             THE COURT:  As far as Mr. Ahmed is concerned,

19   Mr. Blanch had just come into the case at that point and I

20   think he wanted to review it further before he told me what his

21   position was.  What's your position?

22             MR. HENRY:  I and Mr. Blanch have reviewed the

23   protective order.  We would consent at this time.

24             THE COURT:  Finally as to Mr. Lustyik, I had been told

25   back on August 28 that Mr. Mansolillo, who wasn't in the case

D9hilusc ag                    CONFERENCE

1   yet at that point, objected to the order.  I think that's what

2   I was told.  But I just decided to hold off on deciding whether

3   to enter it or not pending Mr. Lustyik's arrival here in court

4   and also his attorney's appearance.

5          So Mr. Mansolillo, the question to you is, have you

6   had an opportunity to review the protective order, proposed

7   protective order which was enclosed in the government letter

8   dated August 21, 2013?

9          MR. MANSOLILLO:  Yes, I have, your Honor.  I believe

10  that there's been a modified one that was handed to us today as

11  well.

12         THE COURT:  I haven't seen that.  Is that true?

13         MR. ALLEE:  Your Honor, yes.  Mr. Henry pointed out

14  two typos.

15         THE COURT:  Mr. Henry?

16         MR. ALLEE:  Counsel for Mr. Ahmed.  We looked at what

17  he submitted.  He's correct.  We fixed the two typos.  I handed

18  those to counsel moments before we began and I'm prepared to

19  hand it to the Court.

20         THE COURT:  Hand that up, please.  Did you review

21  that?

22         MR. MANSOLILLO:  Yes.  And I talked to Mr. Ser,

23  counsel for Mr. Thaler.  Even though I believe there's some

24  serious shortcomings on this, I'm going to consent to it now so

25  Mr. Ser and the rest of counsel can get discovery moving for

1    them.  I thank you for holding it for me.  I would just like

2    the Court to know that I've gone through this in a collateral

3    case and there's a very likely possibility, good possibility

4    that I'll ask for modifications in this as we go forward, if

5    that's okay with the Court.

6         THE COURT:  You can ask and we'll see.  But as far as

7    I'm concerned, at least for now, you're consenting to the entry

8    of the order in its current form.

9         MR. MANSOLILLO:  Yes, your Honor.

10        THE COURT:  I'll go ahead and sign the proposed order

11   dated today, September 17, 2013.  That will get posted on ECF.

12        I want to talk about discovery, but first of all,

13   Mr. Ahmed had been detained by Judge Yanthis back in August,

14   again I don't have the exact date in front of me, but I know it

15   was in August.  August 2nd, 2013.

16        MR. ALLEE:  Yes, your Honor.

17        THE COURT:  He was represented by CJA counsel at that

18   time.  And I received a one-page motion signed by Mr. Henry

19   dated September 9, a motion for revocation of the magistrate

20   judge's detention order.  Basically you're seeking to appeal

21   the magistrate judge's detention order.  But that's all I have.

22   You didn't submit any other letter or support for that, right?

23        MR. HENRY:  No, your Honor.  We were hoping to do just

24   brief oral argument on the motion today.

25        THE COURT:  That's what I want to do now.  And I did

D9hilusc ag                    CONFERENCE

1    receive a Pretrial Services report from Mr. Barrios who is here

2    in the courtroom dated today.  Does Mr. Henry have a copy of

3    this?

4              MR. BARRIOS:  Yes, he does.

5              THE COURT:  Have you had a chance to review --

6    Mr. Mansolillo, I'm dealing with Mr. Henry at this time.

7              MR. MANSOLILLO:  I'm sorry.

8              THE COURT:  We're just dealing with one thing at a

9    time. You'll have every opportunity to say whatever you want.

10             MR. MANSOLILLO:  I thought you were --

11             THE COURT:  No, no, just Mr. Henry and Mr. Ahmed.  So

12   my question to you is, have you reviewed the September 17, 2013

13   Pretrial Services report, discussed it with your client.

14             MR. HENRY:  I have reviewed it and discussed it, your

15   Honor.

16             THE COURT:  I note in the report that the Pretrial

17   Services agency recommends that the defendant be released on

18   certain conditions and so forth.  You may be heard at this time

19   and of course I'll hear from the government as well.

20             MR. HENRY:  I think at the previous detention hearing

21   there were a couple of issues that were raised by the

22   government that gave the magistrate judge some pause in

23   releasing Mr. Ahmed.  A few of those can be addressed fairly

24   briefly.

25             One.  Obviously, the question here under 3142 is

D9hilusc ag                    CONFERENCE

1    whether Mr. Ahmed is a flight risk, and the flight risk,

2    whether it can be suppressed through conditions on him for

3    release.  The Probation Office recommends obviously some

4    monetary bond in addition to co-signing, pretrial supervision,

5    curfew and surrender of his passport among other things.  His

6    mother and brother are present in court today.  I've spoken to

7    them about the opportunity to be a third-party custodian under

8    3142.  They both consent and would allow him to live at his

9    parents' home where his mother, father and brother, all three

10   live.  So I've discussed with them the importance of that and

11   their obligations to report Mr. Ahmed if he was to do something

12   that he is not supposed to be doing under those conditions of

13   release.

14         THE COURT:  But address for me what Judge Yanthis

15   focused on.  I've read the transcript.  I assume you have that

16   as well, the transcript of that hearing?

17         MR. HENRY:  Correct.  So I think one of the issues was

18   Mr. Ahmed having lied about traveling to Bangladesh.  And so I

19   have Mr. Ahmed's passport, we're prepared to turn that in today

20   as well.  But when you look at the passport, there are a number

21   of stamps which are entry stamps in the back of the passport.

22   There are a number to Heathrow International Airport and then

23   return flights to New York City.  And I can't tell which

24   airport in New York City it is but in any event, he traveled to

25   England and back.

D9hilusc ag                    CONFERENCE

1        There is another stamp.  It is a visa and it says:  No

2   visa required to travel to Bangladesh.  Because Mr. Ahmed was

3   born in Bangladesh, he is entitled to have that stamp and to

4   travel there freely.  However, that stamp is not a stamp, to

5   the best of my knowledge, that he would have received by going

6   to Bangladesh.  I have the benefit of having traveled overseas

7   just a week ago and have been familiarizing myself with these

8   things for better or worse.  But it looks like this is a stamp

9   he receives because of his birthright to be present and travel

10  to Bangladesh, not that he actually went to Bangladesh.

11       THE COURT:  Let me just interrupt you.  I appreciate

12  what you're saying but I read the transcript and counsel for

13  Mr. Ahmed at the time made the same point.  And I don't think

14  that the government disagreed with that.  Or do you disagree

15  with that, the narrow point, which is that this stamp is in

16  effect permission for him to go to Bangladesh but it doesn't

17  show that he's been there recently?

18       MR. ALLEE:  We don't disagree with that.  At the

19  hearing before Judge Yanthis we took the defendant at his word

20  when he represented that to Mr. Barrios.

21       THE COURT:  What else do you have?

22       MR. HENRY:  Then you look at he had a ticket to

23  travel, it would have been shortly after his arrest, to London.

24  And so he had been planning to leave prior to his arrest.  The

25  Court will note, however, that it was a roundtrip ticket.  So

D9hilusc ag                       CONFERENCE

1   he had the intention to travel there and travel back.  He had

2   traveled to England on a number of occasions as evidenced by

3   looking at the back of his passport and subsequently returned

4   to New York.

5            In addition to that, Mr. Ahmed had a job interview

6   scheduled on August 23rd with a technological company that's

7   located in Virginia, so he was planning on returning for the

8   job opportunity.

9            In addition to that, he relates to me that he had made

10  plans to get together with a friend, her name is Emily Coalin,

11  on August 16th.  This is evidenced through some Facebook

12  discussions between he and her.

13           So he had made plans to travel but he had also made

14  plans for his return.  It was not that he was trying to leave

15  the area or flee these particular charges.

16           THE COURT:  How many times has he been to London?  I

17  know you're saying that he had made plans to travel.  Obviously

18  he didn't travel.  But in the five years prior to his arrest,

19  how many times had he been to London?  There was something

20  about that in the Pretrial Services report.

21           MR. HENRY:  I believe three times he's traveled to

22  England over the last five years.  I see stamps in the passport

23  for the 10th of July 2012, 15th of January 2013, and the 15th

24  of March, 2013.  Those are entry stamps from Heathrow

25  International Airport.

D9hilusc ag                    CONFERENCE

1          THE COURT:  Why was he going to the United Kingdom so

2     frequently?  That's three times in less than a year.  It's not

3     illegal to travel to the UK, but I'm curious as to why.

4          MR. HENRY:  He has friends and family there, your

5     Honor, that he goes and visits fairly often.  I think one of

6     the other issues that maybe was a point of contention at the

7     previous hearing was the amount of money that Mr. Ahmed had

8     access to.  Mr. Ahmed was an employee at Macy's in the shoe

9     department and so obviously he wasn't making large amounts of

10    money doing that.  His family, while they do have some means,

11    are certainly not wealthy.  They do have some property that

12    certainly they are willing to put up for purposes of bond as

13    well as some cash that they are willing to present to the Court

14    through family and friends, and some, certainly, unsecured

15    bond.  And we have a list of a number of people, six family

16    members, and five individual family friends, who are willing to

17    sign Mr. Ahmed's bond.  Some of them have cash to provide.

18    Some of them would be unsecured bond signers, but they would be

19    willing to do that.

20         THE COURT:  What about this question?  I've read, I

21    don't pretend to be intimately familiar with the charges in

22    this case, but from reviewing the transcript of the bail

23    hearing -- before I say that, yes, he does have family

24    connections in Bangladesh which is hardly surprising since

25    that's where he was born.  He is a U.S. citizen.  But the one

D9hilusc ag                    CONFERENCE

1    thing in here that is a little bit troubling, if I can find it,

2    hold on a second.  Okay, this is Mr. Allee's statement at page

3    15 of the transcript.  He was talking about the allegations

4    that Mr. Ahmed was attempting to obtain information about a

5    political rival in Bangladesh.  That may or may not be so.  I

6    don't know.  That's the allegation.  Mr. Allee says:  Clearly

7    part of the purpose as alleged is to discredit this person, and

8    we have evidence that Ahmed's purpose was to publicize this

9    information in newspapers in Bangladesh.  And the way I look at

10   it is, it may well be criminal, the way in which Mr. Ahmed is

11   alleged to have attempted to obtain the information.  But using

12   information that's been obtained to discredit political rivals,

13   that's certainly something that gets done in the United States

14   a lot as well, it's not something limited to Bangladesh.

15           But the next paragraph is the sentence that is

16   troubling.  We have further evidence including Mr. Ahmed's own

17   admission that he was considering and contemplating, far worse,

18   kidnapping this person or bringing physical harm to this

19   person, which gives rise to the danger that I mentioned.  What

20   about that?  I'm not putting words in Mr. Allee's mouth because

21   they're already on paper.  I assume he'd say the same thing

22   again.

23           MR. HENRY:  I understand.  Certainly my client would

24   deny those allegations vehemently.  I haven't seen the

25   discovery so I don't know the answer to that question.  Maybe

1    we can be enlightened on that particular point.  But to that

2    end, the charges in this case as they stand are not violent

3    charges.

4              THE COURT:  Serious.  By definition.  We're in federal

5    court, 30 foot ceiling.  It's serious.

6              MR. HENRY:  It's serious.  But there's a distinction

7    between serious and violent, important distinction.  There is

8    no allegation that he has actually engaged in any violent

9    conduct in his life for that matter.  And then the Court has to

10   look at, in these bail applications, that he is innocent of all

11   of those allegations.  So when looking at the interplay of 3142

12   and the factors the Court has to consider, there have been

13   courts that have opined that the allegations of the offense are

14   the least important points that the Court must consider when

15   looking at these.

16             THE COURT:  But in this case, the government doesn't

17   even have that, right?  The allegations of this offense do not

18   include allegations of violence or attempted violence or

19   conspiracy to commit violent crimes.

20             MR. HENRY:  There are no allegations like that in this

21   case, your Honor.  Certainly Mr. Ahmed would deny any such

22   allegation.  He has been, throughout his entire life,

23   especially his adult life, not in trouble, has not caused any

24   harm to anyone and has not threatened anyone in this case.  And

25   so we would say that I don't think that that is a factor that

D9hilusc ag                    CONFERENCE

1    can't, one, be taken care of through pretrial conditions of

2    release, but is probably in fact not a true problem with

3    Mr. Ahmed.

4              THE COURT:  I also see, and again, I apologize if I'm

5    not as familiar with the details as the lawyers in the case

6    are, but just looking at the indictment, I noted that the time

7    frame of the conspiracy is September, the alleged conspiracy is

8    September '11 through in or about March of 2012.  That's

9    roughly a six-month period.  And there are a number of overt

10   acts that are alleged the last one of which is March 12, 2012.

11   And then in the substantive counts, actually the only

12   substantive count against Mr. Ahmed is Count 3, I think that's

13   right.

14             MR. HENRY:  I believe that's correct.

15             THE COURT:  It says again from September 2011 through

16   March 2012 he did certain things.  When you jump to Count 4 it

17   also refers to that same time period, conspiracy to defraud

18   citizens of the United States.  Count 5, theft of government

19   property.  It doesn't involve any allegations of Mr. Ahmed.

20   Count 6, receiving stolen property, again is the same time

21   frame as is the unauthorized disclosure of suspicious activity

22   report, that's only charged against Mr. Lustyik.

23             What jumped out at me is that the allegations of the

24   indictment on their face are about a year and a half prior to

25   when the defendants, in particular Mr. Ahmed, were arrested.

D9hilusc ag                    CONFERENCE

1    So there's nothing in the indictment about, I'm not saying that

2    there's no evidence the government has but at least there's

3    nothing in the indictment that I can see relating to anything

4    that Mr. Ahmed did in connection with this matter subsequent to

5    March of 2012.

6          MR. HENRY:  I believe that's correct, your Honor.

7    During that period from 2012 to his arrest he was traveling in

8    and out of the country but always returned which I think goes

9    to the point that --

10          THE COURT:  All right.  Anything further?

11          MR. HENRY:  I don't believe so, your Honor.  Other

12    than he does have tremendous family support.  I do have a list

13    of individuals who are willing to put up money.  The pretrial

14    report reflects that there is a townhouse, an apartment worth

15    approximately $244,000 but about 55,000 of that his mother and

16    father own which they're willing to sign over as a property

17    bond.

18          THE COURT:  Where is that located?

19          MR. HENRY:  It's in Connecticut, your Honor.

20          THE COURT:  Where in Connecticut?

21          MR. HENRY:  Danbury, Connecticut.  Other than that, I

22    believe that's all I have.

23          THE COURT:  Mr. Allee or Ms woods, either one of you?

24          MR. ALLEE:  It's me, your Honor, thank you.

25          THE COURT:  Are you going to let Ms woods say

D9hilusc ag                    CONFERENCE

anything?  You didn't let her say anything the last time.  I
don't even know what her voice sounds like. I'm kidding. Go
ahead, Mr. Allee.

          MR. ALLEE:  I'm sure she can say all this better than
me but I'm sorry, your Honor, you're stuck with me for this
argument.  As was Judge Yanthis who found rightly in the
government's view that Mr. Ahmed is a flight risk.  He also
found him to be a danger, I believe.

          THE COURT:  I read that already.  I can review it, I
give great, I rely greatly on what magistrate judges do in
these bail matters, but I can review this *de novo*.  And assume
for the moment that I am reviewing this *de novo*, how is the
fact that Mr. Ahmed traveled apparently for completely legal
and legitimate reasons to London on a U.S. passport which is a
legitimate passport because he is a U.S. citizen, like tens of
others of naturalized citizens he has a U.S. passport, he's
allowed to travel to the United Kingdom which he's done, he's
also allowed to travel to Bangladesh, he hasn't done that
recently.  You say he has contacts there which doesn't surprise
me because he's from there.  He came here to the United States
as a child according to the Pretrial Services report, so he's
lived here for 20 plus years.  So under those circumstances,
and when you add in the fact that he's got all these folks
willing to support him and put up their property and co-sign a
bond, let's deal with the risk of flight before we deal with

D9hilusc ag                    CONFERENCE

1    danger to the community, but what is it about the facts of this

2    case that should lead me to decide that there are no conditions

3    or combination of conditions that would reasonably assure his

4    appearance?  Only I don't really see that honestly, I don't

5    really see that.  The danger to the community is a different

6    question.  Risk of flight, what do you got?  The fact that he

7    has contacts in Bangladesh?  Okay.  As I say, maybe a hundred

8    million Americans, I don't know how many naturalized U.S.

9    citizens there are, but there's a lot of them.

10          MR. ALLEE:  To put it into the context of 3142,

11   Mr. Ahmed is unlike folks who merely traveled to London three

12   times in the last year or who have substantial ties to another

13   country.  The first is, when you look at the nature and

14   circumstances of the charges here, Mr. Ahmed is charged with

15   very serious offenses, he's looking at very serious time.

16          THE COURT:  I get that.  Have you ever prosecuted a

17   case in this courtroom where the charges were not serious and

18   did not carry with them serious penalties if convicted?  If

19   that were the standard for deciding risk of flight then

20   everyone would be locked up.  And I don't think the Bail Reform

21   Act, the key word being reform, says that.  I think it's just

22   the opposite.  I think that the message there is that courts

23   should be inclined to release people on bail even when the

24   charges are serious.  There are some presumptions and things

25   that apply in certain cases, none of which apply here, right?

D9hilusc ag                    CONFERENCE

1              MR. ALLEE:  There's no presumptions here, your Honor.

2      The government's view is not that any one of these factors

3      actually by itself would necessarily be enough.  We haven't

4      fought so hard about that, whether the charges alone or the

5      ties would be enough.  This is a defendant when you go through

6      the whole picture, when you go through the factors enumerated

7      in 3142, is a substantial and real flight risk when you add all

8      these things together.

9              Yes, in this courthouse many defendants are charged

10     with serious charges.

11             THE COURT:  All defendants are.  I got that.  What

12     else do you have on risk of night?

13             MR. ALLEE:  Strength of the evidence.

14             THE COURT:  Let's assume that you got a rock solid

15     case, and in most cases the government does have a solid case.

16     I know that from 30 years practicing as a criminal lawyer,

17     usually the government has a very strong case.  What else  have

18     you got?  Strong case and serious case.  That's the vast

19     majority of the cases in this courthouse and in this courtroom.

20             MR. ALLEE:  I'll move to the next factor.  Those are

21     not small things.

22             THE COURT:  They're not small but they exist in

23     virtually every case.  That's what I'm trying to do, I'm trying

24     to see what do you have in addition to things that apply in

25     every case, because if that was enough then no one would get

D9hilusc ag                    CONFERENCE

1    bail.

2             MR. ALLEE:  Understood, your Honor.  I'm hesitant to

3    bypass those important factors.  Many defendants in this

4    courthouse are detained.  To be like other defendants in this

5    case is not exonerating or is not a grounds to be released.

6             THE COURT:  A lot of those people that are detained,

7    Congress has decided that there is a presumption against

8    release.  Congress has not said that in this case.  Putting it

9    another way, although the Bail Reform Act doesn't say it, there

10   is a presumption that you should be released even when there

11   are serious charges and the evidence is not strong.  How can I

12   possibly conclude that the evidence is not strong.  I'm not

13   going to try the case at the time of the bail hearing.  I'm

14   going to assume for purposes of this discussion that you have a

15   very strong case, very high likelihood that you're going to

16   convict Mr. Ahmed, and that the charges that you brought are

17   very serious and carry very long prison terms.  I'm assuming

18   all of that.  What else do you have?

19            MR. ALLEE:  You look at the history and

20   characteristics of the defendant.  First, he was arrested on

21   August 2nd.  He had a plane ticket on August 3rd to London.

22   The evidence in the case includes --

23            THE COURT:  It was a roundtrip ticket.  That kind of

24   cuts against the implication that you want me to draw or the

25   inference you want me to draw, which is that he knew he was

D9hilusc ag                    CONFERENCE

1   under investigation, I think you said that at the bail hearing,

2   he knew he was under investigation and lo and behold, he got a

3   ticket to London, which is true.  And he got a return ticket

4   also.

5           MR. ALLEE:  There's no dispute about the return

6   ticket.  I think that requires some explaining.  The evidence

7   in the case includes that there were at least two aims of

8   Mr. Ahmed in seeking to bribe Mr. Lustyik and his accomplice

9   Thaler.  One was to assist someone Ahmed viewed as an ally, as

10  a political ally in Bangladesh.  There's a two party system,

11  there's allegations of corruption tossed from one party to the

12  other.

13          THE COURT:  Sounds like the United States to me.  Keep

14  going.

15          MR. ALLEE:  In some ways that's pretty familiar, of

16  course.  Let me start actually with the rival and then I'll

17  return to the ally.  One purpose Mr. Ahmed had, in describing

18  the evidence, is that a rival or someone on the other side

19  Mr. Ahmed sought to discredit.  And I want to start there

20  because you mentioned that that was something that came up at

21  the argument we had before Judge Yanthis.  That is, by

22  comparison to the other purpose Ahmed had for that rival, which

23  was to hurt or kidnap that person, which Mr. Ahmed admitted to

24  when he was arrested to the arresting agents with the

25  Department of Justice Inspector General's Office, that is a

D9hilusc ag                    CONFERENCE

1   more benign purpose, to discredit him than to hurt him.  He had

2   both those purposes.  I don't want to glide by that either.

3   This wasn't just sort of muckraking or sort of ordinary

4   political battle.  This was to bribe a agent to discredit

5   someone.  So this was a criminal method to achieve that

6   purpose.

7            Another purpose Mr. Ahmed had was to assist a

8   political ally.  This was someone who at the time was living in

9   London --

10           THE COURT:  I think I tried to make clear before, and

11   let me just state for the record I'm not suggesting for one

12   second that although it might be okay to discredit a political

13   opponent, that might be okay, we do that all the time, it's

14   certainly not okay to bribe a federal agent to obtain the

15   information which you're going to then use to discredit a

16   political opponent.  I don't want to suggest for one second

17   that I think otherwise.  Obviously that's a very serious

18   matter.

19           MR. ALLEE:  This is my long answer on London which

20   I'll try to come to the point.  Yes, he had a return ticket.

21   But London is not a place of insignificance in terms of the

22   evidence in this case.  Because his other purpose was to get

23   the help of Mr. Lustyik to interfere with an investigation and

24   with the execution of a pending arrest warrant for an

25   individual who was in London who was an ally of Mr. Ahmed who

D9hilusc ag                    CONFERENCE

1    was on the other side of that political divide.

2            So there's evidence in the case regarding Ahmed's aim,

3    regarding his efforts to get help from Mr. Lustyik in that

4    regard, to learn information about a pending warrant, to learn

5    who had the warrant, to learn the sources of the investigation,

6    or the agencies involved in the investigation that led to the

7    issuance of that warrant.  Those are all part of the evidence

8    in the case, part of the efforts Mr. Ahmed made to assist this

9    person.

10           This person is also not someone who is insignificant

11   in terms of this argument because the ally of Mr. Ahmed happens

12   to be -- the warrant, I should say, for the ally of Mr. Ahmed

13   had to do with a terrorist act, with a grenade attack in 2004

14   at a political rally in Bangladesh.  And so Mr. Ahmed's going

15   to London, whether or not he intended to return or had a return

16   ticket which might demonstrate an intent to return is not

17   something that can be offered as a bail argument.  At the very

18   least, he's going to the place where the target or the point of

19   his criminal conspiracy resided, someone he was trying to help,

20   someone who was potentially very dangerous.  The fact that he

21   had gone there three times before just makes that something

22   that is of more concern.

23           Now the story doesn't actually end there.  You pointed

24   out that the charges actually stop in March 2012, and that's

25   right, and certainly the voluminous text messages among the

D9hilusc ag                      CONFERENCE

1   participants to the crime show that this kind of petered out.

2   Ahmed wasn't coming up with the money he promised, the 30,000 a

3   month he just hadn't produced that.  And so Lustyik and Thaler

4   and Ahmed just sort of ceased going forward with their

5   conspiracy.  But that didn't affect Ahmed's efforts in either

6   of these fronts.  Assisting the ally or harm the rival.  And so

7   there is proof that the conduct continued into 2013, the

8   conduct being Ahmed's efforts to harm and to assist.

9           And so the London trip, it's not a year and a half

10  passes of nothing.  A year and a half passed during which Ahmed

11  engaged in these efforts to get more information about the

12  rival to discredit him or worse and to assist the ally.

13          Relatedly, and a source of that proof of later efforts

14  by Ahmed post March 2012, is Ahmed's iPhone and relatedly we

15  found some troubling documents on that iPhone, even since the

16  argument we had before Judge Yanthis, and I have a copy I can

17  hand up.  But what's apparent is that Mr. Ahmed was creating

18  false identifications to give the appearance that he was an

19  agent with the FBI including credentials, purported

20  credentials, of course he's not an agent with the FBI, and that

21  these are things we found when we arrested him, that's August

22  2nd of 2013.  I'd like to hand up a copy of just some of the

23  selected fake credentials and fake documents that we found.

24          THE COURT:  Does Mr. Henry have this?

25          MR. ALLEE:  Yes, your Honor.

D9hilusc ag                    CONFERENCE

1           MR. HENRY:  I do.

2           THE COURT:  Who would think that this was legit if he

3     misspelled the name of the agency?

4           MR. ALLEE:  It's clear that these are drafts.  The

5     fourth page of the attachment is getting closer to a passable

6     document.  It's certainly -- the government is concerned about

7     these documents being on his phone a day before he's traveling

8     abroad.

9           THE COURT:  There's other misspellings on this page as

10    well, the fourth page.

11          MR. ALLEE:  Yes, your Honor.

12          THE COURT:  This is troubling, don't get me wrong, but

13    it's also kind of ridiculous.

14          MR. ALLEE:  Maybe if this was all we knew this would

15    be ridiculous.  You have a business card that says you're an

16    undercover agent in Houston, but you have 26 Federal Plaza, the

17    address here, and other things, like misspellings.  But that's

18    not the only thing we know.  We know this is somebody who

19    succeeded in bribing an FBI agent to get a SAR and to get an

20    FBI electronic communication.  So this is somebody who should

21    be taken seriously, even if he's got some draft documents on

22    his phone when he knows he's being investigated.

23          THE COURT:  When you say draft documents on his phone,

24    you mean these were attached to some e-mail or something?  In

25    what form were they on the phone?  Obviously they're not in

D9hilusc ag                    CONFERENCE

1    paper form if they're on his phone.

2              MR. ALLEE:  I'm actually not positive I can fully

3    answer the question.  We did a forensic examination of the

4    phone and found these iterations on there.  I don't know

5    actually whether they were attached to anything or whether

6    they're just in there.  Phones are now somewhat like computers

7    so they can have documents in all kinds of ways other than the

8    documents were attached to communications.  I can get a fuller

9    answer on that, your Honor, if I get a little time after this

10   proceeding.

11             That is in the context of the history and

12   characteristics of the defendant.  So he's leaving for London.

13   London is a place of serious importance here.  London is where

14   the person who is wanted on the warrant that Mr. Ahmed is

15   seeking to help is residing and while there's a pending warrant

16   for that person, where Ahmed's ally is.

17             THE COURT:  From where, warrant from a U.S. court?

18             MR. ALLEE:  No, your Honor.

19             THE COURT:  So a warrant from where?

20             MR. ALLEE:  The most I can say about it now is it's an

21   international warrant not issued by a United States court.

22             There are several things I want to emphasize about

23   Mr. Ahmed's ties abroad and his comparative lack of ties here,

24   again recognizing, because you pointed out, people have ties

25   abroad.  Maybe each by themselves doesn't carry the day, but

D9hilusc ag                    CONFERENCE

1    certainly it would lead to government to think that if he walks

2    out of this courthouse he's just going to keep going.  He's

3    born in Bangladesh.  He has family in Bangladesh including his

4    uncles.  There are supporters and associates of his who are in

5    Bangladesh.  There's evidence that Mr. Ahmed is not the money

6    man, he's gathering money to pay bribes to Lustyik, and to do

7    so he has associates and supporters in Bangladesh in those

8    efforts.  He has ties there and folks in Bangladesh who have

9    access to cash.  Here he has comparatively fewer ties.  He is a

10   citizen, and he's been here for 20 years, since he was 14 years

11   old.  He's 34 years old now.  And he's been employed for the

12   last 15 months.  But before that he was unemployed for three

13   years.  He's got no children here.  He's got no financial ties

14   here.  He's got nothing tying him down here at all.

15          His mother, who I understand is being offered as a

16   co-signer, was the woman who answered the door when we arrested

17   Mr. Ahmed.  I'm repeating myself from what you read before

18   Judge Yanthis.  They asked if Mr. Ahmed was there and she said

19   no, he's not here, and what's all this about.  That's not a

20   good start --

21          THE COURT:  No, you're right, it's not.

22          MR. ALLEE:  -- from a person who you could be asking

23   to vouch for this person to return to court.  The defendant's

24   father, there is some evidence that he was a participant in

25   communications that Ahmed had about getting these documents

D9hilusc ag                    CONFERENCE

1   from Lustyik, from Lustyik through Thaler.  Let me be clear,

2   he's not charged with a crime.  But he's someone who is in the

3   know potentially of the criminal conduct here.  Certainly these

4   are folks who abided this criminal conduct before Mr. Ahmed was

5   charged.

6          One other point, because I just wanted to address

7   something about cash, I'm sorry, two other points but maybe I

8   should address the first, because you asked.  The stamps was

9   not a big issue.  The stamps in the passport was not an issue

10  that was a determinative one at the argument before Judge

11  Yanthis.  We took Mr. Ahmed at his word that he had not been to

12  Bangladesh.  That seemed inconsistent with that stamp.  But we

13  were in court.  Mr. Barrios further inquired, doing his job,

14  and we relied on the representation that he's not been to

15  Bangladesh.  That wasn't a factor in that outcome.

16         And we agree that Mr. Ahmed may not have the cash or

17  resources himself to not return to court when he's facing

18  serious charges, guidelines range of 70 months or potentially

19  more.  But the evidence shows that he has access to folks who

20  do have the means to facilitate his fleeing.  So we are firmly

21  of the view that he's a very serious flight risk.  He is not

22  just somebody just charged with serious crimes, somebody who

23  just has ties abroad.  These things come together such that we

24  would expect him to go to Bangladesh if he's released during

25  the pendency of this case.

D9hilusc ag                      CONFERENCE

1          THE COURT:  You actually think he would leave the

2     country and go to Bangladesh without a passport?

3          MR. ALLEE:  Yes.  Of course a useful measure for

4     somebody who is released is that we get their passport and

5     that's helpful.  But this is someone with access to others.

6     This is someone engaged in a subterfuge.  Some of the documents

7     I submitted you can laugh at, but this is someone who has gone

8     a lot further than the average defendant in creating a fake

9     credential.

10          THE COURT:  Is there any evidence that he used the

11     fake credential?

12          MR. ALLEE:  No, there's not.

13          THE COURT:  If there was, he'd be indicted.

14          MR. ALLEE:  There is evidence that he represented

15     himself as an insider in attempting to sell information that he

16     was attempting to seek by bribes.

17          THE COURT:  He hasn't been charged with possessing

18     this as a crime.  Is it a crime to possess these documents if

19     you don't use them or try to use them?

20          MR. ALLEE:  My answer right now is it depends.  I'm

21     sorry I can't give you a clear answer.  I handed up those

22     because they're easy to see, but there are other items on the

23     phone.  He clearly understood the difference or was attuned to

24     the difference between classified and not classified documents,

25     which others in this room will know quite a bit about, so he

D9hilusc ag                    CONFERENCE

1   had other drafts of documents on his phone that had top secret

2   stamps or were classified and was engaged in other efforts to

3   doctor up documents, to give them an appearance that they were

4   actual FBI classified documents when in fact they were not.

5   Those are separate and apart from the ones that were sold in

6   the criminal conspiracy that's charged.  Separate documents, I

7   mean.  They may have been part of the same conspiracy.

8            Yes, your Honor, the government is very concerned

9   about his being a flight risk.  He certainly has the motive,

10  the means and the opportunity to flee if he's given that chance

11  by the Court.

12           THE COURT:  Mr. Henry, anything further?

13           I'm sorry, Mr. Allee, is there anything further you

14  want to say?

15           MR. ALLEE:  May I just have one moment, your Honor?

16           THE COURT:  Sure.

17           (Pause)

18           MR. ALLEE:  No, your Honor, thank you.

19           THE COURT:  Mr. Henry.

20           MR. HENRY:  Very briefly, your Honor.  Assuming all

21  these things are true, which I don't necessarily think that we

22  can, because a lot of those are issues --

23           THE COURT:  You're not suggesting that Mr. Allee made

24  up the fact that these documents were on his iPhone.  They're

25  bizarre because they're so obviously fake but I don't have

D9hilusc ag                    CONFERENCE

1    documents like that on my phone.  Do you?  This is pretty

2    unusual for somebody to do that.  It sounds like he might be a

3    fraudster or a con man.  You can't deny that these things

4    exist.

5            MR. HENRY:  They exist, your Honor.  There's no

6    denying that.  In what context they exist, were they his

7    documents or did someone else doctor those documents up and

8    e-mail to Mr. Ahmed.  They are were sitting there in an e-mail

9    box.  He had no intention to use them.  We don't know the

10   answer to that question.  There is no proof that he used them

11   or intended to use them for any purpose.  I think more

12   importantly --

13           THE COURT:  The fact that he had them is some evidence

14   that he intended to use them because why else would you have

15   them?  Just for fun because you like the colors?  People have

16   stuff because they think it might be useful for them, whether

17   it's contraband or anything else like that matter.  You have

18   things in your phone like other people's e-mail addresses, why?

19   Because you might send them an e-mail.  Why would you have

20   this?  Because you might want to use it to defraud someone into

21   thinking you're a member of the Federal Bureau of

22   Investigations, plural.  I think we only have one Federal

23   Bureau of Investigation.

24           MR. HENRY:  Alternatively, your Honor, counter to your

25   argument. It's just like people have baseball cards where they

D9hilusc ag                    CONFERENCE

1   have them because they make them feel good.  He may have wanted

2   to feel like he was involved in this, whatever.  There could

3   have been a lot of reasons besides the fact that he was going

4   to go out and use them for some illicit purpose.

5          Moving beyond all of the facts, there are conditions

6   of release that are sufficient to allow Mr. Ahmed out on

7   release.  One, turning in the passport.  Then how do you travel

8   out of the country?  I don't think there are allegations that

9   he was involved other than with the two co-defendants sitting

10  in this courtroom now with any of this illicit activity other

11  than with people who are outside the country.  He hasn't

12  traveled to Bangladesh in something like more than five years.

13  If he was so concerned with their politics and what they were

14  doing over there, why didn't he go to Bangladesh.  He hasn't

15  been there in such a significant amount of time that it's sort

16  of unbelievable to think that he would up and go especially

17  without a passport or the means to get there.  What are they

18  going to do?  Put him in a container, put him on a ship and

19  ship him over there?  I don't know how gets there without a

20  passport.  He's got a lot of people willing to put up a lot of

21  money on his behalf.

22          THE COURT:  How much money or property?  And when I

23  say property I mean equity, not total market value.  What's the

24  value of property and cash or other security that people would

25  be willing to post?

1        MR. HENRY:  His uncle is willing to post 50,000.  His

2   aunt is willing to post 25,000.  His sister is willing to post

3   another 25,000.  His mother it willing to put up 50,000.  His

4   father an additional 50,000.  His brother is willing to sign

5   for 100,000.

6        THE COURT:  I'm talking about putting up actual

7   security, which means cash or property.  That's with regard to

8   the numbers that you just said.

9        MR. HENRY:  His uncle would be willing to come up with

10  20,000 in cash.  His brother would have 20 to 25,000 in cash.

11  And his father would be willing to come up with approximately

12  50,000 in cash.  That is in addition to the condo which they

13  are willing to sign over a bond on, which the mortgage on the

14  house is $210,000 but there is $55,000 approximately of equity

15  in that property.  So altogether, it's pretty close to $150,000

16  in actual property.  And then you have in addition to the

17  people that were willing to sign an unsecured bond, there are

18  five family friends who are willing to sign an unsecured

19  $25,000 bond apiece.

20       THE COURT:  Okay.  Anything else that you want to say

21  in response to Mr. Allee?

22       MR. HENRY:  I don't think so, your Honor.  Like I

23  said, I think there are conditions that are sufficient to have

24  him released and he will appear in court as needed through the

25  duration of the case.  The other consideration is, practically

D9hilusc ag                    CONFERENCE

1    speaking, the two co-defendants have a case in Utah.  We talked

2    about this at the last hearing.  There is no telling how long

3    this case may go.  There is obviously a ton of discovery, there

4    may be issues with getting security clearance for some of those

5    things which is going to take a considerable amount of time

6    that is running against the clock that is not Mr. Ahmed's

7    fault.  That's just things we have to go through to make sure

8    we're able to represent fully and see the evidence in this case

9    to move forward.  So there's going to be a considerable amount

10   of time.  So he runs the risk of, if he is detained, being in

11   detention for quite a serious amount of time on this case.  I

12   would leave the Court with that and ask that he be allowed to

13   be released on conditions.

14           THE COURT:  All right.  As these cases often are, it's

15   not black and white.  There are a number of factors that favor

16   releasing the defendant on bail among which are that he is a

17   U.S. citizen, naturalized citizen, lived in the United States

18   for 20 years.  How long has he lived in the New York area?

19           MR. HENRY:  1994 until 1999, and then 2004 to 2007 he

20   lived in New York.  And he was living in Connecticut at the

21   time.

22           THE COURT:  When he wasn't living in Connecticut or

23   New York, was he living anywhere else?

24           MR. HENRY:  No.

25           THE COURT:  Just Connecticut and New York.

D9hilusc ag                    CONFERENCE

1          MR. HENRY:  I think it reflects he lived in Texas with

2     his wife for a couple of years.

3          THE COURT:  So basically he's lived in the New York

4     area for approximately most of the last 20 years, is that what

5     you're telling me?

6          MR. HENRY:  Yes.

7          THE COURT:  And I'm told that his parents and his

8     brother are U.S. citizens as well.  He's had from what I'm told

9     a somewhat sketchy employment record but he has at least

10    immediately prior to when he was arrested he was gainfully

11    employed.  I'm not aware of any evidence of drug use.

12    Importantly, there's no allegation of violence here, there's no

13    allegation of sale or possession of drugs.  He has no prior

14    record.  That's another factor that obviously cuts in his

15    favor.  I don't think he's ever been arrested, am I right about

16    that, Mr. Allee?

17         MR. ALLEE:  I think that's right.

18         THE COURT:  I really am not moved at all by the fact

19    that he's traveled to London.  People can travel to London.  I

20    have been to London.  I hope I wouldn't be considered a bail

21    risk.  I've been there numerous times and I have friends there

22    and I have contacts overseas, as do many other people.  But

23    having contacts overseas is really not very meaningful.  The

24    government has said that the subject of a warrant not issued by

25    the United States, but a person who is the subject of a warrant

D9hilusc ag                    CONFERENCE

1    is in London, so maybe there's some contact between Mr. Ahmed

2    and this person.  It's a little bit vague.  It's a couple of

3    steps removed from concrete information as far as I'm

4    concerned.  Mr. Ahmed isn't charged with any crime in

5    connection with that.

6          I also think it is relevant that the case that's

7    charged here involves conduct that ended a year and a half

8    prior to, approximately a year and a half prior to when he was

9    charged.  It's not as if it was an ongoing thing.  He was in

10   the middle of trying to, he was caught red-handed so to speak

11   handing over the cash in return for some information he was not

12   entitled to get.  This is a very serious crime but if proven it

13   occurred some years ago and it does not involve allegations

14   that Mr. Ahmed was involved in it in the recent past.

15         I have great respect for Judge Yanthis.  Let me just

16   say one other thing.  I am troubled by these documents and I

17   tell you, on their face they're plainly bogus.  But it's

18   strange that someone would have these documents.  And for what

19   reason?  But even on that point, he hasn't been charged with

20   anything in connection with that.  When I asked the government

21   if this is a crime merely to possess them, I think the

22   government honestly told me it depends or they're not sure, but

23   you didn't tell me that it is a crime and he hasn't been

24   charged with a crime in connection with possession of these

25   documents, the ones that appear to be false FBI identification

D9hilusc ag                    CONFERENCE

1    for Mr. Ahmed.  They are troubling.

2            And as I said, I have a lot of respect for Judge

3    Yanthis.  But I think this is a case where given the fact that

4    there is no presumption against bail -- to put it another way,

5    I should really be presuming that the defendant is bailable.

6    Maybe that's not quite right, maybe there's not a presumption

7    of bail, but I should not assume that he's not bailable, that's

8    for sure.  The only question then is and the key question is

9    whether there are conditions that would reasonably assure the

10   appearance of the defendant and the safety of the community.

11   Because let's face it, every case is a serious case.  Certainly

12   in this courthouse virtually every case is a very serious case,

13   with very serious and long-term consequences if you're

14   convicted.  I'm sorry if I'm jumping around a little bit, only

15   because I'm looking at my notes.

16            The fact that he had a ticket to London I think is

17   somewhat, to the extent that suggests some desire to flee, that

18   inference is blunted I think by the fact that had a return

19   ticket as well and that he's been to London a lot recently

20   which suggests that goes to London a lot.  Ironically, if he

21   hadn't been to London a lot recently, then the fact that he got

22   a ticket right after he was approached by the FBI in connection

23   with this investigation would have a more nefarious connotation

24   to it.  But he's been there repeatedly then that wold suggest,

25   well, he just goes to London a lot like a lot of people do.  So

D9hilusc ag                    CONFERENCE

1    I'm not really offended by that.

2          Getting back to the conditions that would reasonably

3    assure the appearance of the defendant and the safety of the

4    community, I think there are conditions that would reasonably

5    assure those things somewhat more substantially that was

6    represented by Mr. Barrios.  I don't think he's had the

7    information that I have been provided with today.

8          I'm inclined to impose a $500,000 personal

9    recognizance bond secured by $200,000 of cash security.  That

10   could include cash.  It could also include real property where

11   there's evidence that the real property has a particular value,

12   a particular equity.  So just providing an appraisal saying

13   it's worth $250,000 without also providing mortgage documents

14   and current up-to-date statements as to what's owed in terms of

15   principal is not good enough.  You have to establish that the

16   combination of cash and the equity in the house is at least

17   $200,000.  But in any event, the house is going to have to be

18   posted even if there's additional cash that's out there because

19   I'm also going to require that both parents co-sign the bond,

20   that his brother co-sign the bond as well.  I want them to

21   have, you might say, some skin in the game here.  Are his

22   parents here in court today?

23          MR. HENRY:  His mother is.

24          THE COURT:  I want her to know that if she co-signs

25   the bond and posts the house as security and Mr. Ahmed's bail

D9hilusc ag                    CONFERENCE

1  is revoked for some reason there's a very serious risk, in fact

2  a likelihood that her home will be taken away from her, she

3  will be rendered homeless in that sense.  That's how it should

4  be.  Because that would imply that she would provide a certain

5  amount of moral suasion over her son to come to court and see

6  this thing through, come to court when he's supposed to and

7  comply with all the conditions of release.  So the house has to

8  be posted.  But it's going to be part of the $200,000 cash or

9  security, with a $500,000 bond, co-signed by the father, mother

10  and the brother.

11          You said there were other people that would be willing

12  to co-sign the bond.  Are there other financially responsible

13  people that would be willing to co-sign a $500,000 bond?  That

14  doesn't mean they have 500,000 in cash lying around.  But

15  people who have legitimate jobs and pay their taxes and aren't

16  convicted felons, those types of people.

17          MR. HENRY:  I believe there are additional people who

18  would be willing to sign the bond.

19          THE COURT:  Who are they, friends or relatives?

20          MR. HENRY:  Relatives.

21          THE COURT:  I'm going to require a total of five

22  co-signers.  You'll work with Mr. Allee in terms of

23  establishing their financially responsible status.  Three of

24  them have to be the mother, the brother and the father,

25  however.  They have to be co-signers.

D9hilusc ag                CONFERENCE

1              In addition, there will be strict Pretrial Service

2      supervision with home detention.  Mr. Barrios had recommended a

3      curfew, which is sort of one step less than stringent home

4      detention, but I'm going to require home detention with

5      electronic monitoring, and where the defendant can leave his

6      home only for attorney visits during regular business hours,

7      visits to court, visits to Pretrial Services, and medical

8      visits.  But for any of those things that I just mentioned, he

9      would have to provide at least, he'd have to provide notice at

10     least two business days prior to when he intends to leave for

11     any of those reasons that I've just stated to Mr. Barrios at

12     the Pretrial Services agency.  If for some reason there's

13     something else he wants to do other than those very limited

14     things that I mentioned, he's got to get permission from me

15     because that would be a modification of bail.  And you're

16     making a mistake to ask me, oh, my client would like to go to

17     his niece's wedding in Milwaukee tomorrow.  First of all, the

18     more you wait before you ask me for something like that the

19     much less likely it is that I would grant it.  And my

20     inclination is to be, impose pretty rigid conditions here

21     because I do want to make sure that he shows up in court and

22     that he's not a danger to the community.  All these things I've

23     mentioned so far tend to support that, including the home

24     detention.  He's got to surrender his passport.  I understand

25     that Mr. Henry actually has physical custody of his passport.

D9hilusc ag                    CONFERENCE

```
 1    That has to be surrendered.  There have to be no new

 2    applications for travel documents.  Mr. Henry, your office is

 3    in Manhattan, is that correct?

 4              MR. HENRY:  That's correct, your Honor.

 5              THE COURT:  So the defendant is permitted to travel so

 6    long as he's doing it for those very limited purposes that I've

 7    just described to the Southern and Eastern Districts of New

 8    York and also the District of Connecticut.  He would have to

 9    live at his parents' home.  Was he not living there at the time

10    of his arrest or is that where he was living at the time of his

11    arrest?

12              MR. HENRY:  He was living there at the time of his

13    arrest.

14              THE COURT:  Is it 99 Park Avenue, Unit B, Danbury,

15    Connecticut, 06810?

16              MR. HENRY:  That's correct, your Honor.

17              THE COURT:  That's where he's going to have to live

18    and that's where he will be subject to home detention.  There

19    were no positive drug tests in this case, right, Mr. Barrios?

20              MR. BARRIOS:  No, your Honor.

21              THE COURT:  So you don't need drug-testing, is that

22    right?

23              MR. BARRIOS:  No, your Honor.

24              THE COURT:  Just give me one second.

25              (Pause)
```

D9hilusc ag                    CONFERENCE

1          THE COURT:  And the defendant is not to be released

2     until all of the conditions I've stated are satisfied.  He's

3     not getting out today.  All these things have to be taken care

4     of.  You may have to work with Mr. Allee, who is a reasonable

5     person.  He may not like the result but I'm sure he'll

6     cooperate with you in terms of the co-signers and the paperwork

7     and so forth.  It's tedious to have to put all of this

8     together, but you just have to do it.

9          Mr. Ahmed, if I get word of you doing anything that is

10     the least bit problematic, and what does that mean, well,

11     contacting witnesses directly, that doesn't mean that you can't

12     prepare for trial, but the way you do it is you have your

13     lawyer or some investigator working with your lawyer or another

14     lawyer working with your lawyer attempt to do witness

15     interviews or otherwise investigate the case.  If I get the

16     sense that you're engaging with potential witnesses on you're

17     thinking about taking a trip somewhere, or you do something

18     that's akin to these ridiculous documents that apparently were

19     on your phone, your bail is going to be revoked in a New York

20     second.  That's how quickly it's going to happen.

21          I give you a break and I take into consideration the

22     fact that this case may go on for a while.  The period that

23     this case is going to be pending is going to be the shortest

24     possible time that I can do under the circumstances, but it is

25     a circumstances here that there's already a case pending in the

D9hilusc ag                    CONFERENCE

1    District of Utah involving Mr. Ahmed's co-defendants, and I

2    just don't know how exactly that's going to affect the schedule

3    here.  But I know it's going to affect it to some extent.  I

4    just know it.

5          I am concerned that there would be an inordinate

6    period of time that this defendant will be in custody that does

7    not involve allegations of violence, in the indictment that is,

8    or drug-dealing or any of that type of thing where often times

9    people need to be locked up to prevent danger to the community.

10   I think these conditions will reasonably insure that the

11   community is safe, people in foreign countries are safe, and

12   that the defendant will appear in court as required for all the

13   reasons that I've stated.

14         So that's my ruling on Mr. Ahmed's bail application.

15   To the extent it involves overruling Judge Yanthis then Judge

16   Yanthis is overruled.

17         All right.  Moving right along.  Mr. Mansolillo.

18         MR. MANSOLILLO:  Yes, your Honor.

19         THE COURT:  I'm not sure whether you're that familiar

20   with the practices in the Southern District, particularly the

21   ways in which lawyers communicate with each other and with the

22   Court.  I'm going to assume that you're not that familiar with

23   it because otherwise I would have given you a real, as we said

24   around my chambers, a real pep talk about this piece of

25   correspondence that I received a couple of weeks ago, last

D9hilusc ag                    CONFERENCE

1    week, September 9th.  I don't even know if Mr. Allee has it.

2              It's a piece of paper that has your name on the top

3    with a phone number and it says faxed to me from you, with a

4    message.  The message says:  "Please pass this along to Judge

5    Briccetti and his clerk.  Thank you, Raymond Mansolillo, Esq."

6    It doesn't indicate whether it was copied to the government.

7              Mr. Allee, did you receive a copy of this document,

8    this fax?  Attached to it is an e-mail dated September 9th from

9    Mr. Mansolillo to Mr. Allee.  Talking about scheduling in this

10   case.

11             MR. ALLEE:  Yes, I received an e-mail.

12             THE COURT:  I'm not talking about the e-mail.  I'm

13   talking about the fax to me?

14             MR. ALLEE:  Let me be clear.  The first answer is no,

15   I didn't see a copy literally of a fax.  I have gotten some

16   e-mails from Mr. Mansolillo.

17             THE COURT:  Stop right there.  You've answered my

18   question.

19             MR. ALLEE:  One said fax in the subject line, faxed to

20   Judge Briccetti, so maybe I've seen it.

21             THE COURT:  It's ironic.  One of the things that

22   Mr. Mansolillo complained about to Mr. Allee -- and I never

23   want to see correspondence between lawyers again.  If you do it

24   again I'm just throwing it in the circular file and that's the

25   end of it.  I didn't do it with this one because I'm giving you

D9hilusc ag                    CONFERENCE

1    a break.  But it is ironic in your e-mail you complain that

2    Mr. Allee had *ex parte* communications with the Court.  So now

3    you're, you're not just talking about Mr. Allee, because you're

4    talking about me.  It would be wrong for him to have *ex parte*

5    communications with the Court and it would be wrong for me to

6    have *ex parte* communications with him.

7             Let the record reflect there are no *ex parte*

8    communications in this case.  There have been none, there will

9    be none.  We had a court appearance a few weeks ago at which

10   some dates were set.  Because you weren't here and your client

11   wasn't here and the co-defendants in this case were gracious

12   enough to wait for you to get here, we didn't make any

13   decisions.  We thought we should have everybody here before I

14   start making decisions.  There has never been an *ex parte*

15   communication and there never will be one.  When lawyers write

16   letters to the Court, first of all, it's on letterhead, because

17   all members of the bar have letterhead, and it has a subject

18   line with the name of the case, the docket number, which this

19   just says faxed to Judge Briccetti to you, pass it along.

20   There's not even a mention of the name of the case.  I have a

21   crack staff who figured out what the case is this related to.

22            That's preposterous.  You want to send me a letter,

23   it's on letterhead, with a subject line with the name of the

24   case with the docket number, it's addressed to me, the first

25   line is I represent so and so, and that applies to every letter

D9hilusc ag                    CONFERENCE

1    that you send in this case from this date forward.  Don't

2    assume I will remember who you are.  Don't say things like as

3    the Court will recall.  Assume that the Court remembers

4    nothing, which is actually not true, but you assume it.  Say

5    who you are, what you want, why you want it and the extent to

6    which you've discussed it with your adversary and particularly

7    if there's been a consent.  You don't have to get consent from

8    everybody, but tell me if there is consent.  Don't send me

9    copies of correspondence between you and another attorney who

10   appears in front of me on this case unless it's necessary to

11   attach it to some exhibit to some motion or something.  If you

12   were making a discovery motion you might want to attach, for

13   example, Mr. Allee's letter to you enclosing certain discovery

14   so I would know what you've received.  That's okay.  But this

15   kind of thing is completely not okay.  So don't ever do it

16   again.  Is that clear?

17            MR. MANSOLILLO:  Your Honor, I understand your

18   admonishment.  I would like to respond.

19            THE COURT:  Is that cleer?

20            MR. MANSOLILLO:  Yes, it is.

21            THE COURT:  You can respond.

22            MR. MANSOLILLO:  This case has a long history.

23            THE COURT:  My case doesn't have a long history.  The

24   case has been in front of me once.

25            MR. MANSOLILLO:  We had the same problem happen in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D9hilusc ag                    CONFERENCE

1    Utah where prosecutors, in that case DOJ, contacting the court,

2    saying --

3             THE COURT:  Are you saying that anyone at the

4    prosecution table or anyone associated with the prosecution had

5    an *ex parte* communication with me?

6             MR. MANSOLILLO:  Not with you.

7             THE COURT:  I'm glad you're not not saying that.

8             MR. MANSOLILLO:  Contacted the clerks, must have

9    implied that I would be there the 12th, I was traveling.  I

10   told him in several communications that I could not be there

11   the 12th. I could be there on any day you wanted.  This

12   happened on several occasions in Utah.  It's very expensive

13   going back and forth when not one of these clients has ever

14   stepped foot in Utah.  That case should have been brought here

15   with this case.  And I had to contact the chief, with all

16   three, judge there and all I ask is that the scheduling comes

17   from the court, not the prosecutor.

18            THE COURT:  The scheduled in this case came from the

19   court.  We had a conference in open court in this very

20   courtroom.  You weren't here, neither was your client.

21   Parenthetically, I was told that your client refused to appear

22   for arraignment by video conference which he certainly had the

23   right to do in which case he would not have been transported

24   two-thirds of the way across the country for this purpose.  But

25   he has the right to refuse so I don't hold that against him in

D9hilusc ag                    CONFERENCE

1   any way, shape or form.  But we had a conference because the

2   case has to get moving.  And we set dates at that conference

3   that I set because I thought they were appropriate dates.

4        I don't specifically recall what Mr. Allee said.

5   Obviously, Mr. Allee didn't tell me that you could absolutely

6   not be here on September 12th.  What I asked Mr. Allee at that

7   conference was, and you're certainly welcome to get a

8   transcript, this may not be exact words, but the gist of it

9   was:  Mr. Allee, when do you anticipate Mr. Lustyik arriving in

10  the district and therefore being available for an arraignment?

11  And he said he reasonably thought it would be the first week of

12  September.  Because the process was already starting at that

13  point.  And I said:  All right, why don't we do this.  Why

14  don't we set a conference down for the second week of

15  September.  That was my idea.

16       And there are other lawyers here and other defendants

17  and we all came to the conclusion that September 12th was the

18  right day.  I hope it's not the case that Mr. Allee knew prior

19  to that conference in open court, not *ex parte* communication

20  but conference in open court, that you absolutely could not be

21  here on the 12th.

22       MR. MANSOLILLO:  That is the case.

23       THE COURT:  You'll have to work that out with

24  Mr. Allee.

25       MR. MANSOLILLO:  I understand.

D9hilusc ag                    CONFERENCE

1          THE COURT:  Sometimes people make mistakes.  My view

2    is that life is long and you got to cut people a little slack

3    from time to time.  Just like I cut you slack on this

4    ridiculous correspondence that you sent me.  I'm cutting you

5    slack.  I didn't throw it in the garbage.  That would not be

6    cutting you slack.  You made a mistake.  That's fine.  Don't

7    make it again.  If Mr. Allee made a mistake in not informing

8    the Court about your availability that is a mistake he should

9    not make again.

10          Mr. Allee, don't worry about it, I bet you're going to

11   tell me that you didn't know he was not available on September

12   12th.

13          MR. ALLEE:  That's right, your Honor.

14          MR. MANSOLILLO:  I have the e-mails if you want to see

15   them.

16          THE COURT:  I don't want to see them.  Bygones be

17   bygones.  You're here now.  I should point out that when I had

18   that last conference, no appearance had been entered formally

19   on behalf of Mr. Lustyik.  There's nothing wrong with that.

20   But no appearance had been entered.  So even though I had been

21   told that you represented him in Utah, you hadn't filed an

22   appearance.  What was the date of the motion for *pro hac vice*

23   admission?

24          THE COURTROOM DEPUTY:  September 4th.

25          THE COURT:  I ruled on it that day.  And I immediately

D9hilusc ag                    CONFERENCE

 1   signed it and you were therefore appearing.  You're welcome to

 2   be here and as I said at the beginning, nice to meet you, and

 3   I'm sure we're going to have a long and productive

 4   relationship.  But when we had this conference back in August,

 5   I had heard about you, but there was no formal appearance, so I

 6   had no obligation to do anything with respect to you or your

 7   client.  I wanted to do what I thought was reasonable under the

 8   circumstances which is to adjourn the matter for a couple of

 9   weeks but not much longer than that because after all you got

10   other defendants in this case as well who were here and who did

11   have counsel.  And I did that only after hearing in open court

12   from Mr. Allee that he thought Mr. Lustyik would be here and

13   therefore be ready to be arraigned sometime during the first

14   week of September.  So to cut everybody a little slack I said

15   you know, let's make it the second week of September.  That

16   takes care of that.

17            I don't want to hear this kind of stuff.  I want

18   lawyers to get along.  If you got motions you want to make,

19   make a motion.  If you want to seek some kind of relief,

20   extension of time, adjournment, whatever it might be, an

21   informal letter motion kind of thing -- p.s., the court's

22   internal rules have just recently changed.  Prior to September

23   1st if you wanted to make an informal letter request for

24   something like an adjournment, you were precluded from filing

25   that on ECF.  If you tried to do it it would be rejected.  The

D9hilusc ag                    CONFERENCE

```
 1   rule changed.  Now you're required to file it on ECF.  That's
 2   what my individual practice is.  I almost had to revise my
 3   individual practices, and there's a draft sitting on my desk,
 4   but within the next couple of days they'll be revised.  Bottom
 5   line is if you need to make a request for something --
 6              MR. MANSOLILLO:  Understood, your Honor.
 7              THE COURT:  -- you file it on ECF.  That applies to
 8   you, Mr. Allee.  The compensation is if it's confidential
 9   information that's being supplied or there's a need or a
10   request that the letter be filed under seald, that's different.
11   That shouldn't be on the public record.  But the Court of
12   Appeals has given us a pep talk here in the district court and
13   said:  You know what, we don't really like this letter practice
14   where they're not on ECF because when cases come up on appeal,
15   we're missing big chunks of the record.  So the impetus for
16   this is coming from the Circuit.  And that's fine.  I think
17   it's a more efficient way to do that.  Are we clear on that?
18              MR. MANSOLILLO:  Yes.
19              THE COURT:  I don't want to discuss problems you've
20   been had with Mr. Allee any further now.  As far as I'm
21   concerned, everybody starts with a clean slate.  I certainly
22   don't want to hear about problems that you've had with the
23   AUSAs in Utah.  What does that mean to me?
24              MR. MANSOLILLO:  This case is run by DOJ, not by the
25   assistant United States Attorneys.
```

D9hilusc ag                    CONFERENCE

1      THE COURT:  Fine.  It's reasonable for me to conclude

2   that at least in my courtroom Mr. Allee is taking a substantive

3   role.  Since he's the only one who has spoken, I made a lame

4   joke about that earlier, I welcomed Ms Woods to speak if she

5   wants to add anything or clarify.  But it's clear to me

6   Mr. Allee has taken a substantive role.  This may be a Southern

7   District thing but those of us who practice things in the

8   Southern District, realize that Southern District AUSAs rarely

9   take a back seat to main Justice.  They're more than happy to

10  work with them.  They tend to take the lead role.  That's just

11  the tradition and practice in this courthouse.

12      What else do we have to deal with before we set some

13  dates?  We have been here over an hour.

14      MR. MANSOLILLO:  Just for the record, any detention

15  issues I'd like to waive without prejudice to my client.

16      THE COURT:  Absolutely.  I was going to ask you about

17  that.  Again, my access to information is a little bit limited

18  here.  I know that originally Mr. Lustyik was arrested here

19  locally I guess in Westchester County which is where he lives

20  in connection with the Utah case.  Bail was set by Judge Maas

21  in the Southern District in Manhattan.  And he was released on

22  bail and traveled to Utah for whatever purposes he needed to be

23  there.  But at some point there was an application made to

24  revoke his bail I guess for two reasons.

25      One is that he hasn't fully secured it.  That's not

1    happening in my courtroom.  You just heard what I said about

2    the co-defendant's bail.  That has to be fully secured before

3    he gets released, not after he gets released.  That was one of

4    the allegations as far as I can tell looking at Pacer.  And

5    another one was that your client was inappropriately

6    communicating with witnesses, maybe even paying money to

7    witnesses.  There was some kind of a hearing or something that

8    happened in Utah in front of a magistrate judge and the upshot

9    of it is that your client's bail was revoked.  I think

10   somewhere that you appealed that to the district judge and it

11   was upheld.

12           MR. MANSOLILLO:  Within one month it was appealed to

13   the district court judge.  It was upheld and we're seeking

14   review again.

15           THE COURT:  You have an absolute right to do that.

16   What you're telling me is that you're not going to seek bail at

17   this time but without prejudice to doing so in the future.

18           MR. MANSOLILLO:  That's correct.

19           THE COURT:  That's absolutely your right.  You might

20   write me a letter saying you were able to prevail in, what is

21   it, the Tenth Circuit?

22           MR. MANSOLILLO:  Yes, your Honor.

23           THE COURT:  And now we're ready to make an application

24   for bail here in the Southern District of New York and here's

25   the basis of it and so forth.  That's the kind of thing you

D9hilusc ag                    CONFERENCE

1   might write me a letter about at the appropriate time and I

2   will schedule that as soon as I can.  I hope you gleaned from

3   the way I dealt with the co-defendant's application, I prefer

4   for defendants to be out on bail.  Can't do that in every case.

5   In many cases you can't do that.  If I can I will.  But it's a

6   moot point because he's already incarcerated in Utah.

7          The record should reflect that the defendant is

8   detained in this district because I would assume that the

9   government would want to file some kind of detainer or

10  something in connection with Mr. Lustyik's Utah case, so in the

11  event he's released there, he would still be held in custody

12  pending a bail review here.  So you'll do whatever you have to

13  do.  But as far as I'm concerned, the Court's ruling on bail

14  for Mr. Lustyik is detention pending trial, completely subject

15  to review at a later date without prejudice to you.

16          MR. MANSOLILLO:  Thank you, your Honor.

17          THE COURT:  And I'll do it on short notice.  I'll do

18  it as quickly as 24 hours, 48 hours.  Very quickly we can get

19  to that if it becomes relevant.  It's not relevant right now.

20          MR. MANSOLILLO:  That's why I asked.  I do have one

21  other matter.  I don't know if you can address it without the

22  judge in Utah.  As you know, the case is very complex.  There's

23  close to two million documents that have been given to us.

24          THE COURT:  In which case?

25          MR. MANSOLILLO:  In Utah.

D9hilusc ag                    CONFERENCE

1      THE COURT:  I don't know that.  How would I know that?

2  I don't talk to the judge.  Do I need to talk to her for some

3  reason?

4      MR. MANSOLILLO:  Let me get to the point.  The point

5  is he's being transferred and it's fine that he's here, his

6  family is here, can see him, I'm from Boston.

7      THE COURT:  Gee, I never would have realized that.

8  I'm kidding.  It's your accent, obviously New England.

9      MR. MANSOLILLO:  Pending any requirements, and I think

10  the judge will waive most of them in Utah, and I intend to ask

11  her, that he be at the hearings, I ask that this Court hold him

12  here in Valhalla if that's possible.  Otherwise, he's going to

13  be traveling.  I have a trial to prepare for, a huge trial

14  which now looks like it will be sometime in March.

15      THE COURT:  Where is that?

16      MR. MANSOLILLO:  In Utah.

17      THE COURT:  In this case?

18      MR. MANSOLILLO:  In this case.

19      THE COURT:  I see what you're saying.  You're located

20  more or less in the east coast.

21      MR. MANSOLILLO:  Yes.  And he's from New York.  He's

22  from down the street.

23      THE COURT:  But he's in custody so he can be in

24  custody anywhere but you're located here.

25      MR. MANSOLILLO:  It's easy for me to travel from

D9hilusc ag                    CONFERENCE

1   Boston back and forth.  However, when he travels, they just

2   don't put him on a plane and he shows up in Utah.

3          THE COURT:  No.  He has to go through Oklahoma City or

4   Atlanta.

5          MR. MANSOLILLO:  Seven transfers to get here.  Maybe

6   if I can coordinate between Judge Campbell and yourself where

7   he can be held.  There may be other hearings, he's going to be

8   here.  If he's in Valhalla he's here.  Unless there's a stay

9   until after the Utah case is done, then that's fine if he goes

10  back.

11         THE COURT:  I'll hear from Mr. Allee or Ms Woods,

12  since the common denominator is that it's Ms Woods' division in

13  main Justice that's also involved in the Utah case?

14         MR. MANSOLILLO:  Yes.

15         THE COURT:  Although not Ms Woods herself?

16         MR. MANSOLILLO:  Not Ms Woods herself.

17         THE COURT:  One of her colleagues from that, I think

18  that's what I was talking about

19         MR. MANSOLILLO:  That's correct.  It's all one unit,

20  Public Integrity Unit.

21         THE COURT:  When is the next court appearance in Utah?

22         MR. MANSOLILLO:  October 15th.  And those are

23  suppression motions that will have a bearing on this case here.

24         THE COURT:  If Mr. Lustyik were to stay here, which I

25  understand is your preference, I not ruling on this at this

D9hilusc ag                    CONFERENCE

1   point, how does he handle that, how does he appear in court in

2   Utah if he's here in Valhalla?

3         MR. MANSOLILLO:  I going to ask that the judge in Utah

4   waive his appearance for that.

5         THE COURT:  For that hearing?

6         MR. MANSOLILLO:  For those hearings.

7         THE COURT:  I think you need to not ask me to order

8   him to stay here when he's here presumably on a writ from Utah.

9         In other words, Mr. Allee can speak to this, didn't

10  you submit a writ to Judge Smith to have him brought here?

11        MR. ALLEE:  Yes, your Honor.

12        THE COURT:  Normally, once the purpose for which he's

13  brought here is completed, he would be returned to the other

14  court.

15        MR. ALLEE:  Yes, your Honor.

16        THE COURT:  I perfectly happy for him to stay here.  I

17  reluctant to order it especially if the judge in Utah wants him

18  back in Utah.  What I getting at is I think you need to write a

19  letter to both of us, to the judge in Utah and to me, write one

20  letter, explain everything you want to explain, and it seems to

21  me -- what's the name of the judge in Utah?

22        MR. MANSOLILLO:  Judge Tina Campbell.

23        THE COURT:  And then it would probably be appropriate

24  for me to communicate with Judge Campbell and figure out what

25  the best thing to do is.  I not going to do anything that's

D9hilusc ag                  CONFERENCE

1    going to be perceived as ordering her to do anything.  Her

2    commission and my commission are exactly the same.  I can't do

3    that.  Mr. Allee, what were you going to say?

4              MR. ALLEE:  He can't be in both places at once.  He's

5    here on a writ.  I think it depends on the schedule that we set

6    out what will make sense as far as just where Mr. Lustyik is

7    housed.  It's ultimately the responsibility of the marshals, if

8    he's in federal custody, to insure that he appears in court

9    when he's required to do so.

10             THE COURT:  Let's assume that he waives his

11   appearance.  He's not going to waive his appearance at trial in

12   Utah.

13             MR. MANSOLILLO:  Of course not.

14             THE COURT:  Waiving his appearance for a pretrial

15   hearing, if I were a defendant, I would not really want to do,

16   because it's my case and not Mr. Mansolillo's case.  But I

17   think he probably could do that under the circumstances that

18   are present here, waive his appearance assuming that was

19   permitted by Judge Campbell in Utah.  Let's assume he waives

20   his appearance for pretrial matters in Utah and Judge Campbell

21   agrees with that, and also taking into account the fact that

22   this is Mr. Lustyik's home, he is from here, his friends and

23   family are presumably in this area, his attorney, broadly

24   speaking, is from this area, which means it would facilitate

25   communication between Mr. Lustyik and his attorney not only for

D9hilusc ag              CONFERENCE

1    this case but also for the Utah case if Mr. Lustyik remained

2    here in the Southern District.  It's not crazy what

3    Mr. Mansolillo is asking in.  I just not going to order it.  I

4    am just curious as to your position.

5              MR. ALLEE:  Our view is that again it's up to the

6    marshals to insure that he's produced for court.

7              THE COURT:  If he waives his right to be produced in

8    court, let's assume that, I don't want to go to Utah he says,

9    I'd like to stay here until the trial, he's got to be specific,

10   assuming that's the case, what reason would there be for him to

11   be sent back to Utah now?

12             MR. ALLEE:  I am not opposed to that.  I don't have

13   really a position on where he's housed other than he should be

14   where he can be produced.  If he's not needed in Utah and can

15   stay here, and particularly if we can set a schedule where

16   while he's here, he can appear in the intervening time, that's

17   fine with the government, provided that it doesn't conflict

18   with any proceedings in Utah.  October 15th I'm told that

19   that's a date to reserve for counsel in that case for pending

20   motions.  Following that, I told that there's not a trial date

21   yet in that case although I hear today that it will probably be

22   in March and that seems possible based on what I've heard.

23             We have asked for the protective order which I

24   understand your Honor --

25             THE COURT:  I already signed it.

D9hilusc ag                    CONFERENCE

1          MR. ALLEE:  -- will be in a position to sign today.

2    We have discovery here on this table that I would give to

3    counsel today.

4          THE COURT:  Let me ask you if you know the answer to

5    this question and maybe if you don't the marshals can let me

6    know.  If I don't enter any kind of order and do nothing other

7    than to say that it's my preference that he remain here if

8    that's okay with Judge Campbell, I guess that's an accurate way

9    of putting it, would the marshals send him back anyway and say

10   well he's here, he got here for the arraignment, now we have to

11   send him back to Utah?  Do I have to tell the marshals to do

12   something or not to something?  I would appreciate it if the

13   marshals do nothing until we sort this out.  It's not an order,

14   it's sort of a respectful request.

15         MR. ALLEE:  He's here on a writ.  To return a

16   defendant from where they've been brought by a writ requires my

17   office to satisfy that writ.  In my letter to you and to Judge

18   Campbell in August, I represented that in substance this was a

19   window of time where we understood Mr. Lustyik was not needed

20   in Utah.  We obtained a writ.  And that we intended to satisfy

21   the writ and return it so he wouldn't miss anything, so it

22   wouldn't interfere in Utah.  Today, once we have a schedule,

23   once we know what the next court dates are, that would dictate

24   whether I would follow that process or ask you to change it.

25   So if you schedule a date for us to come back to schedule

D9hilusc ag                    CONFERENCE

1   motions, there is a potential *Curcio* issue I want to mention

2   which may require a further court appearance here, if there's a

3   court appearance coming up I would ask you if we could change

4   that, not satisfy the writ, and I could talk to the marshals

5   about insuring that he's not returned contrary to your wishes.

6           THE COURT:  My respectful request to the marshals.

7           MR. MANSOLILLO:  I was a former assistant United

8   States attorney, I was a former DEA agent who retired out of

9   this district.  The marshals talk directly to the prosecutors,

10  they don't talk to defense, and they haven't talked to us once.

11  They've moved him all over the place without telling the judge

12  or the defense where they are.

13          THE COURT:  That's done for security reasons.  That's

14  perfectly acceptable.  They don't tell people in advance where

15  they're moving him.

16          MR. MANSOLILLO:  I don't even know when he's going to

17  be moved.  We were told he wasn't going to be taken from Utah

18  and we have a transcript to that effect.  And a marshal

19  actually stood up in front of Judge Campbell and said that.  I

20  just ask, if those are your wishes, I think they'll abide by

21  them.

22          THE COURT:  My wish is, it would serve this Court's

23  interest if Mr. Lustyik remained here at least long enough for

24  the lawyers in this case to have an opportunity to review the

25  discovery materials, not complete and total every line of the

D9hilusc ag                    CONFERENCE

1   discovery materials, but a basic review of discovery materials

2   sufficient to come back and see me again and tell me what kind

3   of motions if any they expect to file, at which point we would

4   then schedule a motion, we would then set a motion schedule,

5   not today, but after you've had an opportunity to review

6   discovery.

7            MR. MANSOLILLO:  I understand.

8            THE COURT:  So what I thinking is, I was going to say

9   30 days, maybe it's more appropriate to say 60 days, but that

10  would only work if Mr. Lustyik waives his appearance in October

11  or the October date doesn't actually happen for some reason and

12  Judge Campbell is okay with that.  So I not ordering anything.

13  I not ordering the marshals to do anything.  If I were to set a

14  date 60 days out for another conference, what would you do *vis

15  a vis* the writ, Mr. Allee?  Is that too far out for you?  You

16  tell me.

17           MR. ALLEE:  First your Honor, we'd ask for 30 days to

18  make that window as soon as possible but long enough so they

19  can review discovery which 30 days would suffice.  I would ask

20  your Honor for permission not to satisfy the writ so we can

21  come back on that date.

22           THE COURT:  You'd like a shorter date rather than a

23  longer date.

24           MR. ALLEE:  We're ready to hand over the discovery.

25  It's four disks.  A big portion of the proof in this case is

D9hilusc ag                    CONFERENCE

1    text messages and e-mails with which Lustyik is very familiar

2    from discovery in the other matter and they take up a lot of

3    the pagination of the discovery.  There are several other types

4    of records, bank records, credit reports that certainly require

5    review.  But as the indictment makes clear, an important piece

6    of proof here is those texts and e-mails and we think they can

7    be reviewed in 30 days so we can get a motion schedule at that

8    point.

9              THE COURT:  You also told me the last time there was a

10   search warrant of Mr. Thaler's home, search warrant of

11   Mr. Lustyik's office, maybe Mr. Ahmed's home phone also.  Yes.

12   He provided his computer and phone on consent?

13             MR. ALLEE:  Yes, your Honor.  And so the search

14   warrant materials themselves are part of the discovery and then

15   the evidence they yielded which is partly the texts, partly

16   documents obtained from Lustyik's pod, his office at the White

17   Plains resident agencies of the FBI, from his home, from

18   Thaler's home pursuant to the search warrant.  There were some

19   items obtained from Mr. Ahmed, and those were on consent.  Some

20   of those I referenced today, the iPhone.  There are a few

21   pending items of discovery that are not in this redwell that I

22   brought here that I can report on.  I brought them up at the

23   last conference.  One is the iPhone.  We've completed what

24   technicians called a forensic analysis of iPhone.  We've got a

25   report that we can produce very soon, probably by the end of

1    the week.  We've got Mr. Ahmed's computer which we're still

2    conducting that examination.  We expect to have a report of the

3    results within two weeks.  We're prepared to produce those

4    reports which are very useful summaries, they're in some way

5    work products but they fill in the discovery.  The items will

6    be available themselves if counsel wants the items.  There's

7    also a computer of Mr. Thaler's that has been recovered.  Same

8    thing, we can make a copy of the computer itself if we're

9    provided the hardware to do it and we can do that now.  We're

10   reviewing it for items that are relevant to our case, that's

11   still pending that's not in this batch of discovery that I have

12   here, we can get that out within a few weeks.  And the same

13   goes for the FBI e-mail account of Lustyik.  We're also

14   reviewing that for the search terms for relevant items.  We

15   will produce the results of that to counsel and we think we can

16   do that in a few weeks.

17          THE COURT:  You also told me the last time that

18   discovery might involve classified documents which would

19   require security clearances for attorneys.  You haven't

20   mentioned that today.

21          MR. ALLEE:  We're in the same posture we were on the

22   28th, which is it's still possible.  If that's the case,

23   there's a process for such items under the CIPA statute which

24   you may know.  But we're not in a position yet where it

25   necessarily involves such documents.  We're working on it.

D9hilusc ag                    CONFERENCE

1          THE COURT:  I willing to put the case over for 30 days

2     with the expectation that counsel will make every effort that

3     they can to review the discovery but with the understanding

4     that sometimes it takes a lot longer than that to review

5     discovery depending on how voluminous it is.  But I think it's

6     better to have a shorter date than a longer date.  Even 30 days

7     puts us after the October 15th date that you told me about in

8     Utah.

9          So it seems to me Mr. Mansolillo you still got to

10    write a letter explaining the situation.  I don't want to be

11    perceived by anybody as somehow interfering in any way, shape

12    or form with a case that's in another district, particularly

13    when it's already a year old.  I'll give you a date but that's

14    not the same as saying I'm ordering anybody to keep him here.

15    I just going to give you another date.  I think it behooves you

16    and Mr. Allee and whoever else you need to talk to do sort out

17    what makes the most sense.

18         Let me say this, it's not unreasonable to me that he

19    be held here for all the reasons we talked about so long as he

20    waives any appearances that he would otherwise have to make in

21    Utah.  If he doesn't waive his appearance, then as far as I

22    concerned, off he goes.

23         MR. MANSOLILLO:  I intend do that.  I will cc you a

24    copy either electronically or via letter.

25         THE COURT:  If I were you I would write a letter to

1   Judge Campbell and a copy to me or write it to both of us and

2   explain that you want to do.  We'll give you a date 30 days

3   from now to come back and see me.

4           Before I set that date though, you said there was a

5   *Curcio* issue, with who?  Mr. Mansolillo or someone else?

6           MR. ALLEE:  Mr. Mansolillo.

7           THE COURT:  Is it definitely an issue or something

8   you're not sure of yet?

9           MR. ALLEE:  It's a potentially waivable conflict.

10  It's not an actual conflict as we see it.  These are things

11  that need to be raised right away.  So I would ask to set some

12  kind of schedule to come back on it.

13          The issue arises out of the following circumstance.

14  Mr. Mansolillo as I understand it, is also counsel for Lustyik

15  in Utah and Thaler, a defendant in this case, who is also a

16  defendant in Utah, does not have Jason Ser in Utah, he has

17  another lawyer, Daniel Calabro, and Mr. Mansolillo and

18  Mr. Calabro are partners at a law firm.  My understanding is

19  that circumstance in Utah prompted a *Curcio* proceeding out

20  there where Mr. Lustyik and Mr. Thaler on inquiry, the sort of

21  *Curcio* type inquiry from the court, were found to have

22  knowingly waived those potential conflicts and then the

23  representation remained the same.

24          Some of that conflict is, or the potential conflict is

25  inherited here because of the partnership.  So the government's

D9hilusc ag                    CONFERENCE

view is that the Court should satisfy itself, if Lustyik seeks

to waive that here, that Lustyik understands that

Mr. Mansolillo has a potential duty of loyalty to the client of

his partner.

THE COURT:  That's his client.  Partners, if

Mr. Mansolillo has a partner who is representing Mr. Thaler,

albeit in a different matter, but nonetheless Mr. Thaler, then

effectively Mr. Mansolillo is representing Mr. Thaler.  So yes,

I would say the same sort of *Curcio*, although it's one step

removed I suppose because Mr. Thaler also has Mr. Ser as his

lawyer.  But I would agree that there's a potential conflict of

interest.

MR. ALLEE:  That goes for Mr. Thaler.  The issue here

is that the Court should satisfy itself that in the event

Lustyik seeks to waive that, that he does so knowingly, that he

understands Mr. Mansolillo has a duty of loyalty to a

co-defendant and possibly Mr. Mansolillo has privileged

information arising from the co-defendant that he cannot use.

THE COURT:  The same questions have to be put to

Mr. Thaler.

MR. ALLEE:  We see it as slightly different.  Mr. Ser,

there's no conflict, there's no loyalty to any co-defendant or

any witness.  However, there are ethical rules about continuing

loyalty.  And so to the extent that Mr. Mansolillo has a

continuing duty of loyalty to Thaler, potentially under New

1    York ethical rules Thaler would then have to waive that duty of

2    loyalty or that conflict for Mansolillo to continue to

3    represent Lustyik.  That doesn't go to a constitutional

4    conflict, that has to do with Lustyik's representation in this

5    case.  It's also something I expect could be waived.  I don't

6    say there's any ethical quandary that can't be solved.  But the

7    Court should address these promptly.

8         We're here.  Mr. Mansolillo has pointed out he wants

9    him to stay here.  We ask that we address that as soon as

10   possible.  We do in these cases make a submission where we

11   propose questions the Court can allocute the defendant on.

12        THE COURT:  I think we do have to address it.  Do you

13   agree with that, Mr. Mansolillo?

14        MR. MANSOLILLO:  I think facts have changed that

15   Mr. Allee is not aware of.  That partnership has been

16   dissolved.

17        THE COURT:  I don't really think it matters.  Even as

18   a former partner, effectively you represented Mr. Thaler, even

19   if you never even spoke to Mr. Thaler, through your partner you

20   represented Mr. Thaler.  And the problem that Mr. Lustyik has

21   or potential problem that Mr. Lustyik has is he would have to

22   waive or he'd have to knowingly waive a potential conflict like

23   Mr. Allee said.  For example, he would have to be advised

24   clearly that to the extent you were in possession of any

25   confidential information regarding Mr. Thaler that could be

D9hilusc ag                    CONFERENCE

1   helpful to Mr. Lustyik, that you would be precluded from using

2   that, even though you were no longer a partner with your former

3   partner.  That's the kind of thing I'm talking about.

4          MR. MANSOLILLO:  Okay.

5          THE COURT:  It does sound like a waivable conflict.

6          MR. MANSOLILLO:  We did waive it, we'll waive it again

7   before this Court.

8          THE COURT:  We won't do that right now.  The

9   government will provide me with a letter explaining a little

10  bit more detail what Mr. Allee just put on the record with a

11  proposed set of questions, obviously, you get a copy of this as

12  well, with a proposed set of questions for me to ask

13  Mr. Lustyik and also Mr. Thaler.  Because I agree it's a

14  different situation.  But it is kind of a mirror image.  It's

15  just that the difference is here in this court, Mr. Thaler has

16  a lawyer who has no connection whatsoever to Mr. Mansolillo's

17  law firm.  So he already has independent counsel who can advise

18  him about any potential conflicts that might exist.

19         Mr. Lustyik, however, does not have an independent

20  lawyer who could advise him about any potential conflicts.  And

21  ordinarily in this court I would assign a CJA attorney solely

22  for the purposes of advising Mr. Lustyik on any potential

23  conflicts and the issues that are related to his knowing and

24  intelligent and voluntary waiver of any conflict.  I'm

25  reluctant to do that now because I haven't received anything

1   from the government yet formally.  If I got something from you

2   formally, especially if I got it quickly, I could go ahead and

3   appoint someone from the CJA counsel to represent Mr. Lustyik

4   for this narrow purpose.  Would you agree with me that I should

5   appoint someone from the CJA counsel as an independent lawyer

6   to advise Mr. Lustyik?

7            MR. ALLEE:  Yes.

8            THE COURT:  I won't do that until I get your letter.

9            MR. ALLEE:  We can put in a letter tomorrow.

10           THE COURT:  Why don't we do this.  You give me that

11   letter.  I'll give you a date to come back in mid-October.  And

12   before that time, when I get your letter, I'll arrange to have

13   a letter off the CJA Panel.  Do we know who's on duty tomorrow?

14   Doesn't matter.  Whoever it is it is.  I'll arrange to have an

15   attorney appointed to represent Mr. Lustyik for this limited

16   purpose.

17           It's Joseph Vita.  I assume he doesn't have any

18   connection with this case.  Not James DeVita, who was

19   Mr. Ahmed's attorney, this is a different Vita, Joseph Vita.

20           MR. ALLEE:  We're not aware of any conflict.

21           THE COURT:  I assume that's what you're were asking

22   about, Ms Woods.

23           MS WOODS:  Yes, your Honor.

24           THE COURT:  Okay, different person.  It's okay; it's a

25   reasonable question.  So we can have that *Curcio* hearing on

D9hilusc ag                    CONFERENCE

1    that adjourned date.  Or do you want to do it sooner than 30

2    days?  We could give an interim date just -- except it has to

3    involve Mr. Thaler too, not just Mr. Lustyik.  It involves both

4    of them.

5              MR. ALLEE:  30 days or within 30 days.

6              THE COURT:  Let's give you 30 days and then everybody

7    can come back and we can talk about scheduling and other things

8    as well.  I have a trial which I'm pretty certain is going to

9    go forward the week of the 15th.  So really it's difficult for

10   me to carve out a big chunk of time and I think we need to

11   carve out at least an hour.  We've been here for two hours

12   today.  How about October 24th, two o'clock in the afternoon.

13             MR. MANSOLILLO:  That's fine.

14             MR. SER:  That works, your Honor.

15             THE COURT:  Thank you.  Mr. Ser, you've been very

16   quiet over there.

17             MR. SER:  That's fine,  your Honor.

18             MR. HENRY:  The 24th at two is fine, your Honor.

19             THE COURT:  How about the government table?

20             MS WOODS:  That works for the government, your Honor.

21             THE COURT:  We'll put that matter over until October

22   24th at two p.m.  In the meantime, the government is going to

23   produce whatever discovery it has, I'm not going to set any

24   precise deadline for them to do this, I have great confidence

25   in Mr. Allee's professionalism in that regard.  In other words,

D9hilusc ag                    CONFERENCE

1   he's going to give you what he has to give you and he's going

2   to do it promptly but it has to be by definition on a bit of a

3   rolling basis.  I'm sure, Mr. Allee, you will commit to me to

4   produce things as promptly as they're available to produce,

5   including some things that you have today that you can provide.

6           MR. ALLEE:  Yes, your Honor.

7           THE COURT:  On October 24th, I recognize this might be

8   a bit of a shorter adjournment than would ordinarily apply in a

9   case like this, but I would like to think that all counsel

10  would have had at least a reasonable opportunity to review the

11  materials that have been produced.  And I would like on October

12  24th to hear from counsel as to what sorts of motions they

13  think they might want to make, if any.  You're not required to

14  make motions.  But if you want to make them, it would be nice

15  to know what they are.  Including whether counsel think there's

16  a need for hearing, some sort of evidentiary hearing,

17  suppression hearing, that kind of thing.  I know there are

18  search warrants involved here.  Sometimes there's a need for a

19  suppression hearing.  So hopefully you can all do that and I

20  hope I'm not putting too much pressure on you.  Let's try to do

21  that so when you come back on the 24th of October you can tell

22  me what you think you're likely going to have to do in terms of

23  motions and whether you're going to do it.

24          And I recognize that there is another case pending for

25  two of these defendants, a serious matter in another district.

D9hilusc ag                    CONFERENCE

 1   There's nothing I can do about that other than try to be as

 2   reasonable as possible which is what I'm trying to do.  Does

 3   that work for everybody?

 4          MR. MANSOLILLO:  One question, your Honor.  Is it

 5   possible that we can set up -- I'm pretty certain, being very

 6   familiar with this case, that there's going to be classified

 7   information, and it's going to involve CIPA -- is it possible

 8   we can set up a discovery schedule for classified and

 9   nonclassified?  That's what we have done in the Utah case.

10          THE COURT:  The government is going to produce

11   nonclassified materials today.  And if there's other materials

12   like the forensic report, that's all nonclassified.  There's no

13   CIPA problem there, that doesn't implicate CIPA.

14          MR. ALLEE:  Right.

15          THE COURT:  You haven't even told me whether there is

16   anything that implicates CIPA?

17          MR. ALLEE:  There may be and there may not be.

18          THE COURT:  I think we have to wait and see.

19          MR. MANSOLILLO:  Okay, your Honor.

20          THE COURT:  It may be a moot point.  I have been

21   through this in other cases where the government tells me it

22   may be a CIPA case, we may have to do this and we may have to

23   do that, and in the end, it's not, and a lot of time and energy

24   is required dealing with CIPA when it doesn't require any

25   security clearances.  Right now I have two defendants sitting

D9hilusc ag                    CONFERENCE

1    in jail and I recognize there's another case pending in Utah.

2    But thank you for raising it.  We'll deal with it if and when

3    we have do.  Anything else today?

4              MR. HENRY:  May I go ahead and turn in the Pretrial

5    Services report and turn in the passport to the Pretrial

6    Services officer?

7              THE COURT:  You don't have to do that, but on the

8    record I'm going to assume you're going to do that.

9              Mr. Ser, is there anything you want me to deal with

10   today?

11             MR. SER:  No, your Honor.

12             THE COURT:  Do you agree with me that your client has

13   a sort of mirror image *Curcio* issue, because your client has

14   been represented by Mr. Mansolillo's partner which means

15   Mr. Mansolillo represents your client?

16             MR. SER:  I do, your Honor.

17             THE COURT:  But I don't think I need to appoint

18   independent counsel because you're already independent counsel.

19   You can advise him as to what the issues are.  But I think I

20   have to allocute your client as well.  I can revise or add to

21   what the government provides, and you can as well.

22             Mr. Mansolillo, if there's anything you think I should

23   be adding or subtracting from the government's *Curcio* letter,

24   you should tell me that.  My experience is they're pretty

25   comprehensive.

D9hilusc ag                    CONFERENCE

1          MR. MANSOLILLO:  I have been through it three times,

2     your Honor.

3          THE COURT:  All right.  I appreciate that.  Anything

4     further?

5          MR. MANSOLILLO:  No.  Just to add, there will be

6     classified information coming from the defense.

7          THE COURT:  Coming from the defense?

8          MR. MANSOLILLO:  Yes.

9          THE COURT:  Your client doesn't work for the FBI any

10    more, right?

11         MR. MANSOLILLO:  That's correct.

12         THE COURT:  I'm not sure what you're saying, that he's

13    in possession of classified information?

14         MR. MANSOLILLO:  The DOJ has taken a separate position

15    saying that that information is the government's and not his

16    and he can't talk to his defense attorney until there's a

17    ruling on that.

18         THE COURT:  In my case or in the Utah case?

19         MR. MANSOLILLO:  In the Utah case.

20         THE COURT:  Don't ask me to get involved in the Utah

21    case any more than I absolutely have to.

22         MR. MANSOLILLO:  I'm not.  It's just the same issue.

23    And Section 5 of CIPA is what the defense intends to present as

24    part of their defense and I intend to present some of that

25    information.  So it's going to invoke CIPA.

D9hilusc ag                    CONFERENCE

1      THE COURT:  We will deal with it when we have to.  We

2 don't have to deal with it right now.

3      Anything else Mr. Allee, other than an application for

4 a speedy trial exclusion?

5      MR. ALLEE:  Just one moment, your Honor.

6      (Pause)

7      MR. ALLEE:  Just a couple of things, your Honor.

8      First, when we come back on the 24th, that's also for

9 the *Curcio*?

10     THE COURT:  Yes, it is.

11     MR. ALLEE:  I am still in the position of having

12 represented both to your Honor and to Judge Campbell that we

13 would satisfy the writ after having completed the arraignment

14 and conference, but now I'm not going to do that with your

15 authority.  I would like to clarify that to the judge in Utah.

16     THE COURT:  Don't tell the judge in Utah that I

17 ordered Mr. Lustyik to stay here.

18     MR. ALLEE:  You've not done that.  This is all

19 triggered by the waiver of a potential appearance on October

20 15th by Lustyik.  What I don't want is just to be stuck not

21 doing what I said I'd do, which is send him back.

22     THE COURT:  You should write a letter to Judge

23 Campbell.

24     MR. ALLEE:  I think I will do that just sort of

25 describing this circumstance.  And then, having done that, I

D9hilusc ag                    CONFERENCE

1    will not satisfy the writ, I'll speak to the marshals about

2    that.  If I hear from Judge Campbell that that's not acceptable

3    to her, then I'll get back to your Honor.

4         Before I get to speedy trial, what Mr. Mansolillo just

5    said I don't fully understand about the defense using or

6    producing or having something to do with classified documents.

7    But I am concerned about that.  And I think I would just ask

8    that when we return, there is a Rule 16 procedure for defense

9    discovery, if the defense intends to put on a case, if there

10   are classified documents or items that the defense anticipates

11   putting on, I'd ask for some notice about that and I'd like to

12   be able to address it at the next conference.

13        THE COURT:  Obviously you should get notice but I

14   think what he was saying is even though there are documents

15   that are being produced in the Utah case, that those documents

16   are subject to CIPA and he may want to use them in this case

17   which arguably implicates CIPA.  I don't pretend to be an

18   expert in this area.  I'm generally aware of it.  I don't know

19   what his obligations are, or yours for that matter.

20        MR. ALLEE:  If there's something for the defense that

21   they would otherwise want to produce but they're prevented from

22   doing so, I would want to know that so we can deal with it

23   rather than just sit on it.

24        THE COURT:  Why don't you try to clarify that among

25   yourselves.  Notwithstanding any bad blood that may be out

D9hilusc ag                    CONFERENCE

1    there, I'm directing both of you to act like grown-ups.  Is

2    that a specific enough order?

3              MR. MANSOLILLO:  Yes, your Honor.

4              MR. ALLEE:  We'd ask that you exclude time in the

5    interest of justice in this case until October 24th.  We ask

6    that you do that for, among other reasons, the defense can get

7    the discovery we're producing today, and forthcoming

8    productions, so they can determine whether they want to make

9    any motions, and what kind of motions to make, and it would

10   also allow the government to submit the *Curcio* submission, for

11   the defense to review that and consider whether to respond.

12             THE COURT:  And also the need to appoint independent

13   counsel for Mr. Lustyik to deal with the *Curcio*.  He'll need

14   some time for that as well.

15             MR. ALLEE:  Yes, your Honor.

16             THE COURT:  Any objection?

17             MR. MANSOLILLO:  At this point I'm fine for October

18   24th, we'll go with the *Curcio* hearing, I've done that three

19   times.  I'll bring all my materials from there, and if they

20   want the transcripts, I'll bring those as well.

21             THE COURT:  But you're not objecting to an exclusion

22   under the Speedy Trial Act stopping the clock in effect?

23             MR. MANSOLILLO:  No.  It would be unreasonable to do

24   that at this time knowing that Utah is going to come first.

25             THE COURT:  Anything else?

D9hilusc ag                    CONFERENCE

1            MR. SER:  No, your Honor.

2            MR. HENRY:  No objection.

3            THE COURT:  Okay.  The Court excludes time under the

4   Speedy Trial Act from today through and including October 24,

5   2013.  I find the ends of justice served by granting the

6   requested continuance outweigh the best interests of the public

7   and the defendants in a speedy trial for the reasons stated by

8   Mr. Allee on the record.  Thank you all very much and I'll see

9   you all on October 24th.

10           THE COURTROOM DEPUTY:  Thank you very much; this Court

11  will be in recess.

12           (Proceedings adjourned)