# Sentencing Memorandum

ROTHMAN, SCHNEIDER, SOLOWAY & STERN, LLP

Attorneys at Law
100 Lafayette Street, Suite 501
New York, NY 10013

FRANKLIN A. ROTHMAN
JEREMY SCHNEIDER
ROBERT A. SOLOWAY
DAVID STERN
───────
LUCAS ANDERSON

Tel: (212) 571-5500
Fax: (212) 571-5507

August 31, 2015

BY ECF

Hon. Vincent L. Briccetti
United States District Court
Southern District of New York
300 Quarropas Street
White Plains, New York 10601

             Re:  USA v. Robert Lustyik
                  13 Cr. 616 (VB)

Dear Judge Briccetti:

    Bob Lustyik has devoted his life to his family, neighbors, and
to public service.  This offense, and his parallel but separate
corruption case in Utah, is a total aberration in what was by all
accounts a successful and honorable career in law enforcement.  Now
53 years old, he is already condemned to serve a ten year sentence
by the Utah Court.  He is shunned and reviled by everyone he knew
in law enforcement.  His spirit is broken, and his family is
stressed to  the breaking point.  He is wracked by remorse and
guilt for his  deplorable, almost inexplicable, violation of the
oath he took to "support and defend the Constitution of the United
States ... [and to] well and faithfully discharge the duties of
[his] office."

    Bob Lustyik comes before you for sentence on September 14.
Other than as specifically set forth herein, he has no objection to
the factual recitations or guideline calculations contained in the
Pre-Sentence Report of Probation Officer Sara K. Willette. (the
PSR)

    He objects, for reasons that will be detailed herein, to the
following offense level computations set forth in the PSR:

    - Application of a ten point enhancement pursuant to U.S.S.G.
§ 2B1.1(b)(1)(F) based on an asserted "value of the payments" of
$131,000. (PSR ¶ 50)  No reliable evidence exists to support this
enhancement level. Rather, this Court should apply a "value of the

benefit" analysis and find such value equals $30,000, the sale price received by co-defendant Rizve Ahmed, who sold the documents he bought for a $1,000 bribe to a Bangladeshi journalist. Such $30,000 amount yields a four point enhancement to the base offense level pursuant to Section 2B1.1(b)(1)(C);

- Application of the two point enhancement for more than one bribe pursuant U.S.S.G. § 3C1.1(b)(1); and,

- Application of a four point aggravating role adjustment for leadership pursuant to 3B1.1(a). Rather, if any adjustment is applied, the defendant's conduct warrants no more than a supervisory enhancement for a criminal activity involving five or more participants, which, if imposed, supports a three point adjustment pursuant U.S.S.G. § 3B1.1(b).

Should the defendant's challenges be sustained, his total offense level is 21, and his guideline sentencing range in Criminal History II will be 46 - 57 months.

As stated, defendant's positions with respect to each of these objections will be set forth more fully herein.

## I. Bob Lustyik's Personal History and Characteristics

### A. Letters of Support

Annexed as Exhibits A, B, and C, respectively, are letters written to the Court about Bob separated into three categories. Exhibit A contains four letters written respectively by his wife, mother, brother, and his daughter. Exhibit B contains letters from five individuals who have written to tell their personal stories of Bob's kindness and how it changed the course of their lives. The letters express gratitude to Bob, and while each is different, they share the common thread of showing there is far more that defines Bob Lustyik than the crimes of which he is convicted. Exhibit C is comprised of eighteen moving letters from Bob's neighbors and friends. Collectively, they leave no doubt that decade after decade, Bob was an exemplary, honorable, and rare neighbor, known universally for his generosity, decency, and strong family ties and values.

Taken together, the letters reflect the positive ways in which Bob has impacted scores of people throughout his adult life through coaching, volunteering, parenting, caring, friendship, and mentoring. Despite the serious crimes he has committed near the end of a long and storied law enforcement career, the letters stand as a testament to how he has consistently touched and inspired

2

ordinary people for decades, and how in return, they have not forgotten or abandoned him.

Bob's wife's letter informs the Court that among the many reasons she fell in love with him is because he's always been "a doer". She explains the difficulties she now endures without him trying to raise their children; coping with major financial challenges; trying to manage feeling alone in near unendurable circumstances. She worries that if something happens to her, her children will have nobody to care for them, and that her daughter is treating with a therapist for anxiety. A copy of the letter of Hannah's psychotherapist, Justine De Leon, LCSW, is annexed as Exhibit D. Clearly, the challenges to Bob's family are a major consequence of his offense and incarceration.

Bob's brother, Michael, a retired State Police officer, describes from the perspective of an officer the crushing loss his brother endures as a disgraced and humiliated former member of law enforcement. He views Bob, by virtue of his remorse, as posing virtually no risk of recidivism, and a man who is desperately missed and needed by his wife and children.

Dominick Ciaccia, currently an Assistant Athletic Director at New York University, describes his gratitude for Bob for inspiring him to pursue his dream of a career in athletics when to achieve that goal meant "fighting through long hours, night school, and getting the coaching experience needed to be successful and riding a train home through three boroughs of NYC, to sleep five hours, and go back to the grind the next day, I wanted to quit it all." He met Bob as an assistant coach on a team which included Bob's nephew. A near legendary athlete in his town of Sleepy Hollow, Bob also served as a volunteer assistant coach of the team, and they quickly became friends.

Ciaccia explains that Bob was the difference-maker for him when he was about to compromise on his dreams:

> Bob through his words, and more importantly, actions kept me on the right path. I watched him guide young men to college through football. Some of these young men did not think going to college was possible. Some didn't think they could afford to go. Some didn't have the family structure to support the idea. Bob simplified the process for the involved parties and guided them through the convoluted college application process. Through all of this, he was a father figure and a friend to those families.

3

Ciaccia Letter, part of collective Exhibit B.

One of those young men to whom Mr. Ciaccia refers, Hyoshin Clarke, has also submitted a letter in which he explains that "the thought of attending college had never entered my mind" until Bob, who served as a volunteer coach of the high school team on which Hyoshin played, "threw me off guard by saying, 'I hope you know that you can play football in college if you want.'" Inspired by Bob, who made the "future look bright" Hyoshin "focus[ed] more on my academics and athletics." He observes that Bob was "a constant push to better myself," and describes how Bob's "work ethic and love for his family and friends is something not many people possess," and that "he became a great supportive figure for myself and some others on the team. That is something that not every child has." Hyoshin ultimately graduated from Springfield College. He credits Bob with presenting "the opportunity for me to be resilient and grow with my own individuality."

### B. Bob's Background and Career

Bob Lustyik had a difficult childhood during which he fought and overcame significant challenges. He grew up the middle child of Robert Sr and Arlene Lustyik in North Tarrytown, New York, now Sleepy Hollow. (PSR ¶ 68) He suffered from a "terrible speech impediment" and hearing loss due a cleft palate and cleft lip with which he was born. (PSR ¶ 72) His medical condition put great strain on him and his family, including enduring teasing and bullying from other children, and the necessity for his father to give up a career with the Westchester County Department of Corrections to operate a landscaping business so that the family could better afford Bob's medical costs. (PSR ¶¶ 71-74)

Bob and his wife, Virginia, are raising two children, Hannah, 14, and Bobby, age 11. They have been married for fifteen years and she remains supportive of him while living through a "nightmare". (PSR ¶ 82, and Virginia Lustyik's letter, attached as part of collective exhibit A).

He was a star athlete in high school and attended Susquehanna University on a football scholarship. He played four years on the football team as fullback and graduated with a degree in geology. (PSR ¶ 95)

Bob reports that his lifelong dream was to be an FBI special agent. He realized that dream in 1988, and remained in that position until September 2012, when he resigned due to the investigation into his misconduct in Utah.

4

As in his athletic career, Bob was a star in the world of international counter-intelligence, including recruitment of spies, managing cases, and handling of spies and double agents. He won many honors during his career, accumulated letters of recognition and appreciation from high ranking officers in the military, and was awarded many meritorious service awards. Annexed as Exhibit E is a list of Bob's awards and in some cases the Certificates memorializing them. Some of the paperwork has been lost to him for the moment because it was seized by the government in the search of his office, and has not yet been returned.

After the September 11 terrorist attacks, Bob began to suffer from anxiety, including panic attacks. In 2012, while watching television, he believed he was having a heart attack and was rushed to the hospital by his wife. From then until 2011, he regularly treated with a psychiatrist, Dr. Marie DeCorse, who prescribed anti-anxiety medication (Ativan and Paxil) to help manage his symptoms.

While on bail in the instant matter, Bob treated with Dr. Maurice Haberman at Westchester Psychiatric Associates in Tarrytown. Dr. Haberman diagnosed him with BiPolar Disorder and Anxiety Disorder. A copy of Dr. Haberman's letter to P.O. Sara Willette detailing Bob's treatment and diagnosis, and a typed transcription thereof, is annexed as Exhibit F.

It should be noted that most of Bob's offense conduct in this matter occurred when he had stopped taking his medications regularly and as prescribed. (See Virginia Lustyik's letter at p. 2) His behavior exhibited out-of-character grandiosity, impulsiveness, and poor judgment which Bob, in searching for answers to why he did what he did, attributes to untreated Bipolar Disorder.

Whatever the cause of his crimes, it is clear that until the conduct underlying this case occurred, Bob was a loyal and accomplished FBI counter-intelligence agent working for decades in the interest of the United States, and trying to protect the country from its enemies.

He lives now trying to understand what happened, trying to better himself, and for the far off day when he will leave prison and re-unite with his children and wife.

II.   General Sentencing Principles and Challenges to Certain Guidelines Calculations.

The legal framework governing imposition of federal sentences

is well known and often repeated. The Court must consider the factors set forth in 18 U.S.C. § 3553(a) to determine a reasonable sentence in each individual case. See, *United States v. Booker*, 543 U.S. 220 (2005).

Specifically, Section 3553(a) directs the Court to impose a sentence that is "sufficient but not greater than necessary" to accomplish the goals of federal sentencing, which are set forth in paragraph 2 of the statute, and include just punishment, deterrence, incapacitation, and rehabilitation. The Court must also give consideration to "the nature and circumstances of the offense" and the defendant's "history and characteristics." 18 U.S.C. § 3553(a)(1). And while the Court must consider the Guidelines calculation as part of the sentencing process, the Guidelines merely "serve as one factor among several courts must consider in determining an appropriate sentence." *Kimbrough v. United States*, 552 U.S. 85, 90 (2007).

The defendant stands convicted by guilty plea of five separate crimes arising out of his participation in a scheme to commit bribery, honest services fraud, and theft of government property.

The PSR calculates his total offense level as 31, places him provisionally in criminal history category I, and finds his guideline sentencing range is 108 to 135 months. (PSR ¶¶ 48-59, and 109) As he has now received a sentence in Utah in excess of one year and one month, his criminal history category is elevated to II pursuant to U.S.S.G. § 4A1.1(a), and the PSR's calculation changes to an imprisonment range of 121 to 151 months. (PSR ¶ 61)[1] The recommendation of probation as to sentence at the time Ms. Willette wrote her report was that a sentence of 108 months imprisonment be imposed to run *concurrently* with the Utah sentence. Citing U.S.S.G. § 5G1.1(3)(C), and specifically noting that "the conduct in the instant offense was similar in nature to the conduct of the Utah case, and the two occurred during the same approximate time period, we recommend that the sentence runs concurrently to  the term imposed in Utah." (PSR at p. 30) The defense strongly endorses

---

[1]

Unaccountably, the footnote at page 11 of the PSR provides for a total offense level of 35 instead of 31 if Criminal History Category II applies (which it does). Thus, the PSR incorrectly identifies the imprisonment range in Category II as 181 to 235 months. This calculation appears to be a simple oversight as nothing about the criminal history category should affect the defendant's total offense level in this case.

this reasoning and the recommendation of a concurrent sentence.[2]

   A. Contrary to the government position, the facts do not
   support a ten level enhancement pursuant to U.S.S.G. § 2B1.1.

   The defendant's conviction for participation in a bribery
scheme exposes him to the § 2B1.1 enhancements based on loss value.
*See*, U.S.S.G. § 2C1.1(b)(2).  The referring language of the bribery
Guideline reads:

> If the value of the payment, the benefit received or
> to be received in return for the payment, the value
> of anything obtained or to be obtained by a public
> official or others acting with a public official, or
> the loss to the government from the offense,
> whichever is greatest, exceeded $5,000, increase by
> the number of levels from the table in § 2B1.1
> (Theft, Property Destruction, and Fraud)
> corresponding to that amount.

   This section recognizes that there is obviously more than one
way to measure "value" for 2B1.1 purposes.  To do so, the fact
finder must ascertain the correct amount of each measuring option
listed in the Guideline, and utilize the one which is greatest.
Not every case has an ascertainable value in each category.  For
example, not every case has "loss to the government," as that
measure comes into play in cases such as bribing an IRS agent to
reduce someone's taxes.  In such a case, the "loss to the
government" will be the amount of tax the government won't collect
due to the agent's corruption. (*See*, for example, *United States v.
Falcioni*, 45 F.3d 24 (2nd Cir. 1995)(intended loss to the
government of $41,000 in tax revenue constituted correct § 2B1.1
measure although bribe amount was $3,500).

   At different times, the government has advocated two different
methods of arriving at the sought after ten point enhancement, but
both of them have problems.  In its *Pimentel* letter, the government
notices the theory that the "value of the payments to be obtained

---

[2]

   Hon. Tena Campbell, when imposing sentence in Utah, makes the same
point: "I am ... looking at the history and characteristics of Mr.
Lustyik.  I will say that I find it very serious that at the same time
he was carrying out this scheme, he was doing similar acts based in New
York City." (Utah Sentence Minutes, p. 35).  How much, if any, of the ten
year sentence the Utah District Court imposed based on consideration of
the "similar acts based in New York City" is unclear.

by a public official and others acting with the public official was more than $120,000 but less than $200,000." (*Pimentel* Letter at p.2). This phrasing focuses on the dollar amount of the bribes the government argues Thaler and Bob intended to collect from Ahmed and his associates, a total it posits, which equals $40,000 plus three monthly payments of $30,000.

At other times, the focus of the government's attention is on the value of what Ahmed obtained. Usually, alternate measures such as these will produce different results, which is why the Guideline specifically directs the Court to use the greatest to calculate the enhancement in order to achieve "maximum deterrent effect."[3] Here, according to the government, both measures produce an identical result, but, as noted, both are also unreliable.

Examining the *Pimentel* letter first, several problems plague the government's analysis. In the instant case, the value of the bribe is obviously $1,000 because that is the amount Rizve Ahmed paid Thaler for documents on December 9, 2011. As noted, nothing was paid after the initial $1,000. No further payments is not fatal to the government's position as intended amounts may clearly be used to fix loss pursuant to § 2B1.1. But in this particular case the fact that no further amounts were ever paid invites the conclusion that no solid agreement existed among the parties to support (and prove) the government's intended loss amount.

A starting point of the analysis is the fact that the government "bears the burden of supporting its loss calculation with reliable and specific evidence." *United States v. Gupta*, 463 F.3d 1182, 1200 (11th Cir. 2006). Here, there were months of vague, wary dealings between Ahmed and Thaler, and then between Thaler and Bob Lustyik, that do not reliably support the $130,000 loss figure. Text exchanges illustrate this proposition, and a lengthy one is reproduced below from December 17, eight days after

--------

[3]

The Background Section to U.S.S.G. 2C1.1 reads, in pertinent part:

> In a case in which the value of the bribe exceeds the value of the benefit, or in which the value of the benefit cannot be determined, the value of the bribe is used because it is likely that the payer of such a bribe expected something in return that would be worth more than the value of the bribe. Moreover, for deterrence purposes, the punishment should be commensurate with the gain to the payer or the recipient of the bribe, whichever is greater.

the $1,000 payment:

[9:11 AM - 9:55 AM]
Lustyik: So how much is this contract w cezar?  And what r
they expecting from it?  And can we get like 20gs quick?

Thaler: Our original terms. $40 retainer and $30 monthly.
They want everything on [Wazed] plus getting the PM's
charges dropped. I don't know how quick.  his dad is still
there.  Right now they just want verbal on our info.

Lustyik: The problem is ... the longer they take, the
harder it will be to work on getting the case dropped. Due
to the fact that the case is progressing along.

Thaler: I will tell him time is of the essence.  Also, that
we will need more $ to pay off woman because she's most
likely getting paid already.

Lustyik: Don't mention money till we get the first payment.

Thaler: Gotcha

Lustyik: We can use the fact she is getting paid as info

Thaler: We just need something good to start them off

Lustyik: They need something good to hire us.

[2:42 PM - 3:23 PM]
Thaler: Taylor needs a comfort call.  Also I need to give
Caesar some info verbally to get the contract signed.

Lustyik: He has it w him?

Thaler: No the PM will sign off on it.

Lustyik:  We will tell them one thing n they will want
more. And do we really want our names on something like
this?  Tell him [Wazed] is a cooperating witness against
the "future" PM and the other side is feeding [Wazed] all
the evidence so he can bargain away any issue he has.  A
genius move on their part.

Thaler: I think we need to talk about this.  I think its
gonna come back and bite us in the ass.

[5:10 PM - 5:19 PM]

R. Ahmed [to Thaler]: U have something

Thaler: Yes

[7:19 PM - 7:58 PM]
Thaler: C says PM's main concern is investigation of son.
What they have, his [stet] far along they are, etc...

Lustyik: That's easy enough.

Thaler: That's all they're asking for right now.

Lustyik: Well they gotta pay first.

Thaler: They want verbal right now and then they'll pay.

Lustyik: Verbal what?   That there is a pending
investigation and they want to arrest him?   Cause yes.
They do.   The case is also with the Secret Service who
handles US credit card fraud.

Thaler: They want to know what the evidence and what
witnesses.  Can they arrest him in London?

Lustyik:  Yup. On an Interpol warrant.

Thaler:  Do they have one?

Lustyik:  Tween me n u?  Cause we could make money on it?

Thaler: I'll tell him they are about to get an Interpol
warrant and we have to move quickly

Lustyik: Ok.

    This rambling, disjointed series of cogitations and frequently
unadulterated mendacity underscores the lack of agreement between
Lustyik and Thaler on one side of the table, and Ahmed on the
other.  In Bob Lustyik's first pertinent December 17 communication,
he asks, "so how much is the contract w cezar and what are they
expecting from it?"  There's no agreement there.  They text about
Ahmed wanting "everything" on Wazed, and also "getting the PM's
charges dropped."  The "PM" here is a relation of Ahmed's who was
worried he was under investigation and about to be arrested.
Further along, they discuss the need to "give Caesar some info
verbally to get the contract signed."  That's because at that
point, no agreement exists.  They freestyle a discussion about what
s to tell Ahmed as to the issue of whether the PM's son will be

arrested on an Interpol warrant, and when Thaler asks, "Do they have one," Bob Lustyik answers, "Tween me n u? Cause we could make money on it?" Without skipping a beat, and with seemingly no regard for establishing and reporting actual facts, Thaler writes, "I'll tell him that they are about to get an Interpol warrant and we have to move quickly." Bob Lustyik responds, "Ok."

No money is forthcoming. All of this is a shakedown. Nobody can be relied on to tell anyone else the truth. That same evening at 10:32 PM, Ahmed texts Thaler inquiring about the relative likelihood of the PM's imminent arrest and seeking more facts:

> Ahmed: Ok how sure n if I tell them that n turn out to be false I will be fuck.
>
> Thaler: I am sure.
>
> Ahmed: Ok.
>
> Thaler: Next few days. End of week at most.
>
> Ahmed: Who asked for the warrant n based on what.
>
> Thaler: Don't know for sure. But US Secret Service is investigating him for credit card fraud. Or it could be your government. I don't have all the details.
>
> Ahmed: Ok.

No payments were made as a result of any of this, no action was taken, and many of the purported facts were largely invented.

By early February, 2012, the situation had not advanced. A meeting had occurred, but still no payments were made, and Thaler and Bob Lustyik continued searching to find some fraudulent means to successfully extract payments from Ahmed. On February 4, there is a text exchange on the subject of whether further efforts to reach an agreement should continue:

> [11:20 AM - 11:28 AM]
> Ahmed [to Thaler]: I can see that ... Was my mistake to put myself into this .... I should have let them go with their source ... I did so u could have made some money n my dad would look good .... Anyway not harm done yet ... Anyway I will talk to the uncle n convey your message ....
>
> Lustyik: What does this even mean? Now the money is gone?

11

Thaler: It means that he's full of shit.  I told him the 10K is our consultation fee.  For 10 more they will get info.  He had our terms for 3 months and now he just insults us with these numbers.

Lustyik: What does the USA guy mean?  I don't get all that?

Thaler: I have no idea.

Lustyik: Like the other retired guy?  They make no sense.

Thaler: Maybe the retired guy works for minimum wage.

[6:09 PM]
Lustyik:  He begging yet?

[7:41 PM]
Thaler:  He says he's gonna call his uncle to see what they can do.  I don't have high expectations.

9:33 PM - 9:51 PM]
Lustyik: So the money he has.  He gave back?

Thaler: No he still has it.

Lustyik: Let's get it.

Thaler: What's the plan?

Lustyik: To take it n then give him a report in a month

Thaler: They want to exchange for info.  They won't just give it to us.

Lustyik: If u tell him I have the info n uve got to bring the money to me ....

Thaler: They want to see the info first then give us the money.  We just need to type something up and give it to him.  Make it look semi-official - they won't know the difference.

Lustyik: How much?

Thaler: Money? Or info?

Lustyik: Cash

Thaler: 6 for the info from the meeting.  10 from the questions.

The point of all of this is simply that while communications progressed for months, Ahmed and his associates never paid a dime after the initial $1,000 payment.  And given the changing figures and terms continually being introduced, withdrawn and re-formulated, there is no reliable way to measure the value of the benefit or to reliably establish an "intended loss" amount.

As noted the government has at times posited a "value of the benefit" theory in the alternative to intended loss to support its 2B1.1 position.  For example, during Thaler's sentence, AUSA Allee averred that the *actual value* of what Thaler and Bob Lustyik provided was $130,000, and the Court could utilize that analytic in arriving at the enhancement sought:

Mr. Allee:  I want to point out something that you have said but I want to say it in a different way.  Aside from the texts, just one piece of corroboration for this which is much more a 30,000 foot level. [stet]   What was happening here is the corruption through bribery of an FBI agent to the point where Lustyik, to the point where he was violating his oath and betraying a lot of sacred things.  That's very valuable.  So the notion that there would be a payment of 40,000 and then 30,000 a month is corroborated by the fact that it was worth, that that was worth that.  This is not a drug case with a kilo and this is a sting by the government and they've inflated the numbers.  There's not a mismatch between the value of what's being offered on one side and then the discussion of what's going to be paid on the other.  That actually is pretty corroborative.  It is worth a lot of money to get an FBI agent of 24 years in counter-intelligence to do this.

(Thaler Sentence Minutes, pp. 14-15)

The government's argument that texts saying "let's do $40,000 then monthly payments of $30,000" proves a $130,000 value for what was received is doomed by more than just its circularity.[4]  Using

---

[4]

Indeed immediately following Mr. Allee's statement in Court, the Court interjected, "You're right.  But the only problem with that is that everything you said is correct but the only suggestion to the contrary is that they didn't actually pay the money."  (Thaler Sentence Minutes, p. 15)

such reasoning to arrive at a loss figure in this particular case, where the ground shifted almost daily as to what was negotiated for, how much the payer's might pay and payee's demand, and on what timetable events might occur, is treacherous ground.  Thus it is submitted there is little the Court can point to in order to find that the government has presented the "reliable and specific evidence" which constitutes its burden.

There are cases, and this is one of them, in which Courts have held that the requisite "reasonable estimate" of the value of a benefit cannot be determined in the manner advocated by a party. Sometimes it cannot be determined at all, in which case no enhancement may be applied at all.  *See* for example, *United States v. Ring*, 811 F.Supp.2d 359 (DDC 2011)(holding in a case arising out of the Jack Abramoff lobbying scandal that government failed to carry its burden of proving "reasonable estimate" with respect to both benefit received or to be received and with respect to amount of bribe such that no 2B1.1 enhancement was applied, but only enhancement for elected or high-level decision-making official), and *United States v. Anderson*, 517 F.3d 953 (7th Cir. 2008)(government proof with respect to one project in case involving bribe to public official for preferential treatment in development of real estate subdivisions, though it accounted for great amount of benefit received, could not be separated from another project which had nothing to do with bribery case, and therefore could not be used to determine the amount of benefit to defendant).

The government is correct, however, to seek a reliable measure of the benefit to Ahmed, because that is the usual method of valuing a bribe.  Normally, such amount is greater than the amount paid to obtain the benefit.  The government has noted that because it was part of Ahmed's "master plan" to damage the Prime Minister's son, one of steps he took was to sell the information he had obtained to a Bangladeshi journalist.

> In furtherance of this objective, Ahmed provided the confidential, sensitive law enforcement information he obtained to a Bangladeshi journalist, receiving $30,000 in exchange for the materials.

(Gov't Sentencing Submission as to Rizve Ahmed, at p. 3)

Since it may be presumed that a Bangladeshi journalist is in a good position to know what value to place on the information he purchased from Ahmed, and the materials appear to have been sold to the journalist in an arms-length transaction, this Court should find that the "value of the benefit" was $30,000, and that the

applicable enhancement above the base offense level is four levels pursuant to § 2B1.1(b)(1)(C).

B. Because after the initial transfer of $1,000 no agreement to perform official acts for a benefit was consummated, no 2C1.1(b)(1) enhancement for more than one bribe is warranted.

Section 2C1.1(b)(1) states: "If the offense involved more than one bribe or extortion, increase [the defendant's base offense level] by 2 levels.

Bribery requires the corrupt intention to exchange things of value for official acts.  In the instant case, it is simply not clear that there was ever any intent on Bob Lustyik's part to perform any official acts in exchange for money or benefit after the initial exchange on December 9, 2011 was concluded.

As stated during the previous discussion of the loss amount, most of Bob's time in relation to Ahmed after December 9 was spent trying to extract payments without providing anything confidential or of value, but rather by furnishing some investigative services through a private investigation firm he and Thaler were affiliated with, and by providing mis-information and public information which he hoped Ahmed would pay for.  For all of such  conduct taken together, he surely deserves no medals; but neither does he merit an enhancement for multiple bribes.

C. No organizer aggravating role adjustment is merited in this matter pursuant to Section 3B1.1

The government bears the burden of proving by a preponderance of the evidence that the defendant should receive an aggravating role adjustment.

Application Note 4 to U.S.S.G. § 3B1.1 provides a non-exhaustive list for the court to consider in distinguishing leaders from managers:

> Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right of a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

Such matters as the offender's relative degree of moral fault,

whether the offense involves violation of an offender's oath of office, or whether acts committed or undertaken could conceivably have an adverse affect on national security or tend to corrode the public's faith in institutions or law enforcement are not factors in the analysis of whether the defendant is a leader or organizer.

The instant offense began when Hannes Thaler began discussing and receiving emails from Ahmed describing the latter's belief that Sajeb Wazed was involved in corruption. (Indictment ¶¶ 9(a) and (b)). These matters were brought to Bob Lustyik's attention by Thaler, and he began accessing FBI databases to obtain further information, prior to any thoughts or intentions on his part of committing any criminal acts.

Throughout the months over which the offense played out, Bob Lustyik and Thaler played essentially equal roles in planning, organizing, sharing proceeds, strategizing, and decision-making with respect to the offense. The major distinguishing feature between the two of them was that Bob alone, as the FBI agent with sole access to the means by which the offense could occur, could have stopped it at any time by withdrawing his participation. This feature alone, however, should not by itself make him a leader or organizer pursuant to § 3B1.1.

III. The Need to Avoid Unwarranted Sentencing Disparities and to Impose a Sentence that is Reasonable

When considering an appropriate sentence, 18 U.S.C. § 3553(a)(6) instructs the Court to impose a sentence that "avoid[s] unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." Finding cases which have true similarities is often a challenge, no less so in a case such as this as there are not many reported cases. I believe however, the sentences in the matters of Jeffrey Royer in the Eastern District of New York and David Petraeus in the Western District of North Carolina have relevance.

A. USA v. Jeffrey Royer, EDNY, 02 Cr. 589 (RJD)

In 2006, former FBI Special Agent Jeffrey Royer was sentenced for corruption to 72 months imprisonment by Hon. Raymond Dearie in the Eastern District of New York. Royer had been a Special Agent from November 1996 to December 2001 assigned to the FBI's field office in Oklahoma City, Oklahoma. In return for corrupt payments over a period of approximately two years, Royer provided confidential information about ongoing federal criminal investigations into publicly traded companies to his co-defendant, Amr I. Elgindy, and others. Elgindy, a trader and financial

16

analyst who also operated a public investment website, used Royer's information to profit from short-sales of the companies Royer informed him about. (EDNY Case No. 02 Cr. 589, Indictment, Pacer Document 4, pp. 2-6)   After shorting the stock, Elgindy would post on his website the negative information Royer had supplied him causing the shares of the subject company to decline in price. These acts had obvious damaging impacts on the affected companies and the investing public, but were lucrative for Elgindy and Royer.

Royer engaged in this practice and received regular payments from Elgindy for approximately the final two years of his employment with the FBI.   (EDNY Case No. 02 Cr. 589, Sentence Memorandum of AUSA John Nathanson, Document 658, p. 1).   He became known in Elgindy's social circles as "Elgindy's FBI Agent."

To make matters worse, in September 2001, the Department of Justice, Criminal Division set up a Capital Markets Unit within a Task Force in the Eastern District of New York to investigate certain financial crimes.   In October, of that year, the unit initiated a criminal investigation into the activities of Elgindy and his associates.   Royer regularly accessed the federal confidential "Automated Case Support" database to gather information about the status of the EDNY investigation, and supplied that information to Elgindy, "all the while continu[ing] to provide confidential law enforcement information to [Elgindy and his associates] to guide their buying and selling of the stocks of Target Companies." (Royer Indictment ¶ 21)

In December 2001, Royer left the FBI and not surprisingly took a job in Elgindy's company.   He then corrupted his girlfriend, who was still employed as an FBI Special Agent, into securing and providing the same kind of confidential  information he had obtained when he was an agent.   (Royer Indictment at ¶ 26)

Royer went to trial and was convicted.   At trial, he testified in his own defense and perjured himself.   (Nathanson Sentencing Memo at pp. 2, 11)   A detailed account of his complex perjured testimony is beyond the scope of this letter.   He also tampered with a law enforcement witness during the pendency of the case by trying to encourage the witness to lie if asked questions by federal agents about Royer's actions.   The witness reported Royer's conduct to the government.

Royer appears to have been held accountable for a loss amount of $1,568,008.93. (Nathanson Sentencing Memo at p. 14)   He was sentenced for the six counts of conviction, including racketeering, conspiracy to defraud the United States, and using force or intimidation against a witness, to concurrent terms of

17

imprisonment of 72 months and three years supervised release.

B. USA v. David Petraeus, WDNC, 15 Cr. 47 (DCK)

In 2015, David Petraeus, former United States Army four-star general who also served as Director of the Central Intelligence Agency from September 6, 2011 to November 9, 2012, was sentenced to two years probation and a $100,000 fine upon his conviction for Unauthorized Removal and Retention of Classified Documents or Material, a misdemeanor, in violation of 18 U.S.C. § 1924.

According to a pleading styled "Factual Basis" which was filed by the government, Mr. Petraeus knowingly provided to his biographer eight bound notebooks which contained classified and unclassified notes he had taken and maintained during his tenure as Commander of the International Security Assistance Force in Afghanistan in 2010 and 2011.[5] When asked about the books by his biographer prior to furnishing them, he advised her they were highly classified, including the fact that they contained "code word stuff". In August, 2011, at her request, he made the books available by delivering them to "a private residence in Washington D.C." where she was staying which was "not approved for the storage of classified information." He then retrieved them four days later. When he resigned from the CIA in 2012, he signed a certification to the effect that he possessed no classified information, although the black books "were still in the Petraeus residence."

In October, 2012, Mr. Petraeus was interviewed by two FBI agents and was advised that they were conducting a criminal investigation. At the interview, Mr. Petraeus told the interviewing agents that he had never provided any classified information to his biographer and never facilitated the provision of classified information to her. "These statements were false. Defendant David Petraeus then and there knew that he previously shared the Black Books with his biographer." (Factual Basis at ¶ 32) The government in it's plea agreement with the defendant, filed the same day as the Factual Basis, agreed not to oppose a non-custodial sentence for the defendant.

False statements to the government are obviously punishable as a felony pursuant to 18 U.S.C. § 1001, and several potential felony counts could also have been charged arising out of the improper delivery by Mr. Petraeus of the classified information to his

---

[5]  United States v. Petraeus, WDNC, 15 Cr. 47 (DCK), Document 3 at ¶ 32.

biographer.    It  has  been  reported  there  was  substantial
disagreement  within  the  Department  of  Justice  over  whether  to
provide such lenient treatment to a person who had held one of the
highest positions of public trust in the country, but who knowingly
made highly classified information available to a biographer, and
then  deliberately  lied  to  the  FBI  when  asked  about  it  during  a
criminal investigation.    But Petraeus was a national hero who had
served the country honorably for more than four decades and that
weighed heavily in his favor.  And no actual harm came from sharing
the classified information with his biographer.[6]

     I  acknowledge  many  significant  distinctions  between  Mr.
Pertraeus' offense  conduct  and  that  of  Mr.  Lustyik.    Bob  too,
however, served his nation honorably for decades.  And in the end,
the release of the documents provided to Mr. Ahmed do not seem to
have caused much actual harm.

     THE SENTENCING GUIDELINES ARE ADVISORY AND A GUIDELINE SENTENCE
     IS GREATER THAN NECESSARY TO PUNISH AND DETER ROBERT LUSTYIK

     As noted, the federal court must impose sentences which are
sufficient but "not greater than necessary" to achieve the federal
statutory sentencing purposes.    18 USC § 3553(a). While the PSR
posits an advisory sentencing guideline range in this matter is 121
- 151 months, United States v. Crosby, 397 F.3d 103 (2nd Cir.
2005), makes clear that the history and characteristics of the
defendant as well as the offense and the guideline range should all
be carefully considered by the sentencing judge:

          Prior   to   Booker/Fanfan,   the   section   3553(a)
          requirement that the sentencing judge "consider all
          of  the  factors  enumerated  in  that  section  had
          uncertain import because subsection 3553(b)(1) re-
          quired  judges  to  select  a  sentence  within  the
          applicable Guidelines range unless the statutory
          standard  for  a  departure  was  met.    Now  with  the
          mandatory duty to apply the Guidelines excised, the
          duty  imposed  by  section  3553(a)  to  "consider"
          numerous factors acquires renewed significance.

Crosby, 397 F.3d at 111

     Pursuant to Booker/Fanfan, the sentencing judge now has a duty

_____

     [6] See, as examples, www.detroitnews.com/story/news/nation/2015
/04/24/petraeus/26289583/ and www.outsidethebeltway.com/david-
petreus-given slap-on-the-wrist-for-espionage-violation.

to determine the sentencing guideline range and to "consider it along with all of the factors listed in section 3553(a)." <u>Crosby</u>, 397 F.3d at 112.

In this regard, the defendant's supportive and loving family, long and honorable years employed by the FBI, lack of prior criminal history or record of violence, and his extremely low risk of recidivism combine to make a sentence which will result in no imprisonment in addition to that which has already been imposed in Utah "sufficient but not greater than necessary" to achieve the objectives of federal sentencing.   It is respectfully requested, therefore, that the Court consider such a sentence which includes no further imprisonment, but rather a term of supervised release of five years, the first year (or more) of which must be served on home detention.

Thank you for your consideration.

Sincerely,

Robert A. Soloway

cc: AUSA Benjamin Allee
    AUSA Emily Rae Woods

RAS:sc
encl.