145GLUSms

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   UNITED STATES OF AMERICA,

4              v.                         13 Cr. 616(VB)
                                          Status Conference
5   ROBERT LUSTYIK, JOHANNES
    THALER, RIZVE AHMED,
6   a/k/a "Ceasar,"

7              Defendants.

8   ------------------------------x

9                                         May 16, 2014
                                          3:00 p.m.
10                                        White Plains, N.Y.

11  Before:

12             THE HONORABLE VINCENT L. BRICCETTI,

13                                        District Judge

14                      APPEARANCES

15  PREET BHARARA
        United States Attorney for the
16      Southern District of New York
    BENJAMIN R. ALLEE
17      Assistant United States Attorney

18
    RAYMOND MANSOLILLO
19       for Defendant Robert Lustyik

20
    JASON I. SER
21      Attorney for Defendant Johannes Thaler

22
    BRADLEY L. HENRY
23      Attorney for Defendant Rizve Ahmed

24

25

1           THE DEPUTY CLERK:  United States of America against

2    Robert Lustyik, et al.

3           Will counsel please note their appearances for the

4    record.

5           MR. ALLEE:  Good afternoon, your Honor.

6           Benjamin Allee and Emily Rae Woods for the government.

7           MR. MANSOLILLO:  Good afternoon, your Honor.

8           Ray Mansolillo for Mr. Robert Lustyik.  And I waive

9    his appearance today.

10          MR. HENRY:  Good afternoon, your Honor.

11          Brad Henry for Mr. Rizve Ahmed, who is standing to my

12   right.

13          MR. SER:  Good afternoon, your Honor.

14          Jason Ser, Federal Defenders, for Mr. Thaler who is

15   present to my right.

16          THE COURT:  Good afternoon, everybody.

17          Have a seat.

18          Mr. Mansolillo, is your client in Utah?  Is that where

19   he is?  Where is your client?

20          MR. MANSOLILLO:  He was released on conditions.

21   However, he's being held pending the government and this Court.

22   So as of last night, he was still in jail in Utah.  He hasn't

23   been transferred or started the transfer process since Tuesday.

24          THE COURT:  Okay.  So he's in custody in Utah.

25          MR. MANSOLILLO:  That's correct, your Honor.

| | |
|---|---|
| 1 | THE COURT:  Okay.  And you say he's been released. |
| 2 | What you're saying is that the Court in Utah set the conditions |
| 3 | of his release, and he's met those conditions, but he's being |
| 4 | held only on this case?  Is that what you're saying? |
| 5 | MR. MANSOLILLO:  Yes, your Honor. |
| 6 | THE COURT:  Is that correct, Mr. Allee? |
| 7 | MR. ALLEE:  No, your Honor. |
| 8 | THE COURT:  Okay.  Help me out here. |
| 9 | MR. ALLEE:  It is correct that the Court in Utah set |
| 10 | conditions of release and granted release on those conditions. |
| 11 | They include several conditions, including the posting of a |
| 12 | $500,000 fully secured bond.  That term is not met.  And then |
| 13 | the defendant is now, on the orders of the judge in Utah, held |
| 14 | pending resolution, if there is any request made in this case |
| 15 | here.  So the defendant is in Utah.  The defendant has been |
| 16 | granted release.  He has not met the terms of release. |
| 17 | THE COURT:  What term has he not met, exactly? |
| 18 | MR. ALLEE:  At least one of them is the posting of |
| 19 | bond. |
| 20 | THE COURT:  When you say "posting of the bond," |
| 21 | usually, that calls for just signing something. |
| 22 | MR. ALLEE:  It's a fully secured bond. |
| 23 | THE COURT:  Okay.  So you're talking about posting the |
| 24 | security for the bond. |
| 25 | MR. ALLEE:  Yes.  Well, the bond is -- yes, there is a |

 1    bond to be posted, and then there is the assurances of the

 2    security in the posting of the security for that.

 3              THE COURT:  Right.  And that hasn't happened yet, as

 4    far as you know.

 5              MR. ALLEE:  Right.

 6              THE COURT:  Is that true, Mr. Mansolillo?

 7              MR. MANSOLILLO:  As far as the posting of the house,

 8    that portion is true.  However, far be it from me to --

 9              THE COURT:  Look.  Look.  I'm just trying to find out.

10    If you guys can't answer the simplest question --

11              MR. MANSOLILLO:  I was there, your Honor.  I'm trying

12    to tell you.  I was there.  He was supposed to be released and

13    coming here, and then we were going to ask for a bail hearing

14    here.

15              THE COURT:  Right.

16              MR. MANSOLILLO:  And he says something different.  I

17    don't know what to tell you.

18              THE COURT:  Well, presumably, you know why your client

19    hasn't been released.  Has he met all the conditions of his

20    release, including the posting of security on the bond?

21              MR. MANSOLILLO:  All he has to do -- he was considered

22    indigent.  He just has his mother posting the house for him.

23    And that was it.

24              THE COURT:  That's a pretty big piece.  It hasn't been

25    done yet.

145GLUSms

1           MR. MANSOLILLO:  It has to be done here in New York,
2    not in Utah.

3           THE COURT:  Okay.  I don't know where it has to be
4    done.  It can be in, you know, Timbuktu.  The point is that
5    you're saying that the security, the house, has not been
6    posted.

7           MR. MANSOLILLO:  Not yet, no.

8           THE COURT:  So in other words, he hasn't met the
9    conditions of release.  Why would you tell me that he has if
10   you know that he hasn't?  That's the part I'm kind of mystified
11   about.

12          MR. MANSOLILLO:  I misinterpreted what you were asking
13   me, your Honor.  The only thing that --

14          THE COURT:  I'll try to make my questions, from this
15   point forward, as simple as possible.  That was pretty darn
16   simple.

17          I said, "Has he met the condition of release?
18          "Yes.
19          "Is that true, Mr. Allee?
20          "No."

21          That's a problem; right?  And now it turns out you're
22   conceding that he hasn't.

23          Okay.  So hopefully, he will, at which point he'll be
24   free to go on the Utah case.  And then the question will be
25   whether I want to set conditions of release in my case.  Right?

145GLUSms

1    I mean that's the --

2              MR. MANSOLILLO:  That's correct, your Honor.

3              THE COURT:  All right.  What exactly in my case did I

4    do?  You've got to remind me, Mr. Allee.  I don't think I ever

5    formally detained him, did I?

6              MR. ALLEE:  Well, you did.  It's required at

7    arraignment, but it's on consent.  So we've not had any

8    argument about it.

9              THE COURT:  So he's been detained in my case.

10             MR. ALLEE:  Yes.

11             THE COURT:  Which means that even if he does -- let's

12   assume that he does -- meet all the conditions of release in

13   Utah, he's still going to be detained --

14             MR. ALLEE:  Yes.

15             THE COURT:  -- until he can appear here and make a

16   bail application here.

17             MR. ALLEE:  Yes, your Honor.

18             THE COURT:  Okay.  Well, that hasn't happened yet.  So

19   in the meantime, his appearance is waived.

20             And if, as and when your client is back here in New

21   York, Mr. Mansolillo, on very short notice, I'm happy to put it

22   on for a bail hearing.

23             MR. MANSOLILLO:  Thank you.

24             THE COURT:  I just need you to contact my chambers,

25   and we will get it arranged as quickly as we can.

1           MR. MANSOLILLO:  Thank you, your Honor.

2           THE COURT:  All right.  But Mr. Lustyik's appearance

3    is waived under the circumstances.

4           All right.  Well, we were last here on March 5th, I

5    think it was.  We had a discussion about various issues at that

6    time.  We set a schedule for trial -- excuse me -- for motions

7    and trial.  A number of motions have been filed.

8           On that point, I'm just curious, Mr. Henry -- and I

9    guess it applies to Mr. Mansolillo, as well -- you filed 15

10   separate motions, like literally 15 different documents.  I've

11   never seen it done that way before.  Is that commonplace in

12   other districts, as opposed to just one motion with 15

13   subheadings?  I've never seen that before in my 33-year career.

14          MR. HENRY:  It is very common for some districts.

15          THE COURT:  Where?

16          MR. HENRY:  The Eastern District of Tennessee, the

17   Middle District of Tennessee, most of the districts in North

18   Carolina.  I know, and I apologize --

19          THE COURT:  You're a member of this bar; right?

20          MR. HENRY:  I am, your Honor.  It should have been

21   filed as an omnibus motion.

22          THE COURT:  Say again.

23          MR. HENRY:  It should have been filed as an omnibus

24   motion.

25          THE COURT:  Like Mr. Thaler's motion was one set of

1    papers.  And you know, it's administratively very difficult to

2    keep track of literally 15 different motions.  Mr. Mansolillo

3    also filed multiple motions, but it wasn't 15.  It was a more

4    manageable number.  It was more like six or seven.  But in the

5    future, if you're filing a motion, you file one motion, and

6    then you have different parts to the motion, different things

7    that you're seeking relief on.  But please don't file 15

8    motions.

9            MR. HENRY:  I understand, sir.

10           THE COURT:  It's almost incomprehensible to try to

11   figure out what's there, number one.

12           And number two, I don't think I received courtesy

13   copies from either of you, paper courtesy copies, which are

14   required by my individual practices.  Obviously, I can access

15   these documents online, but I need you to submit courtesy

16   copies, both of you, as soon as possible.

17           MR. HENRY:  Yes, your Honor.  I spoke to the Clerk

18   just before the hearing, and Mr. Mansolillo did, and those

19   should be in the mail.  If they're not, they will be there

20   Monday.

21           THE COURT:  That's fine.  As soon as possible.  Okay?

22           All right, Mr. Mansolillo?

23           MR. MANSOLILLO:  Yes, your Honor.

24           THE COURT:  All right.  Well, look.  I have a number

25   of items that I made a list of that I think we need to talk

145GLUSms

1    about today.  But before I do that, why don't I just open up

2    the floor first to Mr. Allee or Ms. Woods to tell me about any

3    new developments that you think I should know about or what you

4    think we need to be doing today.

5              MR. ALLEE:  Yes, your Honor.

6              And I'll start, and Ms. Woods will correct me when I'm

7    wrong.

8              THE COURT:  Okay.  I'm still waiting for her to speak.

9    I don't get why she hasn't.

10             MR. ALLEE:  No, she -- I got out of the way once.

11             THE COURT:  Oh, you did?  I didn't remember that.

12   Sorry.

13             MR. ALLEE:  I just can't help it.

14             THE COURT:  Go ahead, Mr. Allee.

15             MR. ALLEE:  All right.  There are a couple of things

16   in response to what you just specifically said.

17             The first thing that you should know about or that we

18   want to highlight, one is that we submitted a letter and

19   attachment to it on Monday, and that letter --

20             THE COURT:  Which contains the protective order --

21             MR. ALLEE:  Yes.

22             THE COURT:  -- the attachment.

23             MR. ALLEE:  And so that letter, of course, describes

24   somewhat the status of where we're at on our end addressing

25   items that are arguably discoverable, and includes information

1    that is classified.  And so that is noteworthy.  I want that,

2    of course, to be on your Honor's radar in discussing anything

3    to do with that letter today, if you have any questions about

4    it.

5              THE COURT:  Here's my first question.

6              You told me previously, when I asked you directly,

7    that as far as the government is concerned, there was no

8    classified information that either the government was going to

9    use or that the government needed to disclose to the defense as

10   part of the discovery obligations, and that all the discussion

11   we had the last couple of times when we were here is the

12   defense's claim that yes, there, was classified information.

13   And I said, "Well, you're going have to, you know, give me some

14   sort of notice of that, and we'll take it from there."

15             So I was a little surprised to see in your letter,

16   last paragraph on Page 2, that you say, "The government has

17   determined that there are two sets of classified material that

18   trigger positions of CIPA," C-I-P-A.  And then you, you know,

19   define each of those sets.

20             So what's happened?  What changed from when you said

21   that there was no secret material or no classified material to

22   where CIPA would apply now?

23             MR. ALLEE:  First, your Honor, yes.  I had said that

24   before.  And this is different.  So to be clear, that's

25   absolutely right.  What's changed is that we've reviewed items

1    that we have and we've discussed them with law enforcement,

2    with the law enforcement agency.  And we also reviewed the law.

3    And we want to get them in front of you.  And that's a

4    Section 4.  And it is not the case that -- one thing that has

5    not changed is that we do not have any information that is

6    classified and that we seek to put on -- put in evidence or

7    that is helpful to the defense.  That is still the same.  But

8    there are items that we would like to put before your Honor for

9    your review, in order to withhold them from discovery.  That's

10   one set of items, the second set.

11          THE COURT:  Second set.

12          MR. ALLEE:  And the first set -- and there is even

13   some development since I submitted this letter.  We have

14   documents that we can soon produce unredacted -- pardon me --

15   redacted without -- that are unclassified.  But we also intend

16   to put those before your Honor in a Section 4 filing.

17          THE COURT:  Okay.  But what's this first set of

18   documents that you're talking about?  When you say "Section 4

19   filing" -- again, I'm not an expert in this area, although I'm

20   rapidly becoming one; I've been reading up on this -- what

21   you're saying there is that there are materials that you want

22   to present to me ex parte.  This is Section 4 we're talking

23   about.  Right?

24          MR. ALLEE:  That's right.

25          THE COURT:  For me either to find that they do not

1   need to be produced at all, or that if they do need to be

2   produced, they need to be produced in some kind of redacted

3   form or modified form, something like that.  Right?  And that's

4   what you're talking about when you're saying Section 4?

5              MR. ALLEE:  Yes.

6              THE COURT:  And that's Set 2, second set, as you

7   described.

8              MR. ALLEE:  Yes.  That's Set 2 that we described in

9   the letter.  That's what we anticipate as what we'll submit to

10  the Court.

11             THE COURT:  All right.  I understand that.

12             What's the first set?

13             MR. ALLEE:  It's a set of documents, set of pages of a

14  document, recovered from the work space of the defendant,

15  Lustyik.  The documents have relevant information which is not

16  classified.  They also have other information.  We have looked

17  into the handling -- how to handle those documents for

18  discovery, and then for affirmative use, to use those

19  documents, particularly the relevant unclassified parts.  We're

20  in a position now where we are soon to produce a redacted

21  version -- that is, unclassified -- and we'll produce that.  It

22  has nothing to do with CIPA.  We anticipate also putting those

23  documents before your Honor, so that you will have them and can

24  have the chance -- so that we're not the only ones passing on

25  the redactions that we propose.  It's our position that the

1   material that is being redacted that is classified is not

2   relevant.  But we're looking into that further, and we expect

3   to give that to you for your consideration, as well.

4          THE COURT:  Okay.  So that's really a modification of

5   your letter.  Right?  Because your letter says -- and you know,

6   it's okay to revisit these things as you go forward, but the

7   letter says that the government is seeking authority to provide

8   this material -- talking about the first set -- in classified

9   discovery to cleared defense counsel pursuant to the terms of

10  the enclosed proposed protective order.  So that's different

11  from saying that you're going to turn over as unclassified

12  certain materials that don't have to come through CIPA.

13  They're just unclassified, but they're redacted.

14         MR. ALLEE:  Yes.

15         THE COURT:  And as far as the redacted part is

16  concerned, the part that you're not turning over, you're saying

17  that that should never be turned over.  That's not going to be

18  turned over to cleared defense counsel at all, unless I require

19  it.  You want me to rule on whether you have to turn that over

20  at all.

21         MR. ALLEE:  We may also -- what I'm saying, your

22  Honor, is different than the letter.  But to be clear, we may

23  also be able to do what I described in the letter, which is

24  just make the production to cleared counsel unredacted.  We're

25  pursuing each of these.  And the status now is that the first

145GLUSms

1    one that is probably going to be ready is the redacted one.

2           THE COURT:  And then it may be after that that you

3    would provide the unredacted form for cleared counsel, or you

4    may provide the unredacted form of those documents to me, with

5    an application that I order that they not be produced to

6    counsel --

7           MR. ALLEE:  Right.

8           THE COURT:  -- cleared or otherwise.

9           MR. ALLEE:  Correct, your Honor.

10          THE COURT:  Okay.  I get it.

11          Now, does anybody want to tell me what the status is

12   with respect to clearing of counsel?  I mean, I don't know how

13   much --

14          Well, Mr. Mansolillo is already cleared, so that's not

15   an issue.  Right?

16          Mr. Ser, what's happening with you?  Are you cleared

17   yet, or close to being cleared?

18          MR. SER:  I have no idea.  I submitted the one-page

19   form that was e-mailed to me to the CIPA official.

20          THE COURT:  You only had to fill out a one-page form?

21          MR. SER:  A one-page form.

22          THE COURT:  You didn't have to fill out that massive

23   form I had to fill out?

24          MR. SER:  The only thing I received was the one-page

25   form.  And that's what I turned in.  So I don't know the status

145GLUSms

1    yet, your Honor.

2            THE COURT:  Mr. Henry, do you know what your status

3    is?

4            MR. HENRY:  Yes, your Honor.  Well, to an extent.

5            THE COURT:  You don't have to tell me any more than

6    you have to, but I'm just trying to figure out the timing here.

7            MR. HENRY:  I filled out the one-page form, and in

8    response to that, I received an online questionnaire that was

9    fairly extensive.  I filled out that questionnaire.  I

10   submitted it, along with a hard copy of a text waiver form for

11   them to search my tax records, I suppose, and went to the

12   Southern District office in Manhattan and had my fingerprints

13   taken, and submitted those, as well.  And those have all been

14   submitted to the security office in D.C., and I assume now that

15   they are processing those.  They did confirm that they had

16   received everything they needed.

17           THE COURT:  I'm confused.  Why haven't you had to do

18   that, Mr. Ser?

19           MR. SER:  I haven't received any e-mail from anybody

20   asking me to do anything additional.

21           MR. ALLEE:  Your Honor, as I think you know, the best

22   person to answer the question about the status of that is Mike

23   Macisso, M-A-C-I-S-S-O.

24           THE COURT:  Yes.

25           MR. ALLEE:  He's, of course, the Classified

1    Information Security Officer.  And I think he's been in touch

2    with your Honor's chambers.

3            And this doesn't really add to what counsel said, but

4    I asked Mr. Macisso that question, and he said counsel have not

5    yet been cleared, and that that process is ongoing.  He was

6    coming here today so he could answer that, but his flight got

7    canceled.

8            THE COURT:  Yes, that's right.

9            MR. ALLEE:  But he's the person that can give

10   specifics to answer that question.

11           THE COURT:  All right.

12           MR. SER:  I will certainly follow up with him today.

13   I have his e-mail.  I'll ask him if there is anything else I

14   need to do.  It could be by oversight he didn't e-mail me

15   whatever Mr. Henry got, but I'll make inquiries today.

16           THE COURT:  All right.  Fair enough.

17           MR. HENRY:  I know that the e-mail, the follow-up

18   e-mail to the one-page document, came from a totally different

19   office and person.  So that may be --

20           THE COURT:  Well, I think that Macisso is the

21   Classified Information Security Officer who sort of liaises

22   with all the participants in the process.  But the actual

23   background investigation is done by the FBI or a contract

24   retired FBI agent.

25           Could you follow up with Mr. Macisso, just because I

1   want this process to --

2           MR. SER:  Absolutely.

3           THE COURT:  -- be over.

4           MR. SER:  I'm aware of what the process typically

5   entails.  I was surprised myself, because I've been a character

6   reference for many attorneys in San Diego in my office who

7   needed clearances in the past.  So I was surprised.  But I'll

8   follow up today, your Honor.

9           THE COURT:  All right.  Okay.  Well, look.  You know,

10  the best possible outcome, at least as to the first set of

11  documents, would be if the government could simply produce an

12  unredacted, unclassified set of those documents.  But at this

13  point, I guess you're telling me that's not what you think you

14  have.  What you think you have is redacted documents which are

15  unclassified, which can be deemed unclassified, but there are

16  unredacted portions which are classified, and so therefore,

17  either they have to be reviewed by me to determine whether they

18  should be produced to the defense, or if I decided they should

19  be produced to the defense, then when all of the defendants'

20  lawyers are cleared, then it would be produced to them.  If I

21  decide that it should not be produced to the defense, then it

22  really wouldn't matter whether they were cleared or not, at

23  least for that set of documents.

24          MR. ALLEE:  Correct.

25          THE COURT:  Is that a fair statement?

1          Well, you can do that.  I'm here.  So you can make the

2     Section -- there is no reason why you can't make your Section 4

3     application, ex parte application, to me with respect to, A,

4     the portion of the first set of documents which you believe is

5     classified, and B, the second set of documents which you

6     haven't really told me what they are, presumably because you

7     need to make an ex parte application.  There is no reason why

8     you can't do that sooner rather than later.  Right?

9          MR. ALLEE:  That's right.

10          I mean, there are some reasons why we haven't done it

11    yet, and the reasons are on my end.  But you're talking about

12    on the Court's end, the equipment to receive the filing, that's

13    right.

14          THE COURT:  Well, I'm going have all the equipment,

15    meaning a safe, is what it boils down to, I think next week.

16    So you might want to check back with my Deputy to see that we

17    have that equipment.  But as soon as you can, you ought to make

18    those submissions, those Section 4 submissions.

19          MR. ALLEE:  Yes, your Honor, absolutely.

20          THE COURT:  All right.  Now, that gets to the

21    protective order.

22          I have reviewed the protective order -- it's pretty

23    detailed -- and also the attached memorandum of understanding.

24    All of this is attached to the government's May 12th letter.

25    And in the May 12th letter, the government said that counsel

145GLUSms

1    for Defendant Thaler consents to the entry of the order.

2    That's Mr. Ser.  Counsel for Defendant Lustyik does not

3    consent.  And Counsel for Ahmed is not taking a position.

4          Well, let's take Mr. Henry first.

5          What does that mean, you're not taking a position?  To

6    me it sounds like you don't object.

7          MR. ALLEE:  Your Honor, before Mr. Henry, since I

8    wrote the letter --

9          THE COURT:  Right.

10         MR. ALLEE:  -- I just want to clarify.  He just -- I

11   had asked for his position and hadn't heard back.  And that's

12   my way of saying that.

13         THE COURT:  Okay.  That's a little bit different.  You

14   could have said that, "I haven't heard back," rather than he's

15   not taking a position.

16         MR. ALLEE:  Well, I was trying to find a way to say

17   it's not Mr. Henry's fault at all.  That was my way of saying

18   that.

19         THE COURT:  Don't worry about it.

20         What is your position?

21         MR. HENRY:  To explain, I was out of the country until

22   just last evening about 8:00 p.m.

23         THE COURT:  All right.

24         MR. HENRY:  So I couldn't get back to him.

25         But my position is that I have no objection.  My

1    position is the same as Mr. Ser.

2              THE COURT:  Okay.  Which gets us to Mr. Mansolillo.

3              In this letter, you do not consent to the entry of the

4    protective order.  Are you objecting in some way to the

5    protective order?

6              MR. MANSOLILLO:  Yes, I am.  And I'd like to address

7    that in a memorandum to the Court, as well.  I received this on

8    Friday.

9              THE COURT:  Friday?  Today is Friday.

10             MR. MANSOLILLO:  Past Friday, yes.

11             And I actually learned of it on Monday morning.

12   However, I am basing it on the protective order that was

13   issued, modified, modified and is under review now in Utah.

14   It's similar.  And I don't think that CIPA requires a

15   protective order.  We have CIPA.  It's the Classified

16   Procedures Act.  I think the protective order is unnecessary.

17             THE COURT:  Okay.  Let me deal with that first.

18             I'm going to enter a protective order.  So to the

19   extent you're saying there shouldn't be a protective order,

20   that application is denied, or that objection is overruled.

21             Having said that, having said that, if you do want to

22   write me a letter, write me a letter, post it on ECF,

23   explaining why this particular protective order or certain

24   aspects of it should not be entered in the form in which it's

25   been submitted.  Fine.  You're welcome to do that.  But I am

1  going to enter a protective order.

2          I mean, when I look at it, what jumps out at me is

3  that it seems very complex.  But what also jumps out at me --

4  and this is probably why Mr. Allee referenced it in the first

5  paragraph of his letter -- he says that an identical protective

6  order has been entered in other cases in this district by

7  Judge Kaplan, and that's a pretty good indication to me that

8  the protective order is in the proper form, although I'm

9  willing to hear from you, Mr. Mansolillo.  I am.  But you just

10  need to send me a letter and tell me what it is that -- if you

11  don't want to do it today, you might be better off doing it in

12  writing.  Fine.  But you need to do that quickly, because I

13  want to get this process moving.

14          So how long will you need to send me a letter

15  addressing whatever you want to address in the protective

16  order?  I don't think this is going to be a situation where I'm

17  not going to issue a protective order.  I am going to issue a

18  protective order, maybe not exactly in this form.  I want to

19  give you an opportunity to be heard about that.

20          MR. MANSOLILLO:  Is a week okay, your Honor?

21          THE COURT:  Sure.  Okay.  So let's see.  A week from

22  today is what?  The 23rd?  So by the 23rd, Mr. Mansolillo will

23  send me a letter regarding the form of the protective order.

24  That's really what I'm interested in.  Okay?  Because the

25  clearances aren't complete yet, anyway.  So it's not as if --

1  even if I signed it today, it wouldn't matter, because nothing

2  has been produced, because the two lawyers in the back haven't

3  even been cleared yet.  And as we heard from Mr. Allee, there

4  are portions of documents which they do believe are classified

5  which they want to present to me in the first instance for

6  review.

7          MR. MANSOLILLO:  May I address that, your Honor?

8          THE COURT:  Sure.  Yes, you may.  You may.  They have

9  a right to do it under Section 4.  I'm not necessarily going to

10  agree with them.

11          MR. MANSOLILLO:  Yes, I understand.

12          THE COURT:  But it gives them that option.

13          MR. MANSOLILLO:  Just for the Court's purview -- and I

14  know it's done in a lot of cases, mostly terrorism cases,

15  however, there is nowhere in CIPA -- and the judge in Utah

16  ruled on this initially -- that requires defense counsel to

17  have to -- it's purely up to the judge.  And what happened in

18  the case there is, we were -- he ruled against it.  It was

19  ruled in our favor.  We proceeded for several months until the

20  National Security Branch came in, and we don't know what

21  happened.  They went in an ex parte meeting.  It was classified

22  and under seal for review, and then we were later required --

23  the judge changed her mind, reversed her opinion.

24          So nowhere in CIPA does it say that counsel has to be

25  cleared.  And Macisso will inform you of this.  Actually,

1    classified information can be presented at trial.  The jurors

2    don't get security clearances, so that decision is purely up to

3    the judge.

4              THE COURT:  Okay.  I'm telling you I'm going to enter

5    a protective order.  Okay?  There is no chance that I'm going

6    to rule that defense counsel can receive classified information

7    without being cleared.

8              Now, the good news is, you've already been cleared, so

9    it's a moot point as to you, in terms of whether you need

10   clearance.  You have the clearance.

11             MR. MANSOLILLO:  I'm just informing the Court --

12             THE COURT:  You have it.  But you see, the thing is,

13   with all due respect to the District Court in Utah, I don't

14   really care.  Okay?  I'm giving you an opportunity to comment

15   on the proposed order.  You can do so.  You said you can do so

16   by next Friday, which is the 23rd.  We'll take it from there.

17   Okay?

18             All right.  I'm not sure if I asked this, Mr. Allee.

19   That first set, some of which you now say is going to be

20   declassified, what's the magnitude of that first set of

21   documents?  How many pages is it, approximately?

22             MS. WOODS:  Your Honor, it's 17 pages.

23             THE COURT:  Okay.  So it's a relatively modest amount.

24             MS. WOODS:  It is, your Honor.

25             THE COURT:  And when you say "work space," what does

145GLUSms

```
1    that mean in English?

2             MS. WOODS:  It was like his cubicle space at FBI.

3             When the documents were recovered, although they were

4    marked "Classified," they weren't contained in any sort of

5    safe, or anything like that.

6             THE COURT:  But they were actual paper documents.

7    You're not talking about some electronic file or something.

8             MS. WOODS:  That's right.  There are 17 pages of

9    classified material.

10            THE COURT:  Okay.  All right.  I think that's it for

11   now on that particular issue.

12            And we talked about the CIPA Section 4 application

13   which you should -- I would like to have you make that by the

14   end of next week.  I can't think of any reason why you can't do

15   that, unless you tell me there is a reason why you can't do

16   that.  But before you do it, just verify with chambers that we

17   can physically receive it, meaning we have the security

18   facility in order to hold it.

19            MR. ALLEE:  May I respond to that --

20            THE COURT:  Sure.

21            MR. ALLEE:  -- just on the timing?  As best as I can,

22   I'll try to respond to that.

23            I would like to submit that to you and intend to

24   submit that to you.  We would intend to do that as soon as we

25   can.  At the end of next week, which is a week from today, we
```

```
 1   will try to do that.  I'm not sure --
 2            THE COURT:  How much time do you need, Mr. Allee?  I
 3   want to be reasonable.  I just asked Mr. Mansolillo how much
 4   time he needed, and I gave it to him.  How much time do you
 5   need?
 6            MR. ALLEE:  I think this is what I would like to do,
 7   your Honor.
 8            THE COURT:  Okay.
 9            MR. ALLEE:  And if this works for you, I guess, let me
10   know.  We will submit it as soon as we can, whenever that is.
11   And if we need to have a deadline from today's proceeding, I
12   would ask that it be not within 30 days.
13            THE COURT:  Really?  Why does it take that long?
14            MR. ALLEE:  Part of the submission that we make
15   includes statements of law enforcement officers.  That takes
16   some time to put before your Honor.  We've started that
17   process, but it would be very -- I'm not sure it would be
18   possible to do it within --
19            THE COURT:  You're not talking about those 17 pages.
20            MR. ALLEE:  No.
21            THE COURT:  You're talking about Set 2 --
22            MR. ALLEE:  Yes.
23            THE COURT:  -- or the second set.
24            MR. ALLEE:  When I say that to your Honor just about
25   the 30 days, that's what -- I think that that's a plausible
```

1    amount of time.  I think if I talk to the law enforcement

2    agency about it, they'll tell me they can get it done, that

3    it's tight, but that they can get it done.  And I won't have

4    that slow us down.  If we can get it next week, I'll do that.

5    I just don't think I'll have it.

6         THE COURT:  Well, it may also be helpful in talking to

7    these agencies if you tell the agencies, "Look.  I tried, but,

8    you know, this judge, who really wants to push this case, he

9    gave me 30 days, and we really need to get this done or I've

10   got to give him a really good reason why we didn't get it

11   done."

12        MR. ALLEE:  I think they would make the effort right

13   now, and they would want a lot of time to do this, but I'm not

14   asking for more than 30 days.

15        THE COURT:  All right.  Okay.  So your Section 4

16   submission is due by June 16th; in other words, as soon as you

17   can, but no later than June 16th, absent further order of the

18   Court.  If you really need more time; obviously, you can always

19   ask for it.  But I want to get the ball rolling on this.  Okay?

20   So you got that date?  June 16th?

21        MR. ALLEE:  Yes.

22        THE COURT:  If you can do it sooner, that's fine.

23        MR. ALLEE:  Yes, your Honor.

24        THE COURT:  Okay.  Now, still on the subject of CIPA,

25   Mr. Ahmed moved for an extension of time to file a Section 5

145GLUSms

1    notice.  And Mr. Lustyik did file a Section 5 notice, but

2    essentially said the same thing that Mr. Ahmed is saying, which

3    is, "We really can't identify the documents that we intend to

4    use at trial because" -- well, essentially because the

5    government has not produced any CIPA documents as of yet, and

6    also because there is no formal designation or appointment of a

7    Classified Information Security Officer.  So that's true.  And

8    so I think that that's got to be held in abeyance.  The statute

9    says no later than 30 days before trial, unless otherwise

10   ordered by the Court, I think is what it says.  I'm talking

11   about Section 5 right now.

12           Hold on one second.

13           (Pause)

14           THE COURT:  It says, "The defendant shall, within the

15   time specified by the Court or, where no time is specified,

16   within 30 days prior to trial, notify the attorney for the

17   United States and the Court in writing."

18           So I know that I had previously set a date for a

19   Section 5 notice.  But again, that was in a different context

20   at that time, because what I was being told by the government

21   was, "There are no classified documents, or there is no

22   classified information that either we intend to use or that

23   needs to be turned over to the defense under Rule 16."  That

24   was what I was told earlier.

25           Mr. Mansolillo told me, and might have been other

1    attorneys as well, but certainly Mr. Mansolillo told me, "Well,

2    look.  I have had access to classified materials in the Utah

3    case, and I know that there are classified materials which we

4    are going to seek to use at trial in this case, and I'll give

5    you notice of that."

6         So that's why I set the date for the notice.  But I

7    think that under the circumstances, where, number one, we don't

8    have a protective order in place, number two, we don't have a

9    formal CISO, you know, appointed, which is another reason why I

10   want to move forward on this protective order sooner rather

11   than later, number three, the government hasn't made any

12   disclosures under CIPA, hasn't done a Section 4 notice, the

13   defense counsel aren't cleared yet, I mean, for all those

14   reasons, it is premature, it seems to me, to require the

15   defense to notify the government and the Court under Section 5

16   of classified information that it intends to use.

17        So I think we have to fall back to what the statute

18   says, which is no later than 30 days before trial, unless the

19   Court otherwise orders, "unless otherwise specified by the

20   Court," is what it says.  And I'll have to revisit this

21   question of timing as we go forward, once some of the other

22   things we've talked about happen.

23        Does that make sense to you, Mr. Allee?

24        I'm not sure I can order them to identify classified

25   information when they don't even have it yet.

1           MR. ALLEE:  I have a concern about -- we have a

2    concern about that.  The context, as I see it, is that there

3    are two different things, your Honor, happening.  One is what

4    we just talked about with Section 4.  And if that results in

5    the defense then obtaining information that for some reason

6    they seek to use or go forward, that would then trigger

7    Section 5, and that would be a sort of sequence.  And, of

8    course, they can't do that now.  We haven't given them -- done

9    Section 5.  We haven't given them anything.  So there is no

10   objection to what I described.  But in that process, 30 days is

11   really too small a window for the government to respond to a

12   Section 5.  So that's a concern in that world.

13           Then second, what we understand to be separate is,

14   Mr. Lustyik, through his counsel, has repeatedly described to

15   your Honor that there is something classified that they view

16   as -- they have in their possession or access to or are aware

17   of, and that it's helpful to their defense, so that they will

18   seek to use, having nothing to do with what we've produced or

19   any of the Section 4 that I've discussed.

20           And we understood the purpose of Monday's date to be

21   to get a notice of that.  And none of that has changed.  And

22   it's important that we get that within more than 30 days,

23   certainly, because then we can figure out what to do about it.

24           Suppose it's that -- it's a little hard to do a

25   suppose, but maybe Lustyik intends to testify and say something

1    about -- I mean, he was a counterintelligence agent.  Maybe he

2    intends to say something that would be classified, or there are

3    documents produced in the Utah case that counsel has referenced

4    that they think are relevant that we have no basis to think are

5    relevant.  We've got to get those in time to evaluates them,

6    talk to law enforcement about whatever sensitivities there are,

7    reasons for the classification, and figure out whether they

8    could be used at trial or, if not, take a position on that, how

9    to redact or keep them out.

10         And that, I don't know why that would have to wait.  I

11   don't know what in the future will happen that will change that

12   scenario for the defense.  If their position now is that there

13   is information like that, we need notice of it, and we need it

14   as soon as we can get it.  I thought that was what the point of

15   the May 12th deadline was.

16         THE COURT:  Well, it was the point of the May 12th

17   deadline, but the landscape has changed, because before, you

18   said there was no CIPA -- now you say there is -- that the

19   government is going to produce.  And you know, 5 comes after 4.

20   So usually what happens is, I think, under the -- and after 3.

21         Really, Section 3 is the section that talks about the

22   protective order.  It says, "Upon motion of the United States,

23   the Court shall issue an order to protect against the

24   disclosure of any classified information," which I think is the

25   statutory basis for the protective order that you've submitted,

1   or the proposed protective order that you've submitted.

2           The point is that I think the statute presumes that

3   first, the government is going to produce classified

4   information or explain to the Court why it can't or why it has

5   to modify it, or whatever the case may be, which is Section 4.

6   And then Section 5 is when, after the defense has received

7   whatever it's received, it gives its notice to the government

8   and to the Court as to what it's going to use.  Right?  And

9   then Section 6 is when, if necessary, there is a hearing, and

10  at the time of the hearing or under-seal hearing, you figure

11  out what, if anything, can be used pursuant to Section 5.

12  Right?

13          I understand what you're saying, but it's sort of a

14  hybrid here, because previously, we were only talking about

15  materials that the defense said they already had -- or not had

16  personally, but knew about.  And so in that sense, you're

17  right.  But now you're saying that you have information, too.

18  So I don't know.  It just seems -- well, it seems that we're

19  coming at this from two different directions.  And what you're

20  saying is that they should go ahead now and tell you and tell

21  me what it is that they want to use that they already know

22  about, and that they should do it right away, because they

23  already know this information.  But surely, they can't identify

24  any information, any classified information, that you might

25  provide, because they haven't gotten it yet.  Right?

1              MR. ALLEE:  That's right.

2              THE COURT:  So it puts them in a difficult spot.  They

3    can't really do a complete Section 5 notice; only piecemeal, I

4    suppose.  And I don't really like piecemeal.

5              And also, on top of that, I think Mr. Mansolillo is

6    right that the Court had not formally designated or appointed a

7    Classified Information Security Officer.  And there is

8    currently no mechanism to facilitate CIPA procedures at this

9    time, which is, of course, why I want to get this protective

10   order entered, because that's the mechanism to facilitate, and

11   it's also the formal appointment of the Classified Information

12   Security Officer.  But, of course, then we have the third

13   problem, which is that the other defense counsel have not even

14   been cleared yet.

15             MR. ALLEE:  That's right, your Honor.

16             I guess the one -- and maybe I've said it before, but

17   the one wrinkle is, Section 5 follows Section 4, but not

18   necessarily.  I mean, the reason it does is because why else

19   would the defense have classified information?  So how could

20   there be a notice by the defense that they want to use

21   something if they haven't gotten it?  But here there have been

22   representations that are a little different.  And this is a

23   defendant who was a counterintelligence agent.  He's received

24   documents in another setting.  All right?

25             What we've interpreted, what we've understood, is that

1       there is something else that is going to be offered or used

2       that has nothing to do with discovery we've provided.  And if

3       that comes in 30 days before trial, that just is a very small

4       window to get it evaluated, talk to the people who care about

5       it in law enforcement, and take a position before your Honor.

6               What I would agree with is, now that we have put in

7       this letter about Section 4, we could keep this all together on

8       one track.  And it's fine that May 12th has come and gone, but

9       we wouldn't want it to go -- we would not agree that the

10      defense's Section 5 should be 30 days before trial.  We would

11      ask that it be some reasonable time after our submission, and

12      then everything can go in.  It could be either something that

13      has come out of Section 4 on our end or something they have

14      separately that we don't know what it is.

15              THE COURT:  You see, part of the problem also is, as

16      we said today, that the only one of them -- the only one of the

17      defense counsel that has been cleared is Mr. Mansolillo.  And

18      then we have this additional odd situation, in that Mr. Thaler

19      is a defendant in the Utah case, but his lawyer in the Utah

20      case is not his lawyer in this case.  So how is Mr. Ser --

21      Mr. Ser has not had -- even though his client is a defendant in

22      that case, Mr. Ser has not had access to that information.

23              MR. ALLEE:  That's correct.

24              And my understanding -- I don't have any understanding

25      that either of the other defendants are asking to use

1    classified information at trial.  My understanding is, they

2    say, "Well, maybe, depending on what you -- now that you,

3    government, have put in this notice, maybe that will change."

4    But there isn't some separate other world of possible testimony

5    or documents, outside of discovery in our case, that they may

6    seek to affirmatively use.  So that's the difference between

7    those two defendants and us.

8            THE COURT:  Well, what about that, Mr. Mansolillo?

9    You did tell me before that you had access to classified

10   information.  I already said this, but I'll say it again, and I

11   said well, okay.  And in fact, you specifically said to me that

12   you were going to make a Section 5 notice.  The notice that you

13   filed stopped short of that.  It correctly pointed out that we

14   don't have, you know, a formally appointed Classified

15   Information Security Officer.  But let's assume we have that

16   within the next few weeks, and we have a procedure and a

17   mechanism in place within two weeks, which I think is

18   reasonable, because you're going to write me a letter in a

19   week.  I already have the government's proposed order.  I've

20   reviewed it.  I would say within two weeks, we're going to have

21   that procedure, that mechanism, in place.  Now, if that's in

22   place, why can't you provide notice of what you already have

23   that you think is -- that you think that you're going to use at

24   trial?

25           MR. MANSOLILLO:  I think the government, your Honor,

1    is trying to put the burden on us.  They know what this case is

2    about.  They brought it.

3              THE COURT:  Hold on.  Mr. Mansolillo, you have a bad

4    habit of not answering my question.

5              You told me that you had information, classified

6    information, that you had accessed pursuant to your clearance,

7    and the discovery that was made in the Utah case.  That's what

8    you told me.  I don't know that to be the case one way or the

9    other.  That's what you told me.  And then you also told me

10   that you intended to give notice, under Section 5 in this case,

11   in my case, of what classified information of which you were

12   already aware you intended to use in this case.  So why can't

13   you just do that, once we get these procedures and formalities

14   in place, which, as I just said, will be done in two weeks?

15   That doesn't address the government's Section 4 and Section 3

16   obligations, but we're just talking about what you've already

17   told me you already have.  What are you waiting for?

18             MR. MANSOLILLO:  Well, one is the mechanism.  And I

19   was ordered to do it, and that's why I went with that.  I

20   didn't want to stand here and argue with the Court that it

21   couldn't be done at the last hearing.

22             The other portion is that our Section 5, what we have

23   may change based on what they have now.  If the Court wants it

24   early, then you can rule that it has to be done early.

25             THE COURT:  No, I think that your best argument -- and

1    this is what I was getting at before -- is that we should go in

2    order, which is 3, 4, 5, 6.  It is a hybrid here.  It's this

3    unique situation.  For whatever reason, we have two different

4    cases pending at the same time in two different courts, both of

5    which involve CIPA.  Previously, we had two different cases,

6    but only one of them involved CIPA, according to the

7    government.  Now two involve CIPA.  And it would have been

8    better if we had known months ago that this case was a CIPA

9    case.  But you know, things change, and the government has

10   decided that there is CIPA information in my case, which either

11   is going to be produced, or they're going to try to persuade me

12   that it not be produced.  I think the best way to look at this

13   is just this order to proceed other than in the order of the

14   statute.

15            And I think the bottom line is this.  These procedures

16   are going to be in place within two weeks, or pretty darn close

17   to two weeks, because an order is going to be entered, one way

18   or the other.  My law clerk is going to be cleared, certainly,

19   within two weeks.  I'm sure of that.  I'm going to have the

20   safe that I need, whatever other materials I need.

21            I'm told -- I had a brief conversation with Mr.

22   Macisso.  He tells me that he doesn't believe, at least at this

23   point, that there will be a need for a SCIF, so-called S-C-I-F,

24   because of the nature of the government's classified

25   information, even if it did get turned over to the defense, did

145GLUSms

1    not rise to that level.  I forgot what he called it again

2    exactly, sensitive compartment information.  Of course, that

3    may change.

4            There is a SCIF in Manhattan, in the federal

5    courthouse in Manhattan.  And I understand that you've reviewed

6    classified information in Washington on the other case,

7    although I'm not sure that's a SCIF or not.  It is a SCIF.

8            MR. MANSOLILLO:  Yes, your Honor.  And the one in

9    Manhattan, we've been told by Mr. Macisso, is actually full

10   with the other cases.

11           THE COURT:  We'll find somewhere in there.  Don't

12   worry about that.

13           But anyway, the point is, we've got to do this in an

14   orderly way.  So here's what we're going to do, which is what

15   my sense was in the first instance.  We're going to get this

16   order entered.  And before I do that, I'm going to hear from

17   Mr. Mansolillo on it, and then we're going to get it done

18   quickly.  We're going to get these other procedural things in

19   place.  I'm going to try and talk to Mr. Macisso and find out

20   more definitively when other defense counsel are going to be

21   cleared.  The government is going to give me whatever they're

22   going to give me within 30 days.  I'm going to deal with that

23   as quickly as I can.  Based on what I get from the government,

24   I might either require that certain information be turned over

25   to the defense.  I might not.  But at that point, I'll make a

1   decision as to when the defense needs to provide Section 5

2   materials.

3          And I do agree with Mr. Mansolillo that his Section 5

4   notice may depend in part on what he gets from the government.

5   That seems to make sense to me.  Without knowing what the

6   information is, I don't know whether it's true or not, but it

7   has the ring of truth, that what you decide to do might depend

8   in part on what the government decides to do.

9          So that's the way we're going to go.  The dates that

10  we have, your date to respond or write your letter,

11  Mr. Mansolillo, and the government's date to make whatever

12  Section 4 or other notification they want to make to me.  And

13  then after that, I'll decide when these other notices are going

14  to have to be made.  And it's going to apply to everybody, of

15  course, not just to Mr. Mansolillo.  All right?  So that's how

16  we're going to proceed.

17         All right.  Let's move on.

18         Scheduling.  We all knew this from day one, the fact

19  that there was this other case in Utah that was going to make

20  scheduling in my case particularly complicated.  And you know,

21  I feel like I'm playing leapfrog in the playground, because I

22  set a date which was well after the Utah trial date was

23  scheduled.  And then, without asking me whether I had any

24  objection to it, the District Judge in Connecticut adjourned

25  the trial in Utah and said that I wouldn't mind.  I'm not sure

1   how she knew that, but in any event, that's what she said.  And

2   so then that date was set for September 15th, so we set a trial

3   date in my case for November 17th, because I was told that the

4   Utah case would take a month to try.  And I figured a month

5   break between the first trial and the second trial was

6   reasonable, since we were going to go forward with discovery

7   and motions, et cetera, in my case.

8          And then I heard from the government a couple of weeks

9   ago -- I can't remember the exact date, but I got something

10  from the government recently -- okay.  It was April 2nd.  So it

11  was over a month ago now.  On April 2nd, I got a letter from

12  the government attaching an order from the Utah court

13  rescheduling that trial yet again, this time to September 29th.

14         So here's the way I look at that at this point.

15  Number one, there is nothing magical about the fact that that

16  other case is pending.  Yes, it's true, it's older than my

17  case.  But my case is starting to get old.  I mean, this case

18  was filed when?  First time you were here was August of last

19  year.  So that's nine months ago.  I set a trial date for

20  November, which is 15 months after the first appearance.  I am

21  certainly going to make every effort that I can make to be as

22  cooperative and collegial with a fellow District Judge in

23  another district court up to a point.  Right now, that trial is

24  scheduled for September 29th.  If it's a one-month trial and it

25  goes forward on September 29th, then I think, as a practical

1    matter, it's going to be impossible for us to start our trial

2    on November 17th.  But, of course, that assumes that the case

3    does go to trial on September 29th.  And there are a lot of

4    reasons why it might not.  One, maybe there will be -- maybe

5    the government will drop the case.  Two, maybe there will be a

6    plea disposition or dispositions in that case.  Three, maybe

7    that case will get adjourned yet again.

8           So for now, I'm going to leave my November 17th date

9    in place.  But I will say this.  If that case gets adjourned

10   again, I would appreciate it if counsel would communicate to

11   Judge Campbell that before any further adjournment is

12   considered in that case, that I be alerted to that so that we

13   can have a sort of bilateral discussion about it.

14          If, for example, that other case gets adjourned to,

15   let's say, hypothetically, you know, December 1st, well, as far

16   as I'm concerned, our case is going forward on November 17th.

17   And if that means that that other case is going to have to wait

18   until my case is finished, then fine, that's exactly what's

19   going to happen.  Because I don't think it's written down

20   anywhere that I have to just put my case on hold awaiting the

21   outcome of another case.  And I don't care when that case was

22   filed.  Doesn't really matter to me.  It did matter to me, you

23   know, six months ago.  But it doesn't matter to me anymore.  So

24   our case is still scheduled for trial on November 17th.  And I

25   would appreciate it --

 1              I know, Ms. Woods, your office is involved in that

 2     case.  Right?  You're not personally involved, but your office

 3     is involved.

 4              MS. WOODS:  That's right, your Honor.  I will

 5     communicate that.

 6              THE COURT:  Have I made myself clear about this?

 7              MS. WOODS:  Yes, your Honor.

 8              THE COURT:  All right.  And, Mr. Mansolillo, you're

 9     involved in that case, as well.  So you know what I'm getting

10     at here.  Right?

11              MR. MANSOLILLO:  Exactly, your Honor.

12              THE COURT:  All right.  In any event, that case is on

13     for the 29th of September.  So if I hear around September 29th

14     or earlier in September that that case is definitely going to

15     trial, as a practical matter, we're not going to trial on

16     November 17th.  It's just impossible.  Can't be done.  At which

17     point, we'll reschedule my trial.  But for now, I'm not going

18     to reschedule.  I'm going to leave it right where it is,

19     because there is certainly a possibility that that case will

20     get adjourned until January, in which case we'll go in

21     November.  And we'll be first, and that case will be second.

22              All right.  As far as motions are concerned, the

23     defense did file a number of motions.  The government obviously

24     is going to respond to those motions.  I did take a quick look

25     at the motions.  Each -- well, I'm not sure all three of you

1    did this, but certainly, Lustyik and Ahmed made a number of

2    discovery -- what I would call discovery-type motions, bill of

3    particulars, Rule 404(b) disclosure, that sort of thing.  And

4    then -- that's one sort of category.  And then the other

5    category of motions are motions to suppress.

6            Mr. Lustyik has made suppression motions which are

7    based in part on what Mr. Lustyik says are defective words in

8    yet a third case, not the case in Utah, but a different case.

9    It took me a while to sort this out, but you kept referring to

10   the Young case, and, honestly, I had no idea what you were

11   talking about, because I didn't think Young was the name of any

12   of the defendants in the Utah case.  But then I think I figured

13   it out, which was that there was some completely separate case

14   called U.S. against Young.  In connection with that

15   investigation, there were search warrants, I guess, for

16   Taylor's e-mail accounts.  Now, Taylor is a defendant in the --

17   not Thaler.  Taylor is a defendant in the Utah case, in the

18   Lustyik Utah case.

19           And I guess what you're saying, Mr. Mansolillo, is

20   that in the course of the execution of those warrants for

21   Taylor's e-mail account, communications between Taylor and

22   Lustyik were discovered, which is what led to the Lustyik case

23   in Utah.

24           Have I got that basically right?

25           MR. MANSOLILLO:  That's correct, your Honor.

1            THE COURT:  Okay.

2            MR. MANSOLILLO:  Mr. Taylor was in the Young case.

3            THE COURT:  If you say so, but that was the first time

4    I'd ever heard about a Young case.  It really is.

5            MR. MANSOLILLO:  I apologize.

6            THE COURT:  Maybe I just missed it.

7            MR. MANSOLILLO:  No, I didn't make it clear.  It was

8    always referred to as Taylor I, Taylor II.  So it's actually

9    Young.

10            THE COURT:  All right.  Well, when I saw it, I had to

11    actually smile, because I thought, "Gee, it's hard enough that

12    I'm dealing with one other case.  Now I'm dealing with two

13    other cases."  But, okay.  I get it now.  I understand that.

14            I do have some questions about standing.  I'm not

15    clear why your client would have standing to, in effect,

16    challenge warrants that were directed at premises as to which

17    Mr. Taylor had an expectation of privacy.  It's sort of like if

18    Mr. Mansolillo sent me a letter and I had the letter in my

19    house, in my kitchen, and Mr. Allee went and got a search

20    warrant for my house and seized that letter.  Would

21    Mr. Mansolillo have standing to object to the introduction of

22    that letter?  Doesn't sound to me like he would, but maybe he

23    would.  I'm not sure.  But that's the thing that came to mind

24    right away.  So I'm sure the government, I hope the government,

25    is going to deal with standing issues.

```
 1                Are you going to deal with that?

 2                MR. ALLEE:  Yes, your Honor.

 3                THE COURT:  Am I making this up, or is this something

 4     you thought of, as well?

 5                MR. ALLEE:  Standing is an issue.

 6                THE COURT:  Okay.  And then there are other issues, as

 7     well.  When you get past standing, then there are questions of

 8     overbreadth and that the search went beyond the scope of the

 9     warrant, and that the good-faith exception doesn't apply

10     because the warrants were facially deficient.  But before we

11     get to any of those questions, we've got to first deal with the

12     standing question, I think.

13                And by the way, my summary of these motions is not

14     meant to be inclusive.  Obviously, I haven't studied it that

15     closely.  But I'm just trying to get a sense of what's in front

16     of me, so that we can figure out if we need to have a hearing.

17     In particular, that's really my short-term concern.

18                Mr. Ahmed has moved to suppress evidence seized from

19     his iPhone and his home computer.  And I guess the gist of that

20     is that the consent that he provided was involuntary, and

21     therefore, the search pursuant to the consent is invalid.  And

22     then I guess he's also seeking to suppress statements that he

23     made in the course of the execution of that search warrant.  Is

24     that what's going on there?

25                MR. HENRY:  Your Honor, there was -- I guess the
```

1   statements were made during the course of the arrest.  There

2   was no search warrant executed.

3             THE COURT:  Right, not a search warrant.  I'm sorry.

4   When he was arrested, and he purportedly consented to the

5   search of his iPhone and his computer, what you're saying is

6   that it was involuntary.  And you certainly have standing to

7   contest that.  That's not a question there.  Whether it's

8   involuntary or not is a different question.  But in the course

9   of that, statements were made, and you're saying that those

10  statements were involuntary, as well, or they were what?  They

11  were made before Miranda warnings were given, or there was

12  fruit of the poisonous tree?  What's the gist of that?

13            MR. HENRY:  One, that they were involuntary; and two,

14  that they were made without the Miranda warnings.

15            THE COURT:  I notice that your client didn't submit

16  any affidavit in connection with these motions.  And I don't

17  know if you're familiar with the law in the Second Circuit.  I

18  don't really know how it is elsewhere, but you're really not

19  entitled to a hearing unless you can demonstrate that there are

20  issues of fact that need to be resolved on a hearing.  And I

21  don't think there is anything in front of me right now from

22  anybody with actual knowledge of these events.  In other words,

23  no one submitted an affidavit.  I suppose it doesn't absolutely

24  have to be your client, but somebody has to present a factual

25  basis for the motion you're making.  You can't just say, "Trust

1   me.  This was involuntary."  Somebody with knowledge has to say

2   that it was involuntary.

3          MR. HENRY:  That's true, your Honor.

4          THE COURT:  And that hasn't happened yet.

5          MR. HENRY:  I think it's that --

6          THE COURT:  I'm not going to preclude you from making

7   that affidavit, but you ought to give some thought to whether

8   you need to do that, because I'm pretty sure that the

9   government would respond to your motions and say there is no

10  basis for a hearing, because no one has put in an affidavit to

11  present any facts that could give rise to an order suppressing

12  those searches.

13         MR. HENRY:  I think, in relation to the two

14  different -- there were obviously two different motions that

15  were filed, and maybe should have been filed as omnibus.

16         THE COURT:  Don't worry about that.  That's fine.  In

17  future, you'll change that practice.

18         MR. HENRY:  Absolutely.

19         So putting those into two separate categories, the

20  motion to suppress statements, I did invoke the statute, 18

21  U.S.C. 3501, which says the Court shall make a determination

22  prior to the trial, out of the presence of the jury, as to

23  whether the statements were made voluntarily or involuntarily,

24  and gives a certain number of categories that the Court should

25  inquire into, like was Miranda given? was it voluntary? the

145GLUSms

1     issues that we raised.

2              THE COURT:  Right.  But here's the problem.  You

3     haven't presented me any factual basis for that.  You just said

4     it.  You're not a witness.  You weren't there when this

5     happened.

6              MR. HENRY:  True.

7              THE COURT:  I'm giving you sort of a little warning

8     here.  You might want to supplement your motion.  Give it some

9     thought.

10             MR. HENRY:  I will, your Honor.

11             THE COURT:  Maybe you'll talk to Mr. Allee, maybe not.

12    But you need to think about it.

13             MR. HENRY:  Thank you.

14             THE COURT:  By the way, I think there was a case

15    argued very recently in the Supreme Court, Riley against

16    California, where the question is undecided, but it presumably

17    will be decided before the end of June.  The question was

18    whether a phone, a smartphone, seized incident to arrest can be

19    searched without a warrant.  So if the Supreme Court were to

20    say, yes, that it's lawful to search a smartphone, which is

21    really a mini computer, if the smartphone was seized incident

22    to an arrest, to a valid arrest, if that's the case, then,

23    presumably, it wouldn't matter whether your client consented

24    voluntarily or not to the search of that iPhone.

25             MR. HENRY:  I think that's true, your Honor.  It would

145GLUSms

1    be a moot point.

2              THE COURT:  So we'll see how that works out.

3              Okay.  And then Mr. Thaler moved to suppress

4    evidence -- excuse me -- evidence seized pursuant to warrants

5    issued in June of 2012 for Mr. Thaler's Yahoo e-mail account.

6    And then I guess, there were subsequent warrants that were

7    based on the evidence that was seized in the first warrants.

8    So it's really a sort of fruit of the poisonous tree.  If the

9    first warrant is bad, the argument is that the other ones are

10   bad, as well.

11             MR. SER:  Correct, your Honor.

12             THE COURT:  And your client did submit an affidavit.

13             MR. SER:  A declaration.

14             THE COURT:  Or a declaration.  Well, same thing.

15             MR. SER:  Yes, your Honor, I submitted --

16             THE COURT:  A sworn statement.

17             MR. SER:  A sworn statement was submitted.

18             THE COURT:  Okay.  Here's the question.  At this

19   point, Mr. Allee, I don't know if you've had a chance to review

20   these motions, but do you think we're going to need an

21   evidentiary hearing based on what you've seen so far?

22             MR. ALLEE:  I'm really not able to give your Honor a

23   position on that.

24             THE COURT:  That's all right.

25             MR. ALLEE:  I would if I could.

1          (Pause)

2          MR. ALLEE:  I mean, Ms. Woods reminds me that we do

3    have a date reserved in case we need a hearing.

4          THE COURT:  Right.

5          MR. ALLEE:  I won't even give you a forecast today.

6    I'm just not ready to do that.

7          THE COURT:  Then don't do it.  That's fine.  You're

8    going to submit your opposition.  When we get that, we'll take

9    a look at it and figure out whether we need to have a hearing.

10   I'm determined to move this case forward as quickly as I can

11   within reason.  So we have a date, and I'm not changing that

12   date.  That's the date.  But the sooner I know whether there is

13   going to be an actual hearing that day or not, the better it

14   is.  So I thought I would ask today.  You're not prepared to

15   tell me today.  That's fine.  You're going to respond.  I

16   forget what date you have to respond to the motions, but

17   whatever it is, you're going to respond, and then we'll take it

18   from there.

19          I know Mr. Henry thinks that we need an evidentiary

20   hearing.

21          Mr. Ser, do we need an evidentiary hearing on your

22   motion?

23          MR. SER:  I do believe so, your Honor.  There were

24   issues that weren't addressed in Utah.  And I submitted a copy

25   of that transcript in support of my motion.  But I do think

1   there are issues that potentially will require a hearing.

2           THE COURT:  Which raises another question.  Are any of

3   those motions that any of you have filed, were they also filed

4   in Utah?  And if so, were they acted upon?

5           MR. SER:  I don't know.  My motions were original.  I

6   drafted mine.  I know when I read the Court's order in Utah,

7   the Court mentioned a "probable cause" argument by Mr. Thaler's

8   counsel there, but that was after the hearing and supplemental

9   briefing.  So I don't think the "probable cause" issue was

10  briefed.

11          And then, as far as the other issues go, I don't think

12  there were fruit arguments made.  And so I do think my

13  arguments are distinct.  There certainly was no foundational

14  issue or overbroad argument being made with respect to the

15  first warrant.  So as far as I'm aware, my motions have not

16  necessarily been resolved, and I don't think the order in Utah

17  is dispositive of all of them at least.  And so that would be

18  my position.

19          THE COURT:  All right.  And obviously, Mr. Ahmed's

20  motions have never been made before because this is the only

21  case in which he's a defendant.

22          And what about Mr. Lustyik's motion?  Has a

23  suppression motion been made?

24          MR. MANSOLILLO:  Yes, and we were granted a

25  suppression -- partial suppression in our motions.  It's rather

145GLUSms

1    complicated to explain.

2              THE COURT:  Let's not get into it.

3              MR. MANSOLILLO:  I don't think that this is the time.

4              THE COURT:  It occurs to me just again,

5    hypothetically, if the motion you're making here you've already

6    made there, and it's been resolved, what impact does that have

7    on me?  Is there some sort of "collateral estoppel" effect, or

8    is it just a matter of -- I mean, am I allowed to decide a

9    motion differently than it's been decided in Utah?  I mean,

10   again, let's say the motion was made there and granted, and the

11   evidence was suppressed.  Now you're making it again here.

12   Would I have the power to say, "Well, I don't think the

13   evidence should be suppressed?"  In other words, do I have the

14   power to deny the motion?

15             I suppose there is something that you're going to

16   address in your papers in opposition.

17             MR. ALLEE:  Yes, your Honor.

18             THE COURT:  All right.  I'm just throwing all these

19   things out there, because it's just -- all of this is the

20   result of the fact that there are two cases going on, two

21   similar cases that are going on, at the same time.

22             But Mr. Mansolillo, do you think we need an

23   evidentiary hearing on your motions?

24             MR. MANSOLILLO:  Yes, I do, your Honor.

25             THE COURT:  All right.  Again, I'll wait and see what

1    the government has to say about all that, and decide at that

2    point.  And I'll give you notice.  If I really think we need to

3    have an evidentiary hearing on a date that we've set, I'll

4    certainly give all of you as much notice as I possibly can that

5    you need to be prepared for that.

6            Now, one of the things that I noticed that Judge

7    Campbell did in the Utah case is that she ordered the

8    government to provide, much earlier than usual, a witness list

9    and a list of case-in-chief exhibits, because she felt,

10   obviously, that that would make the process fairer and give the

11   defense an opportunity to prepare in a complicated case.  And

12   I'm considering doing something like that in this case.  It

13   might be premature.  It might be something that we should talk

14   about the next time you're here, which is July -- what is the

15   next date?  July 31.

16           But you should give some thought to that, Mr. Allee,

17   and see what your position is about that.  But I'm not going to

18   make you do that here.  I just noticed it when I was preparing

19   for today, and I thought that it might be a useful thing to do

20   in this case for basically the same reasons that she did it in

21   that case.

22           MR. ALLEE:  Understood, your Honor.

23           THE COURT:  All right.  So keep that in mind.

24           I think that's it.  I don't think I have anything else

25   on my list.

1          Hold on just one second.

2          (Pause)

3          THE COURT:  Oh, yes.  We do have an application for a

4    bail modification by Mr. Ahmed.  And I've read the application.

5    I also called the Pretrial Services Officer here in White

6    Plains, and asked her to communicate with the Pretrial Services

7    Officer in Connecticut.  I guess that's Ms. Owens.

8          Is that right?

9          MR. HENRY:  That's correct, your Honor.

10          THE COURT:  And I've been advised that Ms. Owens -- I

11    just wanted to confirm what you said in your memo, but I have

12    confirmed that Ms. Owens believes that a curfew, rather than

13    home detention, so long as there is location monitoring -- that

14    means he'd have to continue to wear the bracelet, but he

15    wouldn't have to stay home all the time, just meet a curfew --

16    would be appropriate, so long as we would add a condition that

17    Mr. Ahmed seek and maintain employment, because, apparently,

18    according to Ms. Owens, that's been a problem.  Mr. Ahmed wants

19    to try and get a job.  And it's very difficult to do that when

20    you're home all the time.

21          Am I right about that, Mr. Henry?

22          MR. HENRY:  That's exactly right, your Honor.

23          THE COURT:  All right.  So, Mr. Allee, according to

24    Mr. Henry, in his memo, you oppose any further modification of

25    Mr. Ahmed's condition of release.  Why would you oppose this?

1    It's a curfew, still with bracelets.  So the idea would be that

2    he would have to be home between, say, 7:00 p.m. and 7:00 a.m.

3    So he would still be wearing a bracelet, and that would still

4    verify that he was home when he was supposed to be home.  But

5    when he didn't have to be home, then, in effect, the monitoring

6    would be turned off.  He wouldn't have to be home.  He could be

7    anywhere he wanted to between the hours of 7:00 a.m. and 7 p.m.

8         MR. ALLEE:  Our opposition is for the reasons we've

9    already argued previously.  So to be perfectly clear, I have no

10   new argument to make, but we have always been concerned about

11   issues of flight risk.  And it's for those same reasons we're

12   concerned if there is any change in the terms that are in place

13   now.

14        THE COURT:  Well, all the lawyers in this courtroom

15   should know that I place great confidence in Pretrial Services.

16   So if my Pretrial Services Officer tells me that the District

17   of Connecticut Pretrial Services Officer thinks that it would

18   be okay to remove the "home detention" aspect of the conditions

19   of release, then that's okay with me, unless there was

20   something specific that the government wanted to tell me about

21   that was new.

22        So that's what I'm going to do.  I'm going to remove

23   the home -- I'm going to grant the application, essentially,

24   and allow Mr. Ahmed -- well, I'm going to require that

25   Mr. Ahmed adhere to a curfew, which is 7:00 p.m. to 7:00 a.m.,

1    seven days a week.  And he will be subject to location

2    monitoring, which, as I said before, essentially means he's got

3    to be home between those hours, and that will be monitored

4    electronically.

5         We're going to add a condition that he has to seek and

6    maintain -- he has to be in the process of seeking employment.

7    And if he gets employment, he should maintain employment.

8    That's going to be an additional condition.

9         And what I want you to do, Mr. Henry, is take

10   Mr. Ahmed to the Pretrial Services Officer in this building on

11   the fourth floor, and see Ms. Labrovic, Cynthia Labrovic, who

12   is the officer that I spoke to earlier, so that you can

13   coordinate the change that needs to be made.  Will you do that?

14        MR. HENRY:  Yes, your Honor.

15        THE COURT:  Okay.  So as soon as you leave here, go

16   down to the fourth floor.

17        All other conditions remain in effect.  Mr. Henry, do

18   you hear?  All other conditions remain in effect.  We've added

19   a condition, but we've changed the home detention to a curfew

20   set at 7:00 p.m. to 7:00 a.m.

21        MR. HENRY:  I understand, and I've explained it to my

22   client.

23        THE COURT:  Was there anything else you wanted to add

24   or ask me about?  Because I saw you talking to your client.

25        MR. HENRY:  Nothing further.

1        Just to clarify, he has to be home between 7:00 p.m.

2   and 7 a.m.?

3        THE COURT:  And that's going to be monitored

4   electronically.

5        MR. HENRY:  Correct.

6        THE COURT:  He's going to be wearing a bracelet.

7        MR. HENRY:  Right.

8        And he'll have to -- it will dial and it will make

9   sure he is home.  If he's not there during those periods of

10  time, he's in trouble.

11       THE COURT:  An alarm will sound.

12       MR. HENRY:  Yes.

13       THE COURT:  And yes, he's in trouble.  I'm sure that

14  he's going to adhere to those conditions.

15       Well, let me ask you, Mr. Ahmed.  Are you going to

16  adhere to those conditions?

17       DEFENDANT AHMED:  Yes, your Honor.

18       THE COURT:  And you know that if you don't, if you get

19  home at 8:00 p.m., you've got a problem.  Right?

20       What's the nature of that problem?

21       DEFENDANT AHMED:  My bail will be revoked.

22       THE COURT:  That's right.

23       Okay.  Have a seat.

24       That might be it on my list.  Is there anything else

25  that any of the lawyers want to discuss today?

1          MR. MANSOLILLO:  Your Honor, I have one procedural

2    question.

3          I was under the impression Mr. Lustyik was on his way

4    down.  The reason we had the bail was to get Mr. Lustyik to

5    move the trial along in Utah.  That was Judge Campbell's

6    desire, because he has to review information in the SCIF in

7    Washington, D.C.  There is no way for him to do it if he was in

8    jail.  So he is technically in the Marshal's custody.

9          If the house is posted this week, will you entertain a

10   bail hearing without his presence or via -- because it could

11   take him six weeks to get back.  And it just is a waste of

12   time, unless you intend to hold him.

13         THE COURT:  Well, I don't know.  I never had him.  I

14   never considered bail.  It was sort of a moot point until now,

15   or until he gets released on the Utah case.  I mean, I would

16   like to do it as soon as possible --

17         MR. MANSOLILLO:  Okay.

18         THE COURT:  -- but that is a little bit --

19         MR. MANSOLILLO:  In other words, if we could -- if the

20   house was posted, and instead of going spot to spot to spot --

21   one time, it took seven transfers to get here -- if he could

22   just fly back, come before you, and we could do the bail

23   hearing, or he could do it from the prison on a monitor.  And

24   if he's out, he could just fly back, and it would avoid six

25   weeks of --

145GLUSms

1           THE COURT:  You're reading my mind, because maybe that

2    is possible, doing it by monitor.  I don't think I'm going to

3    say that he can just get on, you know, US Airways and fly back.

4    He's in custody on my case.  But it seems to me that if you're

5    willing to have a bail hearing with your client participating

6    by video conference so as expedite the bail hearing, I would be

7    willing to do that.

8           MR. MANSOLILLO:  Thank you, your Honor.

9           THE COURT:  So you need to keep me posted on that.

10           MR. MANSOLILLO:  I will.

11           THE COURT:  And I will schedule it as promptly as I

12    can.  It may not be two hours, but promptly.

13           Okay.  Anything else, Mr. Allee? Ms. Woods?

14           MR. ALLEE:  Just one item just on that.

15           THE COURT:  Yes.

16           MR. ALLEE:  If that's what's coming, it may be that we

17    would want to write and submit something in writing to your

18    Honor.

19           THE COURT:  Of course.

20           MR. ALLEE:  So I have no specific request, other than

21    to get as much notice as possible, so we can build into that

22    scheduling the chance for us to write something.

23           THE COURT:  You'll have that.  I guarantee you, you

24    will have an opportunity to do that.  Because even if we

25    schedule something, you know, it can't be done instantaneously.

1    He's in custody.  Mr. Mansolillo is going to have to figure out

2    how to get him to a place where there is video conference.  But

3    presumably, that can be done in the courthouse in Utah.

4              MR. MANSOLILLO:  Actually --

5              THE COURT:  I know we can do it here.

6              MR. MANSOLILLO:  If he's still in the same facility

7    where he was, they could do it from that actual facility.

8              THE COURT:  That's even better.

9              Where is he physically?

10             MR. MANSOLILLO:  It's a correctional -- a county

11   correctional facility -- I don't have the name off the top of

12   my head -- about 40 minutes outside of Salt Lake City.

13             THE COURT:  Well, I know we can do it here.  We have

14   the equipment to do it here.  So the equipment exists.

15   Wherever he is, we can do it pretty quickly.  But I will

16   absolutely give the government fair opportunity to be heard in

17   writing, if that's what they want.  So I'm not going to say you

18   have to be here tomorrow morning.  I'm making it a few days'

19   notice, or maybe a week's notice, or something like that.  All

20   right?

21             Anything further we need to do today?

22             MR. ALLEE:  Not from the government, your Honor.

23             MR. MANSOLILLO:  Thank you, your Honor.

24             THE COURT:  All right.  Then one last question.

25             Mr. Macisso couldn't get here.  Why?  But Ms. Woods

145GLUSms

 1    did.  So I'm curious.  How did you manage to do that, unless

 2    you were here yesterday?

 3              MS. WOODS:  It was complicated, your Honor.  I flew

 4    into LaGuardia, and then took the train up.  I think he was

 5    trying to fly directly into White Plains.

 6              THE COURT:  And it didn't work.

 7              So anyway.  All right.  Okay.  Thank you all very

 8    much.

 9              I'm sorry.  Speedy trial exclusion.  What was the last

10    speedy trial exclusion?

11              MR. ALLEE:  Well, I think there was a speedy trial

12    exclusion the 31st.  There are also pending motions which is an

13    automatic exclusion.

14              THE COURT:  That's true.

15              MR. ALLEE:  Of course, if any defendant now objects to

16    that exclusion, we would like to hear it.  But we presume the

17    trial time clock is not running right now.

18              THE COURT:  Right.

19              The last time we were here, I excluded time to today's

20    date, to May 16th, in the interests of justice.  So there are

21    motions pending, and they are certainly going to continue to be

22    pending at least until July 31st, so time will be excluded for

23    that purpose.

24              Any objection to that exclusion of time?

25              MR. MANSOLILLO:  No objection, your Honor.

145GLUSms

1          MR. HENRY:  No, your Honor.

2          MR. SER:  No, your Honor.

3          THE COURT:  So I will exclude time under the Speedy

4     Trial Act from today through and including July 31st, 2014.

5          All right.  Thank you all.

6          THE DEPUTY CLERK:  All rise.  This Court will be in

7     recess.

8                         -   -   -